## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Universal Cooperatives, Inc., *et al.*,[1] | Case No. 14-_____ (_____) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF DENNIS GYOLAI IN
### SUPPORT OF FIRST DAY MOTIONS

I, Dennis Gyolai, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am Vice President of Finance for Universal Cooperatives, Inc. ("Universal"), headquartered in Eagan, Minnesota, a corporation duly organized and existing pursuant to the laws of Minnesota.  Universal is one of six debtors and debtors in possession (each a "Debtor" and collectively the "Debtors") in these cases, which are as follows: Universal; Heritage Trading Company, LLC ("Heritage"); Bridon Cordage LLC ("Bridon"); Universal Crop Protection Alliance, LLC ("UCPA"); Agrilon International, LLC ("Agrilon"); and Pavalon, Inc. ("Pavalon").  I serve as Vice President of Finance of Universal and Treasurer for each of the six Debtors identified herein, and in this capacity, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.      The corporate headquarters for Universal, UCPA, Agrilon and Pavalon is located at 1300 Corporate Center Curve, Eagan, Minnesota 55121.  Heritage's corporate

---

[1]  The Debtors and the last four digits of their federal tax identification number are:  Universal Cooperatives, Inc. (2405); Heritage Trading Company, LLC (0512); Bridon Cordage LLC (0985); Universal Crop Protection Alliance, LLC (1532); Agrilon International, LLC (7234); and Pavalon, Inc. (1433).  The location of the corporate headquarters for Universal Cooperatives, Inc.; Universal Crop Protection Alliance, LLC; Agrilon International, LLC; and Pavalon, Inc. is 1300 Corporate Center Curve, Eagan, MN 55121.  The location of the corporate headquarters for Heritage Trading Company, LLC is 11020 NW Ambassador Drive, Kansas City, MO 64153.  The location of the corporate headquarters for Bridon Cordage LLC is 909 E. 16th Street, Albert Lea, MN 56007.

headquarters is located at 11020 NW Ambassador Drive, Kansas City, Missouri 64153, and

Bridon's corporate headquarters is located at 909 E. 16th Street, Albert Lea, Minnesota 56007.

3.     I have been employed by Universal since 1981 and have held the position

of Vice President of Finance since 1997.  I am one of the Debtors' officers responsible for

devising and implementing the Debtors' business plans and strategies, and I have historically

played a role in overseeing the Debtors' financial, operational, and legal affairs.  Accordingly, I

am actively involved in the Debtors' restructuring process (the "Restructuring"), which includes,

but is not limited to: (i) participating and overseeing the process of pursuing and consummating

the sale of all or substantially all of the Debtors' assets, as further described herein; (ii) managing

the professionals engaged by the Debtors in connection with the Restructuring; (iii) supervising

the preparation of the documentation necessary to implement the Restructuring; (iv) managing

and negotiating the Debtors' relations with their creditors and other stakeholders; and

(v) consulting with the Debtors' other officers, executives and managers, as well as members of

Universal's Board of Directors, with respect to the foregoing.

4.     On the date hereof (the "Petition Date"), the Debtors filed with this Court

voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") in an effort to preserve and maximize the value of their business assets and

chapter 11 estates through the prosecution of these chapter 11 cases (collectively, the "Chapter

11 Cases").

5.     The Debtors intend to operate their businesses and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The

Debtors have sought an order directing that their cases be jointly administered for procedural

purposes only.  It is my understanding that no trustee, examiner or official committee has been

01:15450901.1

appointed in these cases, and it is also my understanding that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and that the facts of which I am aware demonstrate that venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      As discussed below, the Debtors' primary objective in commencing these Chapter 11 Cases is to pursue a prompt sale of their remaining assets in order to maximize value for stakeholders, thus preserving jobs, minimizing supply disruptions for the Debtors' customers, including, but not limited to, members of Universal and members of such members (collectively, the "Members").

7.      To align the effects of filing for bankruptcy protection on the Debtors' business and employees with processes that are designed to maximize the Debtors' ability to successfully carry out these Chapter 11 Cases , the Debtors have requested various types of "first day" relief (collectively, the "First Day Pleadings").[2]  Each First Day Pleading seeks relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession in these Chapter 11 Cases, and a summary of each First Day Pleading is set forth below.

8.      I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, as well as to avoid immediate and irreparable harm to the Debtors' estates. The approval of the First Day Pleadings would assist the Debtors in maximizing the value of

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable First Day Pleading.

their estates and I believe best serves the interests of the Debtors' estates and their creditors and parties in interest.

9. Accordingly, I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management (without further review of same), my review of relevant documents or information supplied to me by other members of the Debtors' management or professionals (without further review of same), or my opinion based upon my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors. I am of sound mind and, if called as a witness, I would competently testify with regard to the facts described herein.

## I.   THE DEBTORS' BUSINESSES, CAPITAL STRUCTURE AND CIRCUMSTANCES LEADING TO THE FILING

### A.   The Debtors' History

10. Universal was formed on November 1, 1972 as a result of the merger between United Cooperatives, Inc. ("United") of Alliance, Ohio, and National Cooperatives, Inc. ("National") of Albert Lea, Minnesota.

