## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Universal Cooperatives, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 14-11187 (MFW)<br><br>(Jointly Administered)<br><br>**Hearing Date: January 26, 2015 @ 11:30 a.m. (ET)**<br>**Obj. Deadline: January 19, 2015 @ 4:00 p.m. (ET)** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING THE COMMITTEE STANDING AND AUTHORIZING THE COMMITTEE TO COMMENCE AND PROSECUTE CERTAIN ACTIONS ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the bankruptcy cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for an order granting the Committee standing and authority to commence, prosecute and, if appropriate, settle an action (or actions) on behalf of the Debtors' estates against certain of the Debtors' members[2] (the "Member Defendants") and certain current and former directors and officers of Debtor Universal Cooperatives, Inc. (the "Management Defendants" and, together

---

[1]  The Debtors and the last four digits of their federal tax identification numbers are:  Universal Cooperatives, Inc. (2405); Heritage Trading Company, LLC (0512); Bridon Cordage LLC (0985); Universal Crop Protection Alliance, LLC (1532); Agrilon International, LLC (7234); and Pavalon, Inc. (1433).  The location of the corporate headquarters for Universal Cooperatives, Inc.; Universal Crop Protection Alliance, LLC; Agrilon International, LLC; and Pavalon, Inc. is 1300 Corporate Center Curve, Eagan, MN 55121.  The location of the corporate headquarters for Heritage Trading Company, LLC is 11020 NW Ambassador Drive, Kansas City, MO 64153.  The location of the corporate headquarters for Bridon Cordage LLC is 909 E. 16th Street, Albert Lea, MN 56007.

[2]  Debtor Universal Cooperatives, Inc. ("Universal") has fourteen (14) voting members (collectively, the "Voting Members") and over fifty (50) associate members (collectively, the "Associate Members" and, together with the Voting Members, the "Members").  Voting Members must be a cooperative organization to qualify as a candidate for full voting membership, and the membership must be approved by Universal's Board of Directors.  To participate in the governance of Universal, Voting Members were required to purchase $10,000 of Common Stock.  Moreover, if a Member purchases a minimum of $1 million of products from Universal in any given fiscal year, such Members are eligible to sit on Universal's Board of Directors in the year following such purchases.  As of the Petition Date (defined below), Universal's Board of Directors was comprised of nine individuals.

with the Member Defendants, the "Defendants") for, among other things: (i) breaches of fiduciary duty and aiding and abetting such breaches; (ii) avoidance actions; and (iii) disallowance, subordination and recharacterization of certain Defendants' claims (collectively, the "Causes of Action"), as set forth more fully in the draft complaint (the "Complaint") attached hereto as **Exhibit A**.  In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In accordance with its fiduciary duties to unsecured creditors in these cases, the Committee has undertaken an investigation of potential Causes of Action related to prepetition misconduct which precipitated the filing of the above-captioned chapter 11 cases.  In this regard, over the past three months, the Committee served discovery and document requests on an informal basis, and the Committee appreciates the Debtors' cooperation (as evidenced by the lack of Bankruptcy Rule 2004 motion practice) in responding to such requests.  As a result of this preliminary investigation, the Committee believes that the Debtors' estates have valid causes of action against the Defendants and is prepared to proceed in light of the Debtors' refusal and/or inability to do so.

2.      In summary, the Committee alleges that the Management Defendants: (1) ignored certain red flags warning that the Debtors were in a financial crisis; (2) despite such red flags, (a) continued to cause the Debtors to transfer funds to certain non-viable affiliates to keep such non-viable entities in operation, and (b) continued the Debtors' practice of paying their Members (including the Member Defendants) above-market interest payments on Member prepayments and providing such members with rebates and discounts on the Debtors' products that the Debtors could not afford; and (3) approved the sale of Universal's Animal Health Business Unit to an insider for less than fair value.  The Committee further alleges that these actions were taken while the Debtors were insolvent and benefitted the Member Defendants at

the expense of the Debtors' creditors.  The Committee seeks damages for losses the Debtors and, derivatively, the Debtors' creditors have suffered as a result of the aforementioned conduct and recovery of certain preferential and fraudulent transfers to the Member Defendants as a result of the same.

3.     Accordingly, the Committee files this Motion to obtain standing to prosecute the Causes of Action, as well as any other similar causes of action (to the extent discovered through further investigation), against Defendants.

## JURISDICTION AND STATUTORY PREDICATES

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28. U.S.C. §157(b)(2).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for relief are 11 U.S.C. § 105, 1103(c)(2) and (5) and 1109(b).

## BACKGROUND

### A.     The Chapter 11 Filings and Appointment of the Committee

5.     On May 11, 2014 (the "Petition Date"), the Debtors each commenced a voluntary case (collectively, the  "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     These Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  *See* Docket No. 35.

7.     No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.  On May 28, 2014, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See* Docket No. 89.

8.     On August 25, 2014, the Debtors sold substantially all of the assets of Debtors Bridon Cordage LLC ("Bridon") and Heritage Trading Company, LLC ("Heritage") and certain assets of Universal to BCHU Acquisition LLC, an affiliate of Great Lakes Copper, Inc. See Docket No. 402.

