## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Universal Cooperatives, Inc., *et al.*,[1] | Case No. 14-11187 (MFW) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: July 15, 2015 at 4:00 p.m. (ET)**<br>**Hearing Date: July 22, 2015 at 10:30 a.m. (ET)** |

## JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER APPROVING SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND PBGC (I) FIXING THE AMOUNT OF PBGC'S CLAIMS, (II) SUPPLEMENTING DISTRIBUTION TO OTHER GENERAL UNSECURED CREDITORS, AND (III) RESOLVING RELATED MATTERS

Universal Cooperatives, Inc. ("Universal") and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") and the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Creditors' Committee"), by their respective counsel, hereby submit this joint motion (this "Motion") seeking entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), approving the terms of, and authorizing the Debtors to enter into, that certain settlement agreement (the "Plan Settlement Agreement"), attached as Exhibit 1 to the Order, by and among (i) the Debtors, (ii) the Creditors' Committee, and (iii) Pension Benefit Guaranty Corporation ("PBGC," and collectively with the Debtors and the Creditors' Committee, the "Parties"). In support of this Motion, the Debtors and the Creditors' Committee respectfully represent as follows:

---

[1]      The Debtors and the last four digits of their federal tax identification number are: Universal Cooperatives, Inc. (2405); Heritage Trading Company, LLC (0512); Bridon Cordage LLC (0985); Universal Crop Protection Alliance, LLC (1532); Agrilon International, LLC (7234); and Pavalon, Inc. (1433). The location of the corporate headquarters for each of the Debtors is P.O. Box 21327, Eagan, MN 55121.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.    Procedural History**

3.    On May 11, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in these chapter 11 cases (collectively, the "Chapter 11 Cases").

4.    The following foreign entities are affiliates or wholly-owned subsidiaries of Universal but are not debtors in these Chapter 11 Cases: (1) Filatures Et Corderies Ste. Germaine S.A. and (2) UCI do Brasil Industria E Comerica LTDA.  These affiliates and subsidiaries are collectively referred to in this Motion and in the Plan Settlement Agreement as the "Foreign Non-Debtor Affiliates."

5.    On May 27, 2014, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Creditors' Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 89].  These Chapter 11 Cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6.    Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Declaration of Dennis Gyolai in Support of First Day Motions* [Docket No. 3], which is incorporated herein by reference.

**B.    Sale of Substantially All Assets of Certain Debtors**

7.    On July 8, 2014, the Debtors filed the *Debtors' Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of Certain Assets of the Debtors, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Certain Assumption and Assignment Procedures, The Break-Up Fee, and the Expense Reimbursement, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) An Order (I) Approving A Certain Asset Purchase Agreement, (II) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 227] seeking, among other things, approval of bidding procedures related to the sale of substantially all of the assets of Debtors Bridon Cordage LLC ("Bridon") and Heritage Trading Company, LLC ("Heritage") and certain assets of Universal (the "Bridon & Heritage Sale").  On July 23, 2014, the Court entered an order approving the bidding procedures related to the Bridon & Heritage Sale [Docket No. 292].

8.    On August 20, 2014, the Debtors held an auction in connection with the Bridon & Heritage Sale.  At the conclusion of the auction, the Debtors announced that the winning bid was submitted by BCHU Acquisition LLC ("BCHU") [Docket No. 387].  On August 26, 2014, the Court approved the Bridon & Heritage Sale to BCHU [Docket No. 402].

On August 28, 2014, the Bridon & Heritage Sale closed.

9.      The Bridon & Heritage Sale did not include certain non-core assets of the Debtors, including, among other things, certain equipment, inventory, registrations, trademarks, and parcels of real estate (each, a "Residual Asset," and collectively, the "Residual Assets").  On September 30, 2014, the Debtors filed the *Debtors' Motion for Entry of An Order (I) Authorizing and Approving Procedures to Sell, Lease or Otherwise Dispose of Certain Residual Assets, (II) Authorizing the Retention of Brokers and Other Sales Agents, and (III) Waiving the Requirements of Local Bankruptcy Rule 2016-2* [Docket No. 501], seeking, among other things, authority to sell, lease or dispose of the Residual Assets with an aggregate transaction price up to or equal to $1,000,000 pursuant to streamlined sale procedures that would obviate the need for separate sale motions for each transaction (the "Residual Asset Procedures Motion"). An order approving the Residual Asset Procedures Motion was entered on October 22, 2014 [Docket No. 562] (the "Residual Asset Procedures Order").