11. United was formed under the name Farm Bureau Oil Company by three regional Farm Bureau Services in 1930. As membership grew and included a number of cooperatives, not strictly Farm Bureau-sponsored, the name was changed to United Cooperatives, Inc. in 1936. Universal's second predecessor company, National, was formed in 1933 by five regional cooperatives from Wisconsin, Indiana, Missouri, and Minnesota, respectively, including Farm Bureau Oil Company. The two inter-regional cooperatives

01:15450901.1

-4-

continued to grow in membership and soon several regional cooperatives belonged to both National and United.  At the time of the merger in 1972, fourteen regionals belonged to both organizations.  Ultimately, National and United merged to form Universal in 1972, and Universal's headquarters was moved from Alliance, Ohio to Bloomington, Minnesota in 1978, and subsequently to Eagan, Minnesota in 1999, where it remains today.

12. As an inter-regional farm supply cooperative, Universal consolidates the purchasing power of its Members to procure, and/or manufacture, and distribute high quality products at competitive prices.  Historically, Universal has entered and exited various lines of business as directed by the Members, including paint, grocery, hardware, lubricants, tires, livestock equipment, dairy equipment, animal nutrition, and bird seed.  Most recently, Universal's focus shifted to direct shipment of products to Members' dealer locations rather than Members' warehouse locations.

B. **The Debtors' Corporate Structure**

13. Universal has 14 voting Members (collectively, the "Voting Members") and over 50 associate Members (collectively, the "Associate Members").  Voting Members must be a cooperative organization to qualify as a candidate for full voting membership, and the membership must be approved by Universal's Board of Directors.  To participate in the governance of Universal, Voting Members are required to purchase $10,000 of Common Stock.  Moreover, if a Member purchases a minimum of $1 million of products from Universal in any given fiscal year, such Members are eligible to sit on Universal's Board of Directors in the year following such purchases.  As of the date hereof, Universal's Board of Directors is comprised of nine individuals.

14. The largest Voting Members, and their corresponding ownership stake, include the following:  (i) CHS, Inc. ("CHS") (29%), Land O' Lakes , Inc. ("LOL")  (18%),

01:15450901.1

Southern States Cooperative, Inc. ("SSC") (13%), Tennessee Farmers Cooperative ("TFC")

(12%), Growmark, Inc. (9%), MFA, Inc. (4%), Intermountain Farmers Association (2%),

Alabama Farmers Cooperative, Inc. (1%), Union InVivo Cooperative (1%), and United Farmers

of Alberta (< 1%). The remaining 11% is held by additional third parties.

15.     Associate Members are not required to be organized as a cooperative,

though memberships must also be approved by Universal's Board of Directors. Associate

Members do not participate in the governance of Universal but are eligible for patronage refunds,

if and when paid. Stock is mainly held in the form of Certificates of Participation, which are

issued as the non-cash portion of each Member's yearly patronage. However, in 2011,

Universal's Board of Directors agreed to defer all cash patronage payments for the foreseeable

future in order to support the business and increase Universal's retained capital.

16.     For the convenience of the Court and all interested parties, the Debtors'

organizational structure is set forth in the chart attached hereto as Exhibit A.

**C.      The Debtors' Business**

17.     Prior to the commencement of these cases and the restructuring measures

undertaken in the last twelve months, Universal was comprised of seven business units:  (i)

Bridon; (ii) Heritage; (iii) UCPA; (iv) UCI do Brasil; (v) Sainte Germaine; (vi) Animal Health;

and (vii) Pet's Corner (each, a "Business Unit," and collectively, the "Business Units"). Each

Business Unit operated, or continues to operate, in its own unique market space, although certain

Business Units ceased operating prior to the Petition Date.

    *i.      Bridon Cordage LLC*

18.     Bridon is a wholly-owned subsidiary of Universal. Bridon manufactures

polypropylene baler twine, industrial twines and industrial fibers, and distributes other baling

products such as netting and bale wrap. Through eight months of fiscal 2014 ended March 31,

2014, Bridon has generated $33,000,000 in sales and $300,000 in operating income.  Bridon currently has approximately 130 employees and has manufacturing locations in Albert Lea, Minnesota, and Jerome, Idaho.

19.     Bridon's polypropylene twine and industrial products are made from polypropylene resin.  Bridon's "Big Round" twine is produced using both monofilament and split film technology while the twines used for square bales use only split-film technology. Bridon products are highly regarded in the industry for their durability and strength.  Bridon's North American market share for polypropylene agricultural twines is approximately 35%, and Bridon's main competition comes from other domestic manufacturers.