9.     Additional background regarding the Debtors' businesses and the events leading up to the Debtors' Chapter 11 Cases can be found in the *Declaration of Dennis Gyolai in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration").

**B.     The Committee's Investigation of Causes of Action**

10.     In its capacity as a fiduciary to unsecured creditors, the Committee has undertaken an investigation into potential causes of action which the Debtors' estates might hold against the Defendants.  Through this process, which has been ongoing for the past three (3) months and has involved informal discovery produced from the Debtors to the Committee, the Committee has determined that a number of estate causes of action or claims are viable and should be brought.

11.     The Committee has become aware of certain facts and circumstances relating to the Debtors that contributed to and/or caused the Debtors financial harm and caused their creditors to suffer damages.   These facts and circumstances involve wrongful acts constituting, *inter alia*, breaches of fiduciary duties, negligence, gross negligence, willful or intentional misconduct, self-dealing, waste, dissipation, and actual and/or constructive fraud, all of which are included in the Causes of Action.  A more detailed description of the facts and

circumstances giving rise to the foregoing conduct is set forth in the Complaint, and a summary is set forth below.   Additional causes of action may become known as the Committee's investigation continues.

12.     In order to understand the Debtors' pre-petition activity, the Committee has relied on, *inter alia*, financial documentation and data provided, including minutes of meetings of the Debtors' respective board of directors.  As noted above, in an effort to work collaboratively with the Debtors, the Committee forwent formal discovery requests. Accordingly, the Committee submits that while it has made substantial progress in obtaining facts and documents supporting the Causes of Action asserted in the Complaint, and that such Causes of Action are viable with the information presently available, the Committee's investigation is incomplete at this juncture.[3]

### C.      The Debtors' Insolvency

13.     The Debtors incurred substantial losses on a consolidated basis from at least 2010 onwards.  Upon information and belief, the Debtors incurred █████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████

14.     In addition, during this time the Debtors continued to accumulate trade payables. ████████████████████████████████████████████
████████████████████████████   █████████████████████
███████████████████████████████

---

[3] For example, due to certain constraints related to the Debtors' current staffing levels and the focus of the Debtors on winding down their operations and negotiation of a chapter 11 plan of liquidation, the Debtors have not yet produced any electronic mail on an informal basis, but the Committee believes that such electronic mail could provide further significant evidence in support of the Causes of Action.

15. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

16.    Upon information and belief, the Management Defendants became aware
that the ████████████████████████████████████
████████████████████████████████████████
████████████████████

17. ████████████████████████████████
████████████████████████████████████████
████████████████████████ ████████████████
████████████████████████████████████████
████████████

18. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████ ██████████████████████
████████████████████████████████████████
████████████████████

19. ████████████████████████████ ████████████
████████████████████████████████████████

███████   █████████████████████████████████████████████████████

███████████████████████████████████████████████

20.     Upon information and belief, Debtor Heritage had liabilities exceeding

assets ███████████████████████████████████████████████

██████████████████████████████   Upon information and belief, neither the

Management Defendants nor the Debtors' external auditors identified this issue in a timely

manner.

21.     Upon information and belief, the Debtors did not maintain balance sheets

on an entity specific level for all entities.  Instead, upon information and belief, accounts payable

and accounts receivable were maintained on the books of the parent, Universal, for both Heritage

and Debtor Universal Crop Protection Alliance, LLC ("UCPA").  Because these records were

not entity specific, neither the respective boards of directors of each of these entities nor the

Debtors' external auditors were aware or made aware that certain balance sheet accounts,

including accounts payable, had grown over the years.  Further, without the benefit of entity

specific balance sheet analysis, upon information and belief, even a simple rudimentary analysis

such as net working capital, or a quick ratio, could not be readily conducted and was not

analyzed by the Management Defendants.

22.     ████████████████████████████████████████

██████████████████████████████████   ████████████████████

██████████████████████████████████████

D.     **The Management Defendants' Transferred Debtor Funds to Distressed Entities**

23.     While the Debtors were insolvent, the Management Defendants continued

to operate certain Debtor and non-Debtor affiliates and subsidiaries at a loss for years following

these companies' apparent underperformance and financial distress.  For example, ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

       24.     ███████████████████████████████████

███████████████████████████████████████████████████

However, these cash infusions were insufficient, as among other things, ███████████████

███████████████████████████████████████████████████

███████████████ Instead, these transfers ██████████ served merely to diminish the value

of the Debtors' assets by the amount of such transfers.

       25.     Upon information and belief, the Management Defendants ██████████████

██████ by transferring ███████████████████████████████████

███████████████████████████████████████████████████

██████████████

       26.     Upon information and belief, the Debtors ███████████████████

███████████████████████████████████████████████████

████████   ███████████████████████████████████████

███████

       27.     ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

28.     The Management Defendants, as officers and directors of the Debtors, had the obligation to preserve the Debtors' capital and make informed decisions about how the Debtors should invest their capital, including whether the Debtors should continue to support certain of their distressed affiliates.