10.      The Debtors have sold various Residual Assets and continue to market other Residual Assets pursuant to the Residual Asset Procedures Order, and in this regard have retained Lingate Financial Group to serve as broker in conjunction therewith [Docket No. 870].

**C.      Sale of Universal's Corporate Headquarters**

11.      On September 9, 2014, the Debtors filed the *Debtors' Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of a Certain Parcel of Real Property, and the Assumption and Assignment of Certain Executory Contracts and unexpired Leases, (II) Approving Certain Bidding Procedures, Certain Assumption and Assignment procedures, Bid Protections and the Form and Manner of Notice Thereof, and (III) Authorizing the Retention and Compensation of a Broker; and (B) an Order (I) Approving a Certain Asset*

*Purchase Agreement, (II) Authorizing the Sale of a Certain Parcel of Real Property Free and Clear of All Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 425] seeking, among other things, approval of bidding and sale procedures related to that certain parcel of real property located at 1300 Corporate Center Curve, Eagan, Minnesota 55121 (the "Eagan Property Sale").  On September 30, 2014, the Court entered an order approving the bidding procedures related to the Eagan Property Sale [Docket No. 499].

        12.    On November 13, 2014, the Debtors conducted an auction in connection with the Eagan Property Sale.  At the conclusion of the auction, the Debtors announced that the winning bid was submitted by Gloria Real Estate Holdings,.  *See* Docket No. 618.  On November 18, 2014, the Court entered an order approving the Eagan Property Sale.  *See* Docket No. 636. On December 19, 2014, the Eagan Property Sale closed.

**D.    The Joint Administratively Consolidated Plans of Liquidation and Disclosure Statement**

        13.    On June 17, 2015, the Debtors filed the *Joint Administratively Consolidated Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* [Docket No. 1039] (as modified, amended, or supplemented from time to time, the "Plan") and the *Disclosure Statement for Joint Administratively Consolidated Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* [Docket No. 1040] (as modified, amended, or supplemented from time to time, the "Disclosure Statement").[2]

---

[2]        All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, Plan Settlement Agreement, or Disclosure Statement, as applicable.

14.     The Plan is the result of extensive negotiations among the Debtors, the Creditors' Committee, and PBGC, the holder of the largest claims in these Chapter 11 Cases. The Plan is structured to incorporate and implement various settlements to facilitate a successful liquidation of the Debtors' Estates.  Subject to entry of the Order, the Plan will provide for the settlement of a number of potential issues involving the allocation of the proceeds from the sale of the Estates' Assets.

**E.     The Debtors' Pension Liabilities**

15.     Universal is the contributing sponsor, as defined in 29 U.S.C. § 1301(a)(13), of the Universal Cooperatives, Inc. Employee Pension Plan (the "Pension Plan"). The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of the Employment Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 ("ERISA"), which created the federal pension plan termination insurance program.  Under ERISA, the contributing sponsor of a pension plan covered by Title IV of ERISA and each member of the sponsor's "controlled group" are jointly and severally liable for certain obligations relating to such plan.  For purposes of ERISA, a "controlled group" is determined according to 29 U.S.C. § 1301(a)(14).  A pension plan may be terminated only if the statutory requirements of either 29 U.S.C. § 1341 or 29 U.S.C. § 1342 are met.

16.     PBGC asserts that the Debtors and their Foreign Non-Debtor Affiliates are members of a "controlled group" for purposes of ERISA and, as such, each is jointly and severally liable[3] for the unfunded benefit and other liabilities owed with respect to the Pension Plan.  PBGC further asserts that (a) on September 15, 2014, liens arose under 26 U.S.C. § 430(k) (the "PBGC Liens") for unpaid minimum funding contributions due with respect to the Pension

---

[3]     *See* 29 U.S.C. § 1362.