20.     In North America, the use of netting to wrap bales began in the late 1980's and has been steadily increasing due to the improved speed of the baling process and the greater protection of the finished hay bale that netting provides compared to baler twine.  The market began to develop significantly when a key patent expired in 2005, resulting in lower pricing and greater distribution in that market space.  In 2011, Universal formed a 50/50 Chinese joint venture with a Chinese partner under the name Changzhou Agrinet Company Limited ("Agrinet").  Agrinet was formed to manufacture netting to meet and supply approximately 30% of Universal's yearly needs.  Universal markets the product under its own names and approximately holds a 5-10% share of the North American market.  Bale wrap is a stretchable polyethylene film which is wrapped around both round and square high-moisture hay bales allow the product to ferment and produce haylage.  Universal's distribution of bale wrap represents an approximately 1% share of the North American market, which is estimated to be approximately $89,000,000 USD. To diversify its business line and further insulate itself from seasonal agricultural fluctuations, Bridon also sells a range of industrial twines and fibers, and has utilized

01:15450901.1

its expertise in polypropylene extrusion and twisting to produce unique yarns which are converted into fiber reinforcement polymers. These fibers are often used as replacement for steel in reinforcing concrete. In 2007, Bridon began manufacturing a specialized, patented industrial fiber reinforced polymer to be used in concrete to reduce the amount of steel rebar that is otherwise required.

21.     Universal intends to sell Bridon's assets as a going concern. Universal has been and is engaged in discussions to do so. Such discussions are taking place subject to a non-disclosure agreement.

ii.     *Heritage Trading Company, LLC*

22.     Located in Kansas City, Missouri, Heritage is a diversified distribution company focused on feed/farm stores in the United States. Heritage both supplies products to its customers and provides marketing/merchandising support, sales and logistics management in conjunction therewith. Heritage is a distributor that has access to over 400 manufacturers with over 500,000 individual items. As a distributor of this kind, Heritage possesses little inventory at any given time. Heritage's staff currently consists of twelve employees, including three field sales representatives based in Texas, Missouri and Washington, respectively. Through eight months of fiscal 2014 ended March 31, 2014, Heritage has generated $23,000,000 USD in sales and $200,000 USD in operating income.

23.     Heritage was formed by LOL and CHS in March 2003, upon the combination of LOL and CHS's respective general farm supply businesses into one jointly-owned enterprise. Universal, in turn, acquired Heritage in June 2005, and upon doing so obtained direct access to Heritage's customers and a broader platform through which to sell and market Universal's core products, including sisal and plastic twines and proprietary animal

01:15450901.1

health products.  In addition, Universal's acquisition of Heritage has allowed Universal to consolidate Heritage's volumes with purchases of farm supply products made by Universal's other Members.  This consolidation allowed the formation of Heritage Trading Wholesale, an entity created to capitalize and leverage the combined purchasing power of Heritage and Universal's Members.

24.    Major product categories supplied by Heritage include livestock equipment, hardware, fence and wire, pet and equine, apparel, lawn and garden, gifts, and grain handling equipment.  In recent years, Heritage has been increasingly focused on fencing and livestock equipment, the two largest product types purchased by Heritage and Universal Members.

25.    Universal intends to sell Heritage's assets as a going concern.  Universal has been and is engaged in discussions to do so.  Such discussions are taking place subject to a non-disclosure agreement.

*iii.    Universal Crop Protection Alliance LLC*

26.    UCPA, which owns and operates a production facility in Napoleon, Ohio, procures, formulates, packages, and distributes a proprietary line of Crop Protection Products ("CPP") for sale to its members, associate members, and non-member customers.  CPPs include herbicides, insecticides, adjuvants, and spray additives used in commercial agriculture.

27.    Most of the products sold by UCPA are off-patent generic pesticides, the largest of which is glyphosate.  Glyphosate, is the active ingredient in Monsanto's Roundup®, one of the most widely sold herbicides in the United States.  UCPA's private label equivalent is Gly-4 Plus®, and is UCPA's most popular product.

01:15450901.1

-9-

28.     Although substantially all of UCPA's manufactured products are in liquid form, UCPA has packaged and marketed some products in granular form.  Major crops for which UCPA's products are used include corn, soybeans, cotton, wheat, rice, peanuts, tobacco, alfalfa, and potatoes.  UCPA products are packaged at its quality certified Napoleon facility and are marketed under the UCPA brand.

29.     For the eight months of fiscal 2014 ended on March 31, 2014, UCPA generated $11,600,000 USD in revenue with an operating loss of $600,000 USD.  On March 3, 2014, the determination was made to wind down UCPA's operations.  UCPA has been actively selling its inventory of glyphosate and other ancillary products and expects to discontinue active operations in the very near future.

30.     Universal intends to sell UCPA's assets.  Universal has been and is engaged in discussions to do so.  Such discussions are taking place subject to a non-disclosure agreement.

     iv.     *UCI do Brasil*

31.     UCI do Brasil, is Universal's majority-owned subsidiary located in Brazil and is not a debtor in these Chapter 11 Cases.  UCI do Brasil was established by Universal in 1993 and operated ISO 9001:2008 certified plant located in Salvador, Bahia, Brazil.

32.     For the eight months of fiscal 2014 ended on March 31, 2014, UCI do Brasil generated $8,900,000 USD in revenue with an operating loss of $1,200,000 USD.  On March 3, 2014, as a result of the Debtors' financial difficulties and liquidity challenges, the Debtors determined to wind-down all UCI do Brasil operations.  In light thereof, UCI do Brasil has formulated the remaining raw materials in its possession into finished products and shipped them to the United States to be sold through Universal's commercial avenues.  The vast majority

01:15450901.1

of UCI do Brasil's employees have been released and Universal is currently in negotiations to sell UCI do Brasil's real property assets in Brazil. The personal property assets are also expected to be sold.