29.     Further, the Management Defendants acted with gross negligence, indeed with recklessness, in continuing to fund failing entities, ████████████, with the Debtors' money, to the detriment of the Debtors and their creditors.

30.     If the Management Defendants had acted in the best interests of the Debtors, they would have preserved the Debtors' funds for the benefit of their creditors and shareholders.  Instead, the Management Defendants divested certain viable Debtors in order to continue funding the operations of the distressed Debtor and non-Debtor affiliates for the sole benefit of the Member Defendants.

**E.     The Prepayment Programs**

31.     While various Debtor and non-debtor entities controlled by the Management Defendants were insolvent, the Management Defendants permitted the Debtors to continue to offer their Members (including the Member Defendants) the Debtors' prepayment, rebate and discount programs (collectively, the "Prepayment Programs").  Upon information and belief, pursuant to the Prepayment Programs, the Members (including the Member Defendants) would prepay for certain of the Debtors' product in exchange for interest payments ████████

███████████████████████████████████ and obtain the benefit of certain rebates on purchased products.

32.    Upon information and belief, the Debtors provided the following amount of product to the Member Defendants: ████████████████████████████

████████████████████████████████████████████████

████████████████ Upon information and belief, a substantial portion of this product was provided to the Member Defendants at a discounted rate.

33.    The Management Defendants were aware (or should have been aware) of the excessively generous nature of these Prepayment Programs and how such programs were harming the Debtors (and, by extension, the Debtors' creditors).

34.    Upon information and belief, the total prepayments to Debtor Universal received from certain Member Defendants ████████████████████, with $8.5 million outstanding as of the Petition Date.

35.    Upon information and belief, Member prepayments represent approximately 20% of unsecured nonpriority claims against the Debtors on a consolidated basis (based on the Debtors' books and records) and 50% of unsecured nonpriority claims against Debtor Universal Cooperatives, Inc.

36.    ████████████████████████████████████

███████████████████████████████████████

37.    Upon information and belief, on account of the Prepayment Programs, the Member Defendants received an aggregate discount ██████████████████████

████████████████

38. ███ ████████ █████████ ███ ███ █████ ████████ ███████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████

F.    <u>**The Universal Sale**</u>

39. ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████

40. ███████████████████████████████████████████
███████████████████████████████    ████████████████████
███████████████████████████████████████████████████████
█████████████

41. ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████    ████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████

42. ███████████████████████████████████████████
██████████████████████████████████████████████████

43. ████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████

44.     On March 28, 2014, Universal instead sold the Business to Member Defendant Tennessee Farmers Cooperative ("Tennessee Farmers") ████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████

45.     Having been a Voting Member of the Debtors and having appointed a member to the Debtors' board of directors, Tennessee Farmers ███████ were, upon information and belief, aware of Universal's financial condition at the time Tennessee Farmers purchased the Business.  By purchasing the Business approximately one month prior to filing the Chapter 11 Cases, █████████████████████ upon information and belief Tennessee Farmers ████ ████ ensured that ███████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████ Upon information and belief, the Management Defendants turned a blind eye on this insider transaction and allowed this preferential and fraudulent sale of Universal's Animal Health Business Unit precisely at a critical moment in the months immediately prior to the Debtors' chapter 11 filing when the Management Defendants should have been acting to preserve value for the benefit of all of the Debtors' creditors.

G. **The Debtors' D&O Policy**

46.    Upon information and belief, the Debtors maintain certain directors' and officers' liability insurance policies, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

**RELIEF REQUESTED**

47.    To the extent it does not already have such standing or authority, the Committee seeks entry of an order granting it the authority and standing to assert, prosecute and, if appropriate, settle the Causes of Action against the Defendants in this Court, and to take such other action as may be necessary or appropriate in connection therewith.

**BASIS FOR RELIEF**

48.    In chapter 11 cases where no trustee has been appointed, the Bankruptcy Code provides that a debtor-in-possession enjoys the powers that would otherwise vest in a bankruptcy trustee.  *See* 11 U.S.C. § 1107(a).  In conjunction therewith, a debtor is vested with the fiduciary duty to maximize the value of the estate for purposes of distribution to all parties in interest.  *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors"); *see also*, *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (holding that a debtor has a fiduciary duty to refrain from conduct that may damage the estate); *In re Commodore Int'l, Ltd.*, 262 F.3d 96, 99 (2d Cir. 2001) (finding that a debtor-in-possession "has an obligation to pursue all actions that are in the best interests of creditors and the estate").