Plan in the amount of $1,084,101 (the "Lien Claims"), and (b) on January 9, 2015, PBGC perfected the PBGC Liens against the Foreign Non-Debtor Affiliates by filing lien notices with the Recorder of Deeds of the District of Columbia.

17.     On February 23, 2015, PBGC gave notice to the Debtors that it had determined that the Pension Plan should be terminated, effective as of August 31, 2014, under ERISA §§ 4042(a)(1) and (2) and 4042(c), and requested that PBGC be appointed as statutory trustee to administer the Pension Plan going forward.

18.     The Debtors' unfunded pension obligations were one of the catalysts for commencing these Chapter 11 Cases.  Critically, to the extent that the Debtors and their Foreign Non-Debtor Affiliates are found to be members of a "controlled group" under ERISA, they would be *jointly and severally* liable for these unfunded pension obligations.  Indeed, PBGC has filed proofs of claim (Claim Nos. 256-259 and 261-274) against each Debtor (collectively with the Lien Claims, the "PBGC Claims") as follows:

A.     a claim in the amount of **$16,948,175** for unfunded benefit liabilities, of which PBGC asserts that an unliquidated amount is entitled to administrative priority;

B.     a claim in the amount of **$1,500,000** for flat-rate and variable-rate premiums and termination premiums; and

C.     a claim in the amount of **$967,176** for unfunded contributions, of which PBGC asserts that the amount of **$142,267.00** is entitled to administrative priority.

The PBGC Claims are by far the largest claims in these Chapter 11 Cases.

### RELIEF REQUESTED

19.     By this Motion, the Debtors and the Creditors' Committee seek entry of the Order, substantially in the form attached hereto as Exhibit A, approving the terms of, and authorizing the Debtors to enter into, the Plan Settlement Agreement, and granting such other

and further relief as the Court deems just and proper.   In particular, the Debtors and the

Creditors' Committee seek this Court's approval of a global compromise between the Debtors,

the Creditors' Committee, and PBGC that paves the way for the expeditious resolution of these

Chapter 11 Cases and, ultimately, confirmation of the Plan.   The Plan Settlement constitutes a

settlement of a number of potential litigation issues, including the allocation of Assets among the

Estates and the nature and amount of the Pension Claims and PBGC Liens.

       20.      The Plan Settlement Agreement includes, among others things, the

following salient terms:

- On account of the PBGC Liens and the Pension Claims for unpaid minimum funding contributions to the Pension Plan, PBGC is allowed the PBGC Allowed Administrative Claim in the amount of $1,084,101, which claim shall be paid in full on or prior to the Effective Date.

- PBGC is allowed the Allowed PBGC GUC Claims in the amount of $14,277,666.60, which Claims are Allowed against each Debtor and paid pursuant to the sub-paragraph immediately below and as set forth in Classes 4A, 4B, 4C, 4D, 4E, and 4F of the Plan.

- PBGC's $14,277,666.60 Allowed PBGC GUC Claims shall recover *pari passu* (*i.e.*, equal to) the recovery percentage for holders of other Allowed non-PBGC General Unsecured Claims against Universal and Bridon, and holders of Allowed non-PBGC General Unsecured Claims against Heritage and UCPA shall receive a recovery of up to and including 3% prior to the PBGC's receiving any recovery from the estates of Heritage and UCPA (the recovery percentage for PBGC for its Allowed PBGC GUC Claim against Heritage and UCPA to be determined); and upon such receipt of 3% by holders of Allowed non-PBGC General Unsecured Claims against Heritage and UCPA, all holders of Allowed General Unsecured Claims against Heritage and UCPA (including PBGC on account of its Allowed PBGC GUC Claims) will share on a *pro rata* basis in any additional recoveries.

- PBGC shall vote each of its Allowed PBGC GUC Claims asserted against each Debtor in favor of confirmation of the Plan.