        *v.*     *Sainte Germaine S.A.*

      33.     Sainte Germaine S.A. ("<u>Sainte Germaine</u>") is Universal's majority-owned, France-based subsidiary and distributor of sisal and polypropylene baler twines, bale wrap/stretch film, and netting.

      34.     Universal has been selling sisal baler twine in France, Germany and Scandinavia for over twenty years.  Universal entered into an operating agreement with Sainte Germaine in 1997.  In 2003, Universal purchased Sainte Germaine outright in an effort to attain significant market presence in all of the key forage harvest supply products in Europe.

      35.     Sainte Germaine has historically faced strong competitive pressures from suppliers from lower-cost European countries, as well as rising production costs, and it does not currently produce polypropylene twine.

      36.     For the eight months of fiscal 2014 ended on March 31, 2014, Sainte Germaine generated $6,100,000 USD in revenue with an operating loss of $700,000 USD.  On March 3, 2014, as a result of the Debtors' financial difficulties and liquidity challenges, the Debtors determined to wind-down or sell the Sainte Germaine operations.  Universal is currently in discussions with a third party to purchase substantially all of Sainte Germaine's assets and operations subject to and under French law.  It is currently contemplated that all of Sainte Germaine's assets will be liquidated and all employees released during the pendency of these cases.

vi.     *Animal Health*

37.     Prior to April 2014, Universal's Animal Health Business Unit ("Animal Health") procured, warehoused, distributed, and assisted Members in the marketing of packaged health care products for livestock and companion animals.  Animal Health stocked approximately 2,500 items in a centralized distribution center located in Bowling Green, Kentucky, for shipment to Members' dealers or directly to farms.  For most Universal Members, feed is a core product group, and the Animal Health business complemented the feed business.

38.     Animal Health marketed primarily over-the-counter animal health products through retail stores, and cattle products, especially insecticides and wormers, were the largest sales category.   Negative industry trends affecting the Animal Health business line in recent years include declining prices on generic endectocides, the nationwide sell-off of a significant number of cattle, and animal health manufacturers reducing distributor margins.

39.     Pavalon, one of the Debtors in these Chapter 11 Cases, maintained and operated an internet commerce catalog for Animal Health, which filled and shipped all internet-based orders placed with Pavalon.  Ultimately, Pavalon's internet commerce operations on behalf of Animal Health did not generate significant revenues for the Debtors.  Accordingly, the Debtors discontinued Pavalon's internet commerce catalog service.

40.     For the eight months of fiscal 2014 ended on March 31, 2014, Animal Health generated $16.7 million in revenue with an operating loss of $0.2 million.  On March 3, 2014, as a result of Universal's financial difficulties and liquidity challenges, the Debtors determined to wind-down Animal Health's operations.  On March 28, 2014, substantially all of Animal Health's remaining inventory was sold to TFC in consideration for cash and the relief of certain prepayment obligations.  On March 23, 2014, employees of the Animal Health division

were released and notices were sent to customers that the Debtors had terminated the business unit.

       *vii.*    *Pet's Corner*

       41.    Prior to May 2014, Universal's Pet's Corner division marketed a full line of rawhide dog chews.  Through its distribution facility in Bloomington, Minnesota, Pet's Corner sold a full line of rawhide chips, sticks, strips and bones, as well as hooves, chews and novelty items to various retail outlets throughout the United States.

       42.    For the eight months of Fiscal 2014 ended on March 31, 2014, Pet's Corner generated $0.8 million in revenue with an operating loss of $0.1 million.  On March 3, 2014, as a result of the Debtors' financial difficulties and liquidity challenges, the Debtors determined to wind-down the Pet's Corner operations.  At the end of April 2014, SSC purchased approximately $20,000 of current Pet's Corner inventory with the remaining inventory written off.  Simultaneous with the sale and disposal of Pet's Corner's inventory, the lease on the Bloomington, Minnesota warehouse expired and was not renewed, and the three full-time Pet's Corner employees were terminated.

**D.**    **Prepetition Capital Structure**

       43.    On December 10, 2012, Universal, Bridon, Heritage and UCPA (collectively, the "Borrowers") entered into a revolving and term loan Credit Agreement (as amended, modified or supplemented from time to time prior to the Petition Date, the "Existing Credit Agreement") with Bank of America, N.A. ("Bank of America"), as administrative agent and lender.  Upon its consummation, the Existing Credit Agreement had a revolving loan commitment of $60.0 million (the "Revolving Loan"), which was an asset-based loan subject to a borrowing base derived from accounts receivable and inventory and a term loan (the "Term Loan") in the amount of $2.0 million.

01:15450901.1

44.     On August 5, 2013, the Borrowers and Bank of America entered into a first amendment to the Existing Credit Agreement which, among other things, adjusted the availability under the Revolving Loan from August 5, 2013 through September 14, 2013, and further adjusted availability from September 15, 2013 through September 30, 2013.