49.     It is well-settled in this and other circuits that, under appropriate circumstances, bankruptcy courts may allow a creditors' committee to commence and pursue litigation on behalf of the estate.  *See Cybergenics*, 330 F.3d at 580; *Official Committee of Unsecured Creditors v. Barron (In re Polaroid Corporation)*, 2004 Bankr. Lexis 841, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004); *Official Committee of Unsecured Creditors v. Cablevision Systems Corp. (In re Valley Media, Inc.)*, 2003 Bankr. Lexis 940, 2003 WL 21956410 (Bankr. D. Del. August 14, 2003); *Official Committee of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004), *aff'd*, 326 B.R. 532 (W.D. Pa. 2005). *See also Scott v. National Century Enterprises, Inc. (In re Baltimore Emergency Services II Corp,)*, 432 F.3d 557, 560 (4th Cir. 2005); *In re Commodore Int'l Ltd.*, 262 F.3d 96 (2d Cir. 2001); *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 253-54 (5th Cir. 1988); *Unsecured Creditors Committee v. Noyes (In re STN Ent.)*, 779 F.2d 901, 904 (2d Cir. 1985).

50.     Courts in other circuits have held that the Bankruptcy Code contains an implied right for parties in interest to commence a lawsuit or prosecute a claim on behalf of a debtor-in-possession with bankruptcy court approval.  *STN Enterprises*, 779 F.2d at 904.  If a debtor is unable or unwilling to meet its statutory obligation to maximize the value of its estate, "[t]he practice of authorizing the prosecution of actions on behalf of an estate by [parties in interest] upon a showing that such is in the interests of the estate, is one of long-standing, and nearly universally recognized."  *In re Adelphia Comm. Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (citations omitted).  As a result, creditors and other stakeholders have "the comfort that potentially valuable (and sometimes critical) claims on behalf of the estate will be prosecuted – without requiring bankruptcy judges to . . . resort[] to much more draconian or

-14-

ineffective mechanisms to ensure the prosecution of those claims, with the destruction to going concern value and creditor recoveries that would frequently be the result." *Id.*

51.     Although the Third Circuit has held that it is within the equitable powers of the Bankruptcy Court "to confer derivative standing upon a creditors' committee" to pursue claims that maximize the value of the estate, *Cybergenics*, 330 F.3d at 572, it did not establish a precise or specific procedure for bankruptcy courts to follow in granting creditors derivative standing.  The Third Circuit did, however, agree with certain procedures followed in the Seventh and Second Circuits.  *See Valley Media*, 2003 Bankr. Lexis 940, at \*5-\*6, 2003 WL 21956410, at \*2 (citing *Commodore*, 262 F.3d at 100 (2d Cir.)); *Foger v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000); *Cybergenics*, 330 F.3d at 567 (noting an exception to the Second Circuit's broad reading of sections 1103(c)(5) and 1109(b) of the Bankruptcy Code).

52.     Under these approaches, courts following *Cybergenics* in the Third Circuit have determined that derivative standing will be conferred when a creditor or creditors' committee demonstrates:  (i) a colorable claim; (ii) a debtor's unjustified refusal to pursue that claim; and (iii) permission of the bankruptcy court to commence the action.  *In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Washington Mutual, Inc.*, 461 B.R. 200, 254 (Bankr. D. Del. 2011); *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (Bankr. D. Del. 2004); *Valley Media*, 2003 Bankr. Lexis 940, at \*5-\*6.  The burden is on the creditor or the creditors' committee to demonstrate that these prerequisites to standing have been satisfied.  *G-I Holdings, Inc.*, 313 B.R. at 629.

53.     One of the concerns underpinning the *Cybergenics* decision to confer standing upon a creditors' committee was that a debtor-in-possession may be reluctant to pursue types of claims against its own management.  *Id.*, at 573-74.  Indeed, when there is no trustee in

place, a debtor's management enjoys the powers afforded a debtor-in-possession under 11 U.S.C. § 1107(a).

54.    Notwithstanding that *Cybergenics* and its progeny appear to address derivative standing to pursue avoidance actions against a debtor's directors and officers, there is nothing to suggest that derivative standing should not be applied to claims outside the scope of avoidance actions so long as the creditor or creditors' committee show that a debtor has a colorable claim that it unjustifiably refuses to pursue and the Court enters an appropriate order granting the creditors' committee derivative standing. *See, e.g., Washington Mutual*, 461 B.R. at 254-267 (determining that equity committee had established a colorable claim for equitable subordination or disallowance of a claim asserted by creditors who had entered into a global settlement[4]); *Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) (finding that the creditors' committee had standing to pursue claims against the debtor's pre-petition lenders and related parties for claims based on (i) the lenders' status as insiders, including equitable subordination, (ii) preference, (iii) fraudulent conveyance, (iv) deepening insolvency; (v) aiding and abetting the debtors' breach of their fiduciary duty; (vi) declaratory relief regarding equity in repurchased receivables; and (vii) disgorgement of fees, expenses and other payments related to the foregoing claims). *See also Order Granting the Creditors' Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates Against the Debtors' Management Defendants . . .*, entered in *In Re Syntax-Brillian Corp.*, Case No. 08-11407 (Bankr. D. Del. November 25, 2008) [D.I. 677] (granting standing to the creditors' committee to pursue claims and actions against the debtors' directors and officers for breach of fiduciary duties based upon their failure to implement adequate financial procedures and controls and to exercise proper oversight over the debtors'

---

[4]  The Court stayed the Equity Committee's prosecution of its claim for equitable disallowance pending mediation.

operations resulting in substantial damage to the debtors and ultimately their creditors.);  *See Emergency Motion of Debtors for Entry of an Order (I) Granting the Creditors' Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates . . ., Syntax-Brillian, supra*. [D.I. 644].  Thus, courts may confer upon a creditors' committee the authority to pursue claims against a debtor's directors and officers that fall outside the scope of avoidance actions. Therefore, provided the Committee demonstrates that the Debtors have colorable claims against the Member Defendants that the Debtors refuse, explicitly or implicitly, to pursue, the Committee should be authorized to proceed as requested herein.