       21.      The Plan Settlement also provides for cross-debtor subsidies (collectively,

the "Settlement Subsidy") contributed from the Estates of Universal and Bridon, respectively, in

the aggregate amount of $515,000 ($430,000 contributed from the Estate of Bridon, and $85,000 from the Estate of Universal) to the Estates of Heritage and UCPA. The Settlement Subsidy is in full and complete resolution of issues related to the allocation of Assets among the Estates and the nature and amount of the Pension Claims and PBGC Liens, and will enhance the *pro rata* distributions to holders of Allowed General Unsecured Claims against Heritage and UCPA. The Debtors and the Creditors' Committee estimate that $245,000 of the Settlement Subsidy will be allocated to Heritage and $270,000 to UCPA, though the precise allocation will be determined based on the sale of any remaining assets owned by UCPA and certain administrative liabilities of UCPA.

22.     The Debtors and the Creditors' Committee, together with their respective advisors, have reviewed and evaluated numerous avenues to reduce and minimize the impact of the sizeable claims asserted by PBGC against each Debtor and the Debtors' Foreign Non-Debtor Affiliates, respectively. However, it was also immediately apparent that, given the size of PBGC's claims, it would be impossible to confirm a chapter 11 plan without PBGC's support. Moreover, the Parties recognized that it would be extremely difficult to satisfy the numerosity requirement set forth in section 1126(c) of the Bankruptcy Code in order to have accepting Classes of General Unsecured Claims, unless a meaningful compromise with PBGC—which afforded tangible benefits for other General Unsecured Creditors—was achieved. Accordingly, the Debtors and the Creditors' Committee engaged in extensive negotiations with PBGC to resolve its claims as well as secure its support for the Plan.

23.     After extensive, good-faith and arm's-length negotiations, the Parties ultimately reached a global compromise that (a) reduces the amount of distributions to be made on account of the PBGC Claims, subject to PBGC's ability to recover certain additional amounts,

if any, from the Debtors' Foreign Non-Debtor Affiliates, (b) secures support for the Plan from PBGC and the Creditors' Committee, and (c) provides for the Settlement Subsidy to increase recoveries to creditors of the Estates of Heritage and UCPA. Without the Settlement Subsidy, creditors of the Estates of Heritage and UCPA would stand to receive very minimal distributions, if any.

24.     Similarly, the Plan Settlement Agreement materially and meaningfully increases the amount of funds available for distribution to holders of non-PBGC General Unsecured Claims, as the distributable assets made available by the reduction in PBGC's distributions will be allocated to such non-PBGC creditors. The Debtors and the Creditors' Committee estimate that, as illustrated in the chart immediately below, the anticipated distributions provided based on the Plan Settlement Agreement will generally improve anticipated recoveries to creditors holding Allowed General Unsecured Claims against Bridon, Heritage, and UCPA:

*[Chart Follows on Subsequent Page]*

| | Estimated Range of Recovery Without Plan Settlement | Estimated Range of Recovery With Plan Settlement[4] |
|---|---|---|
| Allowed General Unsecured Claims Against Universal | 7.55% | 1.6% - 5.7% |
| Allowed General Unsecured Claims Against Bridon | 42.43% | 37.6% - 43.3% |
| Allowed General Unsecured Claims Against Heritage[5] | 0.11% | 1.7% - 3% |
| Allowed General Unsecured Claims Against UCPA[5] | -0.47% | 1.8% - 3% |
| Allowed General Unsecured Claims Against Agrilon | 0% | 0% |
| Allowed General Unsecured Claims Against Pavalon | 0% | 0% |

25.    Given the expense to the Debtors' Estates of protracted claims litigation and the uncertainty of success of such litigation, the Debtors and the Creditors' Committee anticipate that the recovery for such holders of Allowed General Unsecured Claims would be greater than if the Debtors and the Creditors' Committee litigated the nature and amount of PBGC's claims.

## BASIS FOR RELIEF

A.    **Entry Into The Plan Settlement Agreement Is In The Best Interests Of The Estates.**

26.    Bankruptcy Rule 9019(a) permits a bankruptcy court to approve a "compromise or settlement" after notice and a hearing.  In many instances, compromises or settlements under Bankruptcy Rule 9019 are considered to be a use of property of the estate outside the ordinary course of business under section 363(b) of the Bankruptcy Code.  *See, e.g.,*

---

[4]    These ranges are based on high and low estimates of recoveries from the sale of Excluded Assets and high and low estimates of the Claims pool.