45.     On October 18, 2013, the Borrowers and Bank of America entered into a second amendment to the Existing Credit Agreement which amended certain covenants, including a monthly cumulative minimum cash flow covenant and adjusted availability and borrowing under the Revolving Loan.

46.     On February 28, 2014, the Borrowers and Bank of America entered into a third amendment to the Existing Credit Agreement, which amended the period during which covenants thereunder would be suspended.

47.     On March 18, 2014, upon the occurrence of an event of default ("Event of Default") under the Existing Credit Agreement, the Borrowers and Bank of America entered into a forbearance agreement and fourth amendment (the "Forbearance Agreement") whereby Bank of America reduced the Revolving Loan commitment and amended covenants in connection with cumulative cash receipts, disbursements and cash flow.

48.     On April 11, 2014, given ongoing Events of Default and Universal's request for an extended Forbearance Agreement, the Borrowers and Bank of America entered into a first amendment to the Forbearance Agreement whereby Bank of America extended the forbearance period (the "Forbearance Period") through and including June 16, 2014, and extended the weekly cumulative cash receipts, disbursements and cash flow covenants consistent therewith.

49.     On May 8, 2014, the Borrowers and Bank of America entered into a fifth amendment to the Existing Credit Agreement whereby Bank of America adjusted availability and agreed to provide the Debtors with debtor in possession financing.  Such debtor in possession financing is memorialized in a term sheet executed by the Borrowers and Bank of America on May 8, 2014, and the subject of the Debtors' pending motion seeking approval thereof.

50.     As of May 11, 2014, the current amount outstanding under the Revolving Loan was $7,442,694.39 and the amount outstanding on the Term Loan was $1,548,230.00.

**E.     Circumstances Leading to the Filing**

51.     The events leading to the commencement of these Chapter 11 Cases are discussed in detail below.

52.     <u>Animal Health</u>.  At its core, Animal Health suffered from deteriorating margins.  Animal Health had historically operated as a traditional cooperative that had very high levels of service, but very low margins.  In part, this structure was sustained by volume discounts and purchasing rebates from major suppliers.  As suppliers stopped providing rebates or reduced the prevalence of these programs, however, selling prices did not rise significantly enough to pass cost increases through to customers.  Animal Health operated at a loss prior to the Petition Date.  As the Debtors' liquidity became further constrained, the Debtors determined that there were insufficient funds to continue making inventory purchases for the Animal Health Business Unit.  Given Animal Health's fiscal position, the Debtors concluded that a sale of the business unit was in the Debtors' best interest.  A sale was ultimately completed on March 28, 2014, between Universal and TFC for a sale price of $934,400 following failed negotiations with a large animal health distributor.

01:15450901.1

53.    <u>UCPA</u>.  Prior to the Petition Date, UCPA suffered from increased market competition and the consolidation of crop protection products, mixing seed and feed products by such competitors.  Customers transitioned business away from UCPA in favor of more diverse enterprises.  Consequently, UCPA's Napoleon, Ohio facility began running below 25% of capacity, thereby driving overhead costs up and margins down.

54.    <u>Sainte Germaine and UCI do Brasil</u>.  After Universal's acquisition of Sainte Germaine in 2005, it was expected that Universal would be able to reduce costs and gain market share through improved management practices and synergies with existing businesses.  Unfortunately, increased demand and synergy-based increases in value were not derived.  In addition, cash resources were depleted by a contentious arbitration matter between Sainte Germaine and one of its suppliers.

55.    UCI do Brasil's production required cash payment in advance of manufacture and shipment of sisal bales.  UCI do Brasil was able to source a local secured loan to help supplement its cash needs, but operations were unprofitable and resulted in a large margin adjustment for fiscal year 2013.

56.     In addition, UCI do Brasil had begun to suffer, like many Brazilian sisal twine producers, from increasing material costs due to a large multi-year drought across much of Brazil.  These increased material costs, along with rising wages and employee costs in the greater Salvador, Brazil area, further reduced profit margins as price increases could not be passed through to customers at the same rate as which they were experienced on the production side.  As prices increased, domestically-based farmers often made the decision to switch from natural sisal fiber based twine to a less expensive synthetic alternative.

57.     <u>Pet's Corner</u>.  Pet's Corner generated annual revenues of approximately $1 million in recent years, but operated at a loss in recent years.

58.     A contributing factor to the Debtors' liquidity challenges was the funding of the Debtors' defined benefit pension plan (the "<u>Pension Plan</u>").  The Pension Plan covers certain eligible employees aged 21 and over with a hire date prior to January 1, 2005.  The benefits of the Pension Plan are based on the credited service, the employees' final average compensation, and Social Security covered compensation.  While the Pension Plan was a useful tool in attracting and retaining talented and motivated employees, as liquidity became restricted in recent years, the Plan became a significant financial burden.  Aggregate contributions under the Pension Plan have exceeded $7.3 million during the last five years.