55.    As will be shown *infra*, the Committee has colorable claims, in the form of the Causes of Action, against the Defendants.

A.    <u>The Causes of Action Assert Colorable Claims.</u>

56.    As a result of its investigation, the Committee believes that the Debtors' estates have colorable claims against the Defendants that, if successful, would benefit the estates. To establish the colorable claim element of the derivative standing test, the Court must determine "whether the Committee has asserted 'claims for relief that on appropriate proof would support a recovery.'"  *G-I Holding*, 313 B.R. at 631 (quoting *STN Ent.*, 779 F.2d at 905).  "'Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'"  *Id.* (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (internal quotations omitted).

57.    "The threshold for stating a colorable claim is low and mirrors the standard applicable to a motion to dismiss for failure to state a claim."  *Washington Mutual*, 461 B.R. at 255; *Adelphia Comm. Corp.*, 330 B.R. at 376 (acknowledging that the burden of showing a colorable claim is a "relatively easy one").  A motion to dismiss requires only that a court

accept as true the allegations and facts set forth in a complaint, together with all reasonable inferences derived therefrom. *G-I Holdings*, 313 B.R. at 631; *see also Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir. 1991). Only if, after accepting all of the allegations in a complaint as true, the court determines that the plaintiff is not entitled to the relief sought, should a motion to dismiss be granted. *Doug Grunt, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183 (3d Cir. 2000), *cert. denied*, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001). As set forth below, the Causes of Action, as alleged in the Complaint, are colorable.

i.      **The Management Defendants' Breaches of Fiduciary Duties.**

58.     As set forth more fully in the Complaint, there are plausible and viable claims against the Management Defendants for, among other things, breaches of the fiduciary duties of care, loyalty and good faith. It is well-settled under Delaware law that "[w]hen a firm has reached the point of insolvency . . . the firm's directors are said to owe fiduciary duties to the company's creditors." *Production Resources Group L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790-91 (Del. Ch. Ct. 2004); *but see North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (clarifying that creditors of an insolvent corporation have standing to bring a derivative action against corporation's officers and directors for breach of fiduciary duty on behalf of the corporation but not standing to bring a direct action against the same on behalf of themselves).

59.     Under Delaware law, the duty of loyalty mandates that:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests . . . the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make

-18-

> in the reasonable and lawful exercise of its powers. The rule that
> requires an undivided and unselfish loyalty to the corporation
> demands that there be no conflict between duty and self-interest.

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

60.     "To prove a breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred and that the transaction was unfair to the shareholders."  *In re USDigital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011).   In addition, Delaware courts have held:

> The duty of good faith is a "subsidiary element" of the
> "fundamental duty of loyalty."  The Delaware Supreme Court has
> recognized three non-exclusive categories of conduct indicative of
> a failure to act in good faith. First, a failure to act in good faith
> may be established when a director "intentionally acts with a
> purpose other than that of advancing the best interests of the
> corporation." Second, a failure to act in good faith may be
> established when a director "acts with the intent to violate
> applicable positive law." Third, a failure to act in good faith may
> be established when a director "intentionally fails to act in the face
> of a known duty to act, demonstrating a conscious disregard for his
> duties."

*Id.*

61.     Further, "[t]he duty of care has been described as the duty to act on an informed basis.  To prove a breach of the duty of care, a plaintiff must demonstrate gross negligence.  The precise behavior constituting gross negligence varies depending on the context, but in general 'a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner.'"  *USDigital*, 443 B.R. at 41; *see also Cede Co.*,  634 A.2d at 368 ("In a merger or sale, we have stated that the director's duty of care requires a director, before voting on

a proposed plan of merger or sale, to inform himself and his fellow directors of all material information that is reasonably available to them.").

62.     To the extent applicable, Minnesota law also recognizes claims against directors and officers for breaches of fiduciary duties of care and loyalty.  See *Bolander v. Bolander*, 703 N.W.2d 529, 556 (Minn. Ct. App. 2005) (recognizing that directors can be liable for the breach of several fiduciary duties, including the duty of care); *Writers Inc. v. West Bend Mut. Ins. Co.*, 465 N.W.2d 419, 423 (Minn. Ct. App. 1991) (noting that officers and directors are required "to act in good faith, with honesty in fact, with loyalty, in the best interests of the corporation.").