[5]    The projected recoveries for holders of Allowed General Unsecured Claims against Heritage and UCPA do not include the estimated recovery amount for the Allowed PBGC GUC Claims against Heritage and UCPA.  In the event that the Allowed non-PBGC General Unsecured Claims against Heritage and UCPA receive distributions of 3%, and sufficient funds exist (based on the Distribution Calculation) to also provide distributions of 3% on account of the PBGC General Unsecured Claims against Heritage and UCPA, any remaining funds will be distributed on a *pro rata* basis to all General Unsecured Claims against Heritage and UCPA (*i.e.*, to holders of both the Allowed PBGC GUC Claims and other Allowed non-PBGC General Unsecured Claims against Heritage and UCPA).

*Northview Motors, Inc. v. Chrysler Motors Corp.,* 186 F.3d 346, 350-51 (3d Cir. 1999) (noting

that settlements and compromises are generally considered to be a sale of property of the estate).

Compromise and settlement agreements are standard components of the bankruptcy process and

are favored over litigation. *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996) ("To

minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are

favored in bankruptcy.'") (internal citations omitted); *see also Will v. Northwestern Univ. (In re

Nutraquest), Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

              27.     When courts consider whether to approve a settlement pursuant to

Bankruptcy Rule 9019, the central inquiry is whether the compromise is in the best interests of

the estate.  To this end, courts in the Third Circuit "assess and balance the value of the claim that

is being compromised against the value to the estate of the acceptance of the compromise

proposal." *In re Martin,* 91 F.3d at 393. The Third Circuit has adopted a balancing test under

which a bankruptcy court should consider the following four factors to determine whether to

approve a particular compromise or settlement:

     (a)     the probability of success in litigation;

     (b)     the likely difficulties in collection;

     (c)     the complexity of the litigation involved, and the expense, inconvenience and
              delay necessarily attending it; and

     (d)     the paramount interest of the creditors.

*In re Martin*, 91 F.3d at 393; *see also In re Nutraquest, Inc.,* 434 F.3d at 645.  Ultimately, a

proposed settlement need not be the best result that the debtor could have achieved, as long as it

falls within the "reasonable range of litigation possibilities." *In re Energy Coop., Inc.,* 886 F.2d

921, 929 (7th Cir. 1989); *see also In re Sea Containers Ltd.,* No. 06-11156, 2008 WL 4296562,

at *5 (Bankr. D. Del. Sept. 19, 2008); *In re The Columbia Gas Sys., Inc.,* No. 91- 803, 1995 WL 404892, at *1 (Bankr. D. Del. June 16, 1995).

28.     Accordingly, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after notice and a hearing, approve a compromise or settlement so long as the proposed compromise or settlement is fair, reasonable, and in the best interests of the estate.   *See Key3Media Grp., Inc. v. Pulver, Inc. (In re Key3Media Grp., Inc.),* 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("Under [Bankruptcy] Rule 9019(a), the bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."); *In re Northwestern Corp.*, No. 03-12872, 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("In exercising [its] discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

29.     The Debtors and the Creditors' Committee submit that entry into the Plan Settlement Agreement is appropriate and consistent with the applicable Bankruptcy Rule 9019 factors.  First, and perhaps most importantly, the Plan Settlement Agreement clears the way for expeditious confirmation of the Plan.  Indeed, absent the support of PBGC, the Debtors and the Creditors' Committee believe that confirmation of any plan would be extremely difficult, if not impossible.  Moreover, even if confirmation of a plan without the support of the PBGC were possible, it is likely that PBGC would oppose confirmation of such a plan, resulting in significant additional administrative expenses and substantial delay to the detriment of the Debtors' stakeholders.  The Plan Settlement Agreement ensures that the Creditors' Committee and PBGC (by far the largest creditor in these Chapter 11 Cases) support confirmation of the Plan.