59.     Decreased liquidity in 2013, in combination with reduced inventory reserves and vendors' refusal or inability to provide extended payment terms for purchased inventory, undermined the Debtors' ability to purchase inventory at the rate required to operate at full levels.  This reduction in ability to purchase inventory resulted in lost sales.  By January of 2014, sales were approximately 40% of the prior comparable year.  These decreased sales then led to decreased receivables, and therefore decreased cash collections and decreased ability to purchase new inventory.  This downward trend led to the situation faced by the Debtors today and necessitated the Debtors' initiating the Chapter 11 Cases.

60.     Bridon and Heritage have historically been, and remain, profitable businesses.  Because of the positive net income these two Business Units generate, the Debtors believe that there is a viable market for their assets and the potential to sell their assets and operations on a going concern basis.

01:15450901.1

**F.**    **Restructuring Initiatives**

61.    On March 3, 2014, Universal's Board of Directors replaced then CEO, Terrence Bohman.  Mr. Bohman had been President and CEO of Universal since 1996.  Jamie LaRue was elected President and Chief Executive Officer, and Mr. Christhope Jeannin was appointed as Chief Restructuring Officer.

62.    When it became apparent that chapter 11 filings were a possible necessity to maximize value, the Debtors, with the aid of their financial advisor The Keystone Group ("Keystone"), began the process of identifying potential providers of post-petition financing.  Negotiations with Bank of America, as well as another potential lender, were undertaken.  The Debtors also considered potential credit enhancements from members, but were not able to obtain them.

63.    The Debtors intend to prospectively maintain the Bridon and Heritage operations during the pendency of these Chapter 11 Cases and seek to sell their assets in a manner which maximizes value for their stakeholders. The Debtors believe the filing of their bankruptcy petitions, the relief the Debtors request in their First Day Pleadings, and the availability of post-petition financing will aid the Debtors' operations and ability to do business with both vendors and customers to and of the Debtors' ongoing operations.

64.    The Debtors, in consultation with their advisors, have diligently evaluated a number of options to address their liquidity challenges.  Based on this evaluation, it was determined that a sale of all or substantially all of the assets of Bridon and Heritage is the best way to maximize value for all stakeholders.  The Debtors received a Letter of Interest on April 25, 2014 (the "LOI") from a strategic (i.e. agribusiness) buyer with respect to the assets of both Bridon and Heritage.  It is the Debtors' intention to enter into an asset purchase agreement,

01:15450901.1

-18-

which would include provisions for the assumption and assignment of specified contracts, and conduct a competitive sale process with a stalking horse bidder, subject to the approval of the Court and consistent with their obligations under post-petition financing arrangements.

65.     With respect to Animal Health and Pet's Corner, prior to the Petition Date, it was determined that the best manner in which to maximize stakeholder value with respect to those businesses was to liquidate their underlying assets on a schedule that was completed prior to the necessity of filing the Chapter 11 Cases.  As described above, the assets of the Animal Health Business Unit were sold to TFC for $934,400.  After multiple offers for the Pet's Corner Business Unit were evaluated, it was ultimately determined that value would be maximized by selling some remaining inventory to SSC for $19,289.  The remainder of the inventory, as well as a *de minimis* amount of packaging equipment, was sold to Pet's Expo Distributors Inc. for $9,500.

66.     Finally, the Debtors, in consultation with their advisors, further concluded that a sale of all or substantially all of UCPA's assets will maximize stakeholder value for such assets.  Accordingly, the Debtors intend to implement an orderly sale process with respect to UCPA.

67.     As a result of the foregoing developments, the Debtors have filed (a) their bankruptcy petitions and (b) the First Day Pleadings relating to relief needed in connection with these bankruptcy filings.

68.     I believe that the commencement of these Chapter 11 Cases, and the implementation of an orderly sale processes as described herein, will permit the Debtors to consummate sales of all or substantially all of the assets of their remaining assets, and thus

maximize the value of their estates for creditors and all interested parties, while at the same time preserving jobs related to the profitable aspects of the Debtors' businesses.

## II. **FIRST DAY MOTIONS**

69.     In connection with the commencement of these Chapter 11 Cases, the Debtors have requested various forms of relief in their First Day Motions, all of which are being filed concurrently with this Declaration. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interest of the Debtors' estates, creditors and other parties in interest.

70.     I have reviewed each of the First Day Motions (including the exhibits attached thereto), and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct. If I were called as a witness, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.  That testimony would establish that the failure to receive the relief requested by the First Day Motions would have a deleterious effect on the Debtors' operations and value.

### i.     *Motion for Joint Administration*

71.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect all six Debtors.  Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only.  The Debtors further believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest.  For these reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

01:15450901.1

*ii.     Application to Retain Prime Clerk LLC*

72.     By this motion, the Debtors seek entry of an order authorizing the Debtors

to retain Prime Clerk LLC ("Prime Clerk") as their Claims and Noticing Agent in these Chapter

11 Cases, including assuming full responsibility for the distribution of notices and the

maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.  It is

my understanding that the Debtors' selection of Prime Clerk to act as the Claims and Noticing

Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents*

*under 28 U.S. C. § 156(c)*, in that the Debtors, with the assistance of their advisors, have

obtained and reviewed engagement proposals from at least two other court-approved claims and

noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on

all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and

reasonable given Prime Clerk's quality of services and expertise.