63.     As set forth more fully in the Complaint, the Management Defendants breached their duties of care, loyalty and good faith by: (i) failing to address certain of the Debtors' issues regarding the accumulation of trade payables and other signs of financial distress in time to remedy such issues; (ii) authorizing the Debtors to make above-market interest payments and provide rebates and discounted rates on product to the Member Defendant pursuant to the Prepayment Programs while the Debtors were insolvent; (iii) transferring funds from certain Debtor and non-Debtor affiliated entities to fund losses of distressed entities so the Member Defendants could continue to receive discounted product produced by such distressed entities; and (iv) approving the sale of the Business to an insider for less than fair value.

64.     As a result of the foregoing breaches of fiduciary duty, the Management Defendants caused financial harm to the Debtors' estates and, consequently, to the Debtors' creditors.  Accordingly, the conduct outlined in the Complaint sufficiently establishes colorable claims for breach of fiduciary duty to satisfy the first prong for derivative standing.

ii.      **The Avoidance Actions**

65.    The facts set forth in the Complaint support plausible claims against the Member Defendants for (1) intentional fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code, or (2) constructive fraudulent transfers under section 548 (a)(1)(B) of the Bankruptcy Code, relating to: (a) the above-market interest payments on member prepayments; (b) generous rebates and discounts of members' purchases of the Debtors' products pursuant to the Debtors' Prepayment Programs; and (c) the sale of the Business to an insider for less than fair value, largely by way of Credit Offsets.  *See Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645 (3d Cir. 1991) (stating that an intentional fraudulent transfer occurs when the transfer was made "with actual intent to defraud the debtor's creditors."); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 630 (3d Cir. 2007) (discussing that a constructive fraudulent transfer occurs if the debtor made the transfer or incurred the obligation: (1) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (2) (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due).  Accordingly, as set forth above and in the Complaint, the Committee has pled plausible claims for avoidance actions in the Complaint.

66.    In addition, the Committee asserts colorable claims for the recovery of preferential transfers made to the Member Defendants within one year of the Petition Date.  To show that a preferential transfer occurred, a party must show that the transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

-21-

(4) made –

    (A) on or within 90 days before the [Petition Date]; or

    (B) between ninety days and one year before the [Petition Date], if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if -

    (A) the case were a case under chapter 7 of [the Bankruptcy Code];
    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

11 U.S.C. § 547(b).  Based on the conduct alleged in the Complaint and summarized above, the

Committee has asserted colorable claims for the recovery of preferential transfers to the Member

Defendants.

    **iii.**    **Claims for Recharacterization and Equitable Subordination of Defendants' Claims against Debtors' Estates.**

    67.    Finally, as set forth more fully in the Complaint, the Committee has pled

plausible claims for equitable subordination and recharacterization of the Member Defendants'

claims on account of prepayments and/or deposits funded to the Debtors' estates prior to the

Petition Date.  In *In re Submicron Systems Corp.*, the Third Circuit affirmed the following seven-

factor test applied by the District Court in determining whether to recharacterize a creditor's

claim as equity: (1) the name given to the instrument; (2) the intent of the parties; (3) the

presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and

interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation

to regular corporate contributors; and (7) certainty of payment in the event of the corporation's

insolvency or liquidation.  432 F.3d 448, 455, n.8 (3d Cir. 2006).  The Third Circuit further recognized that the multi-factor test includes pertinent factors, but determined that "[n]o mechanistic scorecard" for a recharacterization inquiry.  *SubMicron*, 432 F.3d at 456.  Instead, the Third Circuit explained that the various factors devolve to an "overarching inquiry" of the parties' intent, rather than a strict multi-factor test.  *Id.* at 456; *see also Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 519 (Bankr. D. Del. 2011) (reading *SubMicron* to require a recharacterization analysis to focus on the overarching inquiry of the parties' intent, rather than a multi-factor test).

68.    Additionally, equitable subordination is a remedy provided in section 510(c) of the Bankruptcy Code and is designed to "'undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'"  *U.S. v. State Street Bank and Trust Co., as Trustee for Junior Subordinated Secured PIK Notes, et al. (In re Scott Cable Commc'n)*, Adv. Proc. No. 01-4605 (KJC), 2014 WL 5298031 (Bankr. D. Del. Oct. 15, 2014) (citing *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'n, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (internal citations omitted)).  The Third Circuit has adopted a "widely-used three-factor test that must be satisfied before deciding whether equitable subordination of a claim is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code."  *Scott Cable Commc'n*, 2014 WL 5298031 (citing, *inter alia*, *Winstar*, 554 F.3d at 411).

69.    Here, as discussed above and in the Complaint, the facts surrounding the Debtors' Prepayment Programs and the significant benefits conferred via such programs support

the claims that such payments constituted equity contributions, and any claim of the Member Defendants in connection thereto should be recharacterized as equity and/or subordinarted in light of the conduct by the Defendants discussed above.