30.     Second, the Plan Settlement Agreement provides a number of significant immediate and tangible benefits to holders of Allowed non-PBGC General Unsecured Creditors.

Notably, the distributable assets made available by the reduction in PBGC's distributions will be allocated to holders of Allowed non-PBGC General Unsecured Claims, which will significantly enhance the distributions to be made to such creditors. In addition, the Plan Settlement Agreement provides for the Settlement Subsidy, which will increase recoveries to creditors of the Estates of Heritage and UCPA. Absent the Settlement Subsidy, creditors of the Estates of Heritage and UCPA would stand to receive very minimal distributions, if any.

31.     Third, the Plan Settlement Agreement fully and finally resolves the PBGC Claims by fixing the amount of PBGC's Allowed General Unsecured Claims against each Debtor in the amount of $14,277,666.60. Considering that the original amount asserted by PBGC against each Debtor was $19,415,351, the Parties' agreement to fix the amount of PBGC's Allowed General Unsecured Claims secures significant economic benefits for, and allocates significant value to be distributed to, holders of non-PBGC General Unsecured Claims that would stand to recover far less in the absence of a settlement with PBGC. Absent the Plan Settlement Agreement, the PBGC Claims (as originally asserted) would eclipse the pool of General Unsecured Claims against each Debtor's Estate and greatly diminish recoveries in connection therewith.

32.     Fourth, the Plan Settlement Agreement fully and finally resolves the Lien Claims against the proceeds to be recovered from the liquidation of the Debtors' Foreign Non-Debtor Affiliates. The Debtors and Creditors' Committee have agreed to not challenge the Lien Claims in light of PBGC's acceptance of the distributional structure and terms set forth in the Plan Settlement Agreement.

33.     Fifth, the resolution of the PBGC Claims is intertwined with a global resolution of key issues that are of paramount importance to the Plan, including the Settlement

Subsidy to be contributed by the Estates of Universal and Bridon to the Estates of Heritage and

UCPA.  The Settlement Subsidy enhances the percentage distribution to creditors of Heritage

and UCPA and further benefits the holders of non-PBGC General Unsecured Claims by

(a) avoiding litigation regarding the allocation of Assets among the Estates and the nature and

amount of the Pension Claims and PBGC Liens and (b) reducing administrative burdens and

expenses.  Moreover, by consensually resolving the PBGC Claims, the Debtors' Estates will

avoid the costs and delay that would be attendant to litigation with PBGC over the allowance,

priority, and treatment of such claims, including challenges to the validity, priority, and extent of

the PBGC Liens.

34.    Under the circumstances described herein, and given the concessions

made by the Parties, the Debtors and the Creditors' Committee submit that the compromises and

settlements memorialized in the Plan Settlement Agreement are in the best interests of the

Debtors, their Estates, their creditors, and other parties-in-interest.  Accordingly, the Debtors and

the Creditors' Committee submit that entry into the Plan Settlement Agreement is appropriate

and should be approved pursuant to Bankruptcy Rule 9019.

**B.    Entry Into The Plan Settlement Agreement
Is An Exercise Of The Debtors' Sound Business Judgment**

35.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a

debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b).  In the Third Circuit, courts authorize a

debtor's use of property of the estate outside the ordinary course of business when such use has a

"sound business purpose" and is proposed in good faith.  *See In re Martin*, 91 F.3d at 395; *Dai-*

*Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding*

*Corp.)*, 242 B.R. 147, 153-54 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169,

175-76 (D. Del. 1991).  Courts authorize a debtor to use property of the estate outside the ordinary course of business if the debtor can show that: (a) a sound business reason or emergency justifies the proposed use; (b) adequate and reasonable notice was provided to all interested parties; (c) the proposed use was requested in good faith; and (d) fair and reasonable consideration is provided in exchange for the use of estate assets. *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *3 (D. Del. May 20, 2002); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176.

36.     Once a debtor articulates a valid business justification under section 363 of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Bridgeport Holdings, Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 567 (Bankr. D. Del. 2008).  Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986).  The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See In re Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville*, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(l) of the Bankruptcy Code.