73.     Although the Debtors have not yet filed their schedules of assets and

liabilities, they anticipate that there will be well in excess of 300 entities to be noticed.  In view

of the number of anticipated claimants and the complexity of the Debtors' businesses, the

Debtors submit that the appointment of a claims and noticing agent is required by Local Rule

2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

*iii.     Motion for Interim Order Deeming Utilities Adequately Assured*

74.     By this motion, and to ensure continued provision of utility services (the

"Utility Services") to the Debtors' various facilities and corporate headquarters, the Debtors seek

entry of an order prohibiting utility companies (the "Utility Companies") from terminating

services on account of pre-petition invoices, deeming the Utility Companies to be adequately

assured of future payment, and establishing procedures to determine additional adequate

01:15450901.1

assurance.  The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to 50% of the Debtors' estimated monthly costs for Utility Services (collectively, the "Utility Deposit") and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

75.     Any disruption of Utility Services at the Debtors' facilities would cause irreparable harm to the Debtors' business operations and their estates.  The successful operation of the Debtors' business requires that the Utility Services be provided on a continual and uninterrupted basis to ensure that the quality of the Debtors' products is never compromised at any stage of the production process.  The Debtors have approximately forty accounts with Utility Companies and have established a good payment history with all of their Utility Companies.  To the best of the Debtors' knowledge, they have no defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices.  However, any disruption of Utility Services could have a significant impact on the Debtors' business operation, revenues, customers and employees.

76.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### iv.     Motion for Authority to Pay Certain Pre-Petition Taxes

77.     By this motion, the Debtors request authorization (but not direction) to pay certain accrued and outstanding prepetition sales, use, franchise, payroll and real and personal property taxes, as well as fees for licenses and other similar charges and assessments (collectively, the "Taxes") which are owed to various local, state and federal taxing authorities (collectively, the "Authorities").  The Debtors seek authority to pay any Taxes that were accrued

01:15450901.1

prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any Authority.  Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion.  Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

78.    The Debtors estimate that outstanding prepetition liabilities owing to the various Authorities for Taxes will not exceed approximately $20,000, exclusive of any Taxes that may have been paid prior to the Petition Date but had not cleared as of the Petition Date.  Some, if not all, of the Authorities may initiate an audit of the Debtors if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from the sale process and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates.

79.    I believe that the Debtors' failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business and thus harm these Chapter 11 Cases to the detriment of all constituents.  Additionally, any attempts to collect the Taxes from the Debtors' officer and directors has the potential to divert the attention of those individuals away from the restructuring process.  Therefore, I believe it is appropriate to pay, and the Debtors seek the authority to pay, in their sole discretion, the Taxes, including any penalties

01:15450901.1

and interest thereon, if any, and any liability resulting from audits of prepetition Taxes, to the relevant Authorities in the ordinary course of business.

      *v.    Motion to Approve Continued Use of Cash Management System*

      80.    By this motion, the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system, (b) authorizing the continued use of their existing bank accounts and business forms, and (c) authorizing their deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationary.

      81.    As described in detail in the motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").  To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that they maintain their Cash Management System.

      82.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates.  It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their large and complex business operations that spread over multiple states.  Substantially disrupting their

current cash management procedures would impair the Debtors' operations and ability to

optimize their business performance.

vi.    *Motion for Authority to Pay Employee Wage and Related Items*

83.    Pursuant to this motion, the Debtors are seeking authority to honor and

pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to

honor certain other policies, programs and benefits the Debtors provide to their employees in the

ordinary course of business.

84.    The Debtors have a current workforce of approximately 171 employees, of

which 115 are hourly and 56 are salaried.  The vast majority of the Company's "operations"

team rely exclusively on their full compensation, benefits and reimbursement of their expenses to

continue to pay their daily living expenses, and these employees will be exposed to significant

financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations.

The Debtors believe that if they are unable to honor all such obligations immediately, employee

morale and loyalty will be jeopardized at a time when such support is critical.

85.    The uninterrupted continuation of the Debtors' business is critically

dependent upon a stable work force.  The Debtors believe that any significant number of

employee departures or deterioration in morale at this time will immediately and substantially

adversely impact the Debtors' business and result in immediate and irreparable harm to the

estates and their creditors.  There is a real, immediate risk that if the Debtors are not authorized

to continue to honor their pre-petition employee obligations in the ordinary course, the

employees would no longer support and maintain the operations of the Debtors, thereby

damaging the Debtors' business operations and the value thereof.  Consequently, the Debtors

strongly believe that it is critical that they be permitted to pay their employees their pre-petition

wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.  It is my understanding and the Debtors' intention that payments sought to be made will not exceed statutory priority limits.

*vii.*   *Motion for Authority to Honor Customer Programs*

86.    Under this motion, the Debtors seek authority to continue honoring their certain incentive programs which are targeted to develop and sustain positive business relationships with the Debtors' Members and in the marketplace, generally (collectively, the "Customer Programs").  Although, in consultation with their professionals, the Debtors have concluded and believe that most of the Customer Programs constitute "ordinary course of business" practices and do not require court approval, out of an abundance of caution, the Debtors seek authority from the Court to honor certain of their prepetition Customer Programs in the ordinary course of business, as detailed in the motion seeking authority to continue such Customer Programs.