70.     Accordingly, the Committee submits that it has stated colorable claims against the Defendants and, therefore, that the Court should grant the Committee derivative standing to bring the Causes of Action.[5]

### B.     The Debtors Have Failed or Refused to Pursue the Causes of Action.

71.     Having shown that the Committee has colorable claims against the Defendants, the Committee must also demonstrate that the Debtors unjustifiably failed or refused to pursue the Causes of Action, which may be implied, or consented to the derivative standing of the Committee, or that the demand was futile because it in essence asked the directors and officers to sue themselves.  *G-I Holdings*, 313 B.R. at 630; *STN Ent.*, 779 F.2d at 904.

72.     A debtor's refusal to pursue certain actions can be implied even where no demand has been made.  *G-I Holdings*, 313 B.R. at 630; *Nat'l Forge*, 326 B.R. at 544-45 (holding that bankruptcy court was justified in concluding that the debtor would have declined to file claims against directors and officers of the debtor because the debtor's "key employees" who presumably would have been instrumental in asserting such claims, were named as defendants in the complaint).  To the extent demand would be futile, it is excused.  *Nat'l Forge*, 304 B.R. at 222 (noting that a formal request is not required to obtain a formal refusal).

73.     A debtor's equivocation is irrelevant, because there is no actual need for a committee even to make a demand, or for a debtor to formally refuse.  "[I]f the demand is

---

[5]  In addition to the colorable counts summarized herein, the Committee also asserts colorable claims (based on the same set of facts discussed above) in the Complaint for: (i) unjust enrichment; (ii) disallowance of claims pursuant to 11 U.S.C. § 502(a); (iii) corporate waste; and (iv) aiding and abetting fraudulent transfers.

presumptively futile under the circumstances . . . the failure to make the demand . . . does not prevent the court from authorizing [a creditor or] other party in interest from pursuing the matter on behalf of the estate." COLLIER ON BANKRUPTCY at ¶ 1109.05[2][a] (16th Ed. Rev. 2013); *see also G-I Holdings*, 313 B.R. at 630 ("[I]n appropriate circumstances form should not override substance. That is, a debtor's refusal . . . can be implied even where no formal demand has been made by a creditors committee").

74.     This is particularly true when, as here, there are potential conflicts of interest that make it likely – if not certain - that a formal demand would be refused. *G-I Holdings*, 313 B.R. at 630. The Debtors face significant conflicts of interest which preclude any unbiased business judgment as to the prosecution of the Causes of Action. Here, the Management Defendants include certain of the Debtors' current officers and directors. These officers and directors cannot be expected to assert the Causes of Action against themselves and the Members that appointed them, no matter how meritorious the claims may be. *Cybergenics*, 330 F.3d at 573 (noting that this "situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. . . . [I]f managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it."); *see also G-I Holdings*, 313 B.R. at 628. Because managers may be in control of the debtor-in-possession, a conflict of interest may result as to whether a claim should be brought, and the debtor may be unwilling to pursue such claims, *Cybergenics*, at 573, but "a creditors committee will not be so hesitant." *Id.*, at 574.

75.     Furthermore, despite the Debtors' actual or constructive awareness of the potential Causes of Action, the Debtors have taken no action to pursue them. The obvious and unavoidable conflict of interest here is independently sufficient to satisfy the demand

requirement and obviates the need for any formal demand and refusal.  The Debtors' refusal may be implied.

76.     A debtor's refusal to pursue actions on behalf of the estate must be "unjustifiable."  *Cybergenics*, 330 F.3d at 566-67.  Derivative standing should be granted when a debtor unjustifiably or unreasonably refuses to pursue claims that the Bankruptcy Court finds would benefit the estate.  *See Cybergenics*, 330 F.3d at 568; *see also In re The V Companies*, 292 B.R. 290 (B.A.P. 6th Cir. 2003).  If a debtor fails to pursue litigation that is likely to benefit its estate, such failure is unjustifiable.  *See, e.g., STN Enterprises*, 779 F.2d at 904-05.  "The 'unjustifiable failure' of a debtor to bring the suit itself does not require an improper motive for the failure.  Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate."  *Adelphia*, 330 B.R. at 374, n.19 (citing *STN Ent.*, 779 F.2d at 905).  A creditor need only show that a debtor was "unable or unwilling to pursue claims" on the estate's behalf.  *In re Newcorn Enterprises Ltd.*, 287 B.R. 744, 749-50 (Bankr. E.D. Mo. 2002); *see also Louisiana World*, 858 F.2d at 253 (finding that "[w]here the interests of an estate and its creditors are impaired by the refusal of a trustee or a debtor-in-possession to initiate adversary proceedings to recover property of the estate, . . . that refusal [is] unjustified").

77.     Relevant factors courts consider in making this analysis include: (1) whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action will be brought; (2) whether the creditors' interests are protected despite the debtor's refusal; (3) whether allowing the creditors' committee to pursue the action on the debtor's behalf will benefit the estate; and (4) whether appointing a trustee and allowing

the trustee, as opposed to the creditors' committee, to pursue the action would be more beneficial to the estate. *In re G-I Holdings*, 313 B.R. at 643 (citing *In re Tennessee Valley Steel Corp.*, 183 B.R. 795, 806 (Bankr. E.D. Tenn. 1995)).   It is more efficient for the Committee to pursue the Causes of Action given its due diligence and efforts to date.