37.     Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Courts in this and other districts have relied on both sections 105(a) and 363(b) of the Bankruptcy Code when approving a plan support agreement, finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code.  *See, e.g.*, *In re Visteon Corp.*, Case No. 09-11786 (Bankr. D. Del. June 17, 2010) (authorizing debtors to implement terms of a postpetition plan support agreement); *In re Intermet Corp.*, Case No. 08-11859 (Bankr. D. Del. June 5, 2009) (same); *In re Global Power Equip. Group, Inc.*, Case No. 06-11045 (Bankr. D. Del. Oct. 31, 2007) (same); *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del. Feb. 6, 2007) (same); *see also In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Aug. 9, 2010) (same); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Dec. 23, 2009) (same); *In re Movie Gallery, Inc.*, Case No. 07-33849 (Bankr. E.D. Va. Feb. 6, 2008) (same).

38.     To the extent that the Plan Settlement Agreement contemplates use of property of the estate outside the ordinary course of business, entering into the Plan Settlement Agreement is a sound and reasonable exercise of the Debtors' business judgment that secures the support of the Creditors' Committee and PBGC for the Plan and the orderly wind-down of the Debtors' Estates.  For these reasons, entry into the Plan Settlement Agreement is a sound and reasonable exercise of the Debtors' business judgment that will secure support for the Plan, achieve an economic resolution of claims against the Debtors' Estates, and pave the way for the efficient resolution of these Chapter 11 Cases.  Accordingly, the Debtors and the Creditors' Committee submit that their proposed use of estate property outside the ordinary course of business is appropriate and should be approved.

01:17334173.1

17

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

39.    To implement the foregoing successfully, the Debtors and the Creditors' Committee seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).   Such a waiver is appropriate under the circumstances, as the Parties' compromise embodied in the Plan Settlement Agreement is a necessary precursor to confirmation of the Plan in the near term.

## NOTICE

40.    Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) PBGC; and (d) those parties who have formally filed requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors and the Creditors' Committee submit that no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors and the Creditors' Committee respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit A, approving the Plan Settlement Agreement attached to the Order as Exhibit 1, and granting the Debtors and the Creditors' Committee such other and further relief as is just and proper.

| | |
|---|---|
| Dated: July 1, 2015<br>      Wilmington, Delaware<br><br>*/s/ Andrew L. Magaziner*<br>**YOUNG CONAWAY STARGATT &**<br>**TAYLOR, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19899-0391<br>Robert S. Brady (No. 2847)<br>Andrew L. Magaziner (No. 5426)<br>Travis G. Buchanan (No. 5595)<br>Telephone: (302) 571-6600<br>Facsimile:  (302) 571-1253<br><br>     -and-<br><br>**FOLEY & LARDNER LLP**<br>321 North Clark Street, Suite 2800<br>Chicago, Illinois 60654<br>Mark L. Prager, Esq.<br>Michael J. Small, Esq.<br>Emil P. Khatchatourian, Esq.<br>Telephone: (312) 832-4500<br>Facsimile:  (312) 832-4700<br><br>*Counsel to the Debtors and Debtors in*<br>*Possession* | Dated: July 1, 2015<br>      Wilmington, Delaware<br><br>*/s/ Daniel A. O'Brien*<br>**VENABLE LLP**<br>1201 North Market Street, Suite 1400<br>Wilmington, DE  19899<br>Jamie L. Edmonson, Esq. (No. 4247)<br>Daniel A. O'Brien, Esq. (No. 4897)<br>Telephone:  (302) 298-3535<br>Facsimile:  (302) 298-3550<br><br>     -and-<br><br>**LOWENSTEIN SANDLER LLP**<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Sharon Levine, Esq.<br>Philip J. Gross, Esq.<br>Anthony De Leo, Esq.<br>Telephone: (973) 597-2500<br>Facsimile:  (973) 597-2400<br><br>     -and-<br><br>Bruce S. Nathan, Esq.<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone:     (212) 262-6700<br>Facsimile:     (212) 262-7402<br><br>*Counsel to the Official Committee of Unsecured*<br>*Creditors* |