87.    The Debtors believe that immediate entry of an order approving the Debtors' ability to continue to honor certain Customer Programs related to volume, freight and warehouse allowances, as well as product rebates, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  The short-term and long-term success and viability of the Debtors' business are dependent upon the loyalty and confidence of their largest customers.  Any delay in honoring the identified Customer Programs or discontinuation of such Customer Programs as a result of the commencement of these cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of those customers are extremely critical.  By contrast, honoring these prepetition obligations will require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for

the benefit of all stakeholders during the pendency of these cases.  Accordingly, to preserve the value of their estates, I believe the Debtors should be permitted, in the Debtors' sole discretion, to continue honoring certain Customer Programs without interruption or modification as set forth in the motion seeking relief in connection therewith.

> viii.    *Motion for Authority to Continue Insurance*
> *Workers' Compensation and Other Insurance Programs*

88.     By this motion, the Debtors seek authority to continue performing under their workers' compensation and other insurance programs.  Such insurance policies include coverage for general liability, umbrella, automobile liability, directors and officers, property, foreign liability, inventory and marine risk liability, and workers' compensation.

89.     In view of the importance of maintaining the insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow by financing their insurance premiums, the Debtors believe it is in the best interest of creditors in these Chapter 11 Cases for the Court to authorize the Debtors to honor their obligations under the applicable agreements.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.  The Debtors anticipate filing a motion to address insurance premium financing as

> ix.    *The DIP Financing and Cash Collateral Motion*

90.     Prior to the Petition Date, the Debtors' day-to-day business operations were funded from cash receipts received from operations and from borrowing under a certain credit facility (referred to above as the "Existing Credit Agreement") with Bank of America, N.A.  As security for the obligations under the Existing Credit Agreement, Bank of America was granted security interests in substantially all of the Debtors' assets and cash (the "Cash Collateral") generated from operations (together with Cash Collateral, the "Prepetition

Collateral"). Thus, the Debtors do not have any unencumbered cash with which to operate their businesses. In addition, as set forth above, the Debtors lack adequate availability under the governing loan documents to sustain their businesses and operations for an extended period of time. As a result, at this time, the Debtors have an immediate need for the use of Cash Collateral, without which they are unable to operate their businesses.

91.     However, the use of Cash Collateral alone will not sustain the Debtors' operations. Without additional liquidity in the form of post-petition financing, the Debtors' could not operate their continuing businesses, which would significantly impair the value of the Debtors' assets to the detriment of all creditor constituencies. Furthermore, by obtaining the proposed post-petition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of their estates, and such estates' creditors and other parties in interest.

92.     To attempt to obtain additional liquidity, the Debtors approached Bank of America to discuss additional financing or to otherwise restructure the applicable credit facility. However, Bank of America was unwilling to undertake such arrangements other than through a court-approved debtor in possession facility.

93.     After consultation with their advisors, the Debtors also determined that, if an acceptable financing arrangement could be reached with Bank of America, it was not in the best interest of the Debtors and their creditors to seek post-petition financing based on priming liens that would be placed ahead of the security interests of Bank of America on a contested basis in light of the risks and costs involved in doing so. As a result, the Debtors, with the assistance of their advisors, determined that finalizing their negotiations with Bank of America on the terms of a debtor in possession financing facility presented the best option to satisfy the Debtors' financing needs during the anticipated course of these Chapter 11 Cases.

94.    After consultation with their advisors, and after negotiations with a potential alternative lender, the Debtors have determined, in the exercise of their sound business judgment, that the proposed debtor in possession financing facility (the "DIP Facility") with Bank of America (the "DIP Lender") is the best financing option available to the Debtors under the circumstances.  Against this backdrop, the Debtors, with the assistance of their advisors, carefully evaluated the proposed financing structure from the DIP Lender, engaged in extensive negotiations with the DIP Lender regarding the proposed terms, and worked with their various advisors to obtain the best possible terms from the DIP Lender.  Eventually, the Debtors determined that the DIP Lender's proposal was the best and, at the present time, the only proposal suited to the Debtors' needs, and agreed to the terms of the DIP Facility.  In particular, the Debtors concluded that adequate alternative financing on terms more favorable than those being provided under the DIP Facility is not currently available.

95.    Finally, the terms and conditions of the DIP Facility were negotiated by the Debtors and the DIP Lender in good faith and at arm's length, and were instituted for the purpose of enabling the Debtors to meet ongoing operational and administrative expenses during the pendency of these Chapter 11 Cases.

96.    In conclusion, for the reasons stated herein and in each First Day Pleading, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

01:15450901.1

I declare under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated:  May 11, 2014
Wilmington, Delaware

Name: Dennis Gyolai
Title:   Vice President of Finance
         and Treasurer

Error!

# EXHIBIT A

01:15450901.1

# Universal Cooperatives, Inc. and Affiliates
## Organization Chart

**The Debtors**



**Non-Debtor International Affiliates**