78.   In assessing whether the refusal is justified or not, a court should give special consideration to actual or possible conflicts of interest. *Cybergenics*, 330 F.3d at 573 (recalling the adage about the "fox guarding the henhouse").   Often it will not be realistic to order the debtor itself to pursue any claims given management's conflicts of interest. *Id.*   Under these circumstances, courts have generally held that a debtor is hopelessly conflicted because the debtor is in essence asked to pursue claims against the very individuals who control the debtor-in-possession.   Where the very same individuals who control the debtor are the parties who would be implicated in the suit, they are naturally adverse to such actions, so no presumption insulates management's business judgments from searching scrutiny by the courts. *In re G-I Holdings, Inc.,* 313 B.R. at 628.   This is the case here.   Many of the Defendants are the current members of senior management and directors of the Debtors.

79.   Furthermore, in determining whether a debtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine whether the creditor's claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued. *Nat'l Forge*, 326 B.R. at 548.   Even a "facially justifiable" reason for failing to prosecute a claim "is insufficient to justify the failure to bring an action if under the circumstances the claim will benefit the estate even after attorney's fees and costs are deducted." *Canadian Pacific Forest Products Ltd. v. J.D. Irving, LTD. (In re The Gibson Group)*, 66 F.3d 1436, 1443 (6th Cir. 1995).   In conducting this cost-benefit analysis,

courts consider the probability of success and the potential costs of the litigation, including attorneys' fees, and whether it is preferable to appoint a trustee to bring suit instead of having the creditors' committee do so.  *Id.*

80.     As discussed above, a potential complaint, premised on the conduct set forth in the Complaint, would assert causes of action that are more than colorable and have merit. The potential cost of litigating the Causes of Action are far outweighed by (i) the potential recovery under the D&O Policies; (ii) the potential avoidance and recovery of significant prepetition fraudulent asset transfers, including (a) transfers made pursuant to the Prepayment Programs and (b) the transfer of the Business to Member Defendant Tennessee Farmers Cooperative; and (iii) the potential subordination, recharacterization and/or disallowance of the various claims asserted by the Defendants against the Debtors.  If there is no challenge to the alleged misconduct, the interests of the unsecured creditors will not be properly protected and the Debtors' estates will have lost the opportunity to recapture significant value.  The loss of this value would undoubtedly and significantly reduce any recovery the unsecured creditors might realize in the future.

C.     **The Committee Seeks Prior Court Approval to Prosecute the Claims**

81.     The final requirement for derivative standing is whether the movant has obtained Court approval prior to asserting claims on behalf of the estate.  This factor will be met if the Court grants the relief requested in this Motion.

**NOTICE AND RESERVATION OF RIGHTS**

82.     Notice of this Motion has been given to the following parties:  (i) Office of the United States Trustee; (ii) counsel to the Debtors; and (iii) all parties that have requested notice pursuant to Fed. R. Bankr. P. 2002 in these cases.  The Committee submits that, given the nature of the relief requested, no further notice is requested.

83.    The Committee reserves its rights to seek authority to commence, prosecute, and settle other claims and/or causes of action not discussed herein on behalf of the Debtors' estates against the Defendants or any other party.

84.    No prior request for the relief sought herein has been made by the Committee to this or any other Court.

<u>**CONCLUSION**</u>

**WHEREFORE**, the Committee respectfully requests that the Court enter an order granting (i) the Committee leave, standing and authority to commence, prosecute and, if appropriate, settle the Causes of Action in substantially the form alleged in the Complaint attached hereto as <u>Exhibit A</u> against the Defendants on behalf of the Debtors' estates, and to exercise, enforce and prosecute any rights of the Debtors' estates with respect thereto (with any and all recoveries to be for the benefit of the Debtors' estates); and (ii) such other and further relief as the court deems just and proper, including any additional relief necessary in order to implement the foregoing.

Dated: January 5, 2015

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
Sharon Levine, Esq.
Philip J. Gross, Esq.
Anthony De Leo, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973-597-2500
Facsimile:  973-597-2400
slevine@lowenstein.com
pgross@lowenstein.com
adeleo@lowenstein.com

-and-

Bruce S. Nathan, Esq.
1251 Avenue of the Americas

New York, New York 10020
Telephone:      212-262-6700
Facsimile:      212-262-7402
bnathan@lowenstein.com

-and -

**VENABLE LLP**

/s/ *Daniel A. O'Brien, Esq*
Jamie L. Edmonson, Esq. (No. 4247)
Daniel A. O'Brien, Esq. (No. 4897)
1201 North Market Street, Suite 1400
Wilmington, DE  19899
Telephone:  302-298-3535
Facsimile:  302-298-3550
jledmonson@venable.com
dao'brien@venable.com

*Counsel to the Official Committee of Unsecured
Creditors*