## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
*In re:*                                                    :    **Chapter 11**
:
**UNIVERSAL COOPERATIVES, INC.,** *et al.,*                 :    **Case No. 14-11187 (MFW)**
:
**Debtors.**[1]                                             :    **Jointly Administered**
:
-------------------------------------------------------------x

## APPROVED AMENDED DISCLOSURE STATEMENT FOR JOINT ADMINISTRATIVELY CONSOLIDATED PLANS OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| | |
|---|---|
| **FOLEY & LARDNER LLP**<br>321 North Clark Street, Suite 2800<br>Chicago, Illinois 60654<br><br>*and*<br><br>**YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br><br>*Counsel to the Debtors and Debtors in Possession* | **LOWENSTEIN SANDLER LLP**<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br><br>*and*<br><br>**VENABLE LLP**<br>1201 North Market Street<br>Suite 1400<br>Wilmington, Delaware 19801<br><br>*Counsel to the Official Committee of Unsecured Creditors* |

Dated: July 17, 2015

---

[1] The Debtors and the last four digits of their federal tax identification number are: Universal Cooperatives, Inc. (2405); Heritage Trading Company, LLC (0512); Bridon Cordage LLC (0985); Universal Crop Protection Alliance, LLC (1532); Agrilon International, LLC (7234); and Pavalon, Inc. (1433). The location of the corporate headquarters for each of the Debtors is P.O. Box 21327, Eagan, MN 55121.

# DISCLAIMER

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREIN BEFORE VOTING FOR OR AGAINST THE PLAN. *SEE SECTION VIII ("CERTAIN FACTORS TO BE CONSIDERED")*.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING STOCK OF UNIVERSAL COOPERATIVES, INC. AND ITS SUBSIDIARIES SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASES OF UNIVERSAL COOPERATIVES, INC. ("UNIVERSAL") AND ITS DEBTOR AFFILIATES (COLLECTIVELY, THE "DEBTORS"), AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

01:17392327.3

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLANS OF LIQUIDATION AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.  YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLANS OF LIQUIDATION ON HOLDERS OF CLAIMS.

01:17392327.3

# EXECUTIVE SUMMARY[2]

On May 11, 2014 (the "Petition Date"), Universal Cooperatives, Inc. ("Universal") and certain of its direct and indirect affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases are being jointly administered under the caption *In re Universal Cooperatives, Inc., et al.*, Case No. 14-11187 (collectively, the "Chapter 11 Cases").

Due to constrained liquidity resulting from declining sales and substantial debt obligations, prior to filing for bankruptcy, the Debtors, with the assistance of their advisors, analyzed various alternatives for a broader financial restructuring that would provide them with the necessary flexibility to either continue as a going concern or sell their businesses to maximize value for all stakeholders. Additional information regarding the Debtors' businesses and the events leading up to the bankruptcy filing can be found in the *Declaration of Dennis Gyolai in Support of First Day Motions* [Docket No. 3], which is incorporated herein by reference.

As a result of the Debtors' prepetition and postpetition marketing efforts, and after extensive arm's-length negotiations with multiple interested parties, the Debtors obtained a proposal from BCHU Acquisition LLC ("BCHU") which served as a "stalking-horse" bid for a substantial portion of the Debtors' assets. BCHU's stalking-horse bid included a purchase price of approximately $16,000,000 for substantially all assets of Debtors Bridon Cordage LLC ("Bridon") and Heritage Trading Company, LLC ("Heritage"), and certain other assets of Universal.

Pursuant to bid procedures approved by the Bankruptcy Court (the "Bidding Procedures Order"), the Debtors and their advisors, with the assistance of the Creditors' Committee and its advisors, continued to engage in extensive, good faith, and arm's-length negotiations with BCHU and other parties interested in acquiring the available assets. As a result of these efforts, the Debtors received two qualifying bids for substantially all of Bridon's and Heritage's assets. An auction was held on August 20, 2014. At the end of a vigorous process of competitive bidding in accordance with the Bidding Procedures Order, the Debtors determined to pursue a sale of Bridon's and Heritage's assets, as well as certain of Universal's assets, to BCHU. The final offer included a purchase price of approximately $22,460,000 for the Bridon and Heritage assets, as well as certain assets of Universal. On August 26, 2014, the Bankruptcy Court approved the sale (the "Bridon/Heritage Sale") to BCHU. The Bridon/Heritage Sale closed on August 28, 2014.

---

[2] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the *Joint Administratively Consolidated Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* (the "Plan"). A term used but not defined in this Disclosure Statement or the Plan has the meaning given to it in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, as the case may be.

The Debtors also sold Universal's corporate headquarters located at 1300 Corporate Center Curve, Eagan, Minnesota 55121 (the "Eagan Property"). Pursuant to bid procedures governing the sale of the Eagan Property (the "Eagan Bidding Procedures Order"), the Debtors and their advisors, with the assistance of the Creditors' Committee and its advisors, engaged in extensive efforts to market the Eagan Property for sale. As a result of these efforts, the Debtors received two bids for the Eagan Property. An auction was held on November 13, 2014. After multiple rounds of competitive bidding in accordance with the Eagan Bidding Procedures Order, the Debtors determined that the bid submitted by Gloria Real Estate Holdings ("Gloria") was the best offer. The initial "stalking-horse" bid was $3,800,000. The final offer included a purchase price of approximately $4,762,000. On November 18, 2014, the Bankruptcy Court approved the sale (the "Eagan Property Sale") to Gloria. The Eagan Property Sale closed on December 19, 2014.

The Debtors, together with their retained pension advisors, and the Creditors' Committee also engaged in good-faith discussions with the creditor holding the vast majority of unsecured claims, Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned United States Government corporation and agency of the United States, regarding PBGC's significant claims asserted against each Debtor with respect to termination of the defined benefit pension plan sponsored by Universal. Such discussions yielded a global settlement (the "Plan Settlement"), whereby the Debtors, the Creditors' Committee, and PBGC agreed as follows, subject to entry of an order approving the Plan Settlement:

- On account of claims asserted by the PBGC related to liens on foreign assets and unpaid post-petition funding contributions, PBGC is allowed an Administrative Expense Claim of $1,084,101 (the "PBGC Allowed Administrative Claim"), which claim shall be paid in full on or prior to the Effective Date as follows: 50% from the Estate of Bridon and 50% from the Estate of Universal.

- PBGC is allowed a General Unsecured Claim against each Debtor of $16,948,175, which amount is reduced dollar for dollar by the $1,084,101 PBGC Allowed Administrative Claim; and further reduced by an additional 10%, such that PBGC's Allowed General Unsecured Claim against each Debtor is $14,277,666.60 (the "Allowed PBGC GUC Claims"), which amount is Allowed against each Debtor and paid pursuant to the immediate following sub-paragraph.

- PBGC's $14,277,666.60 Allowed PBGC GUC Claims shall recover *pari passu* (*i.e.*, equal to) the recovery percentage for holders of other Allowed non-PBGC General Unsecured Claims against Universal and Bridon, and holders of Allowed non-PBGC General Unsecured Claims against Heritage and UCPA shall receive a recovery of up to and including 3% prior to the PBGC receiving any recovery from the Estates of Heritage and UCPA (the recovery percentage for PBGC for its Allowed PBGC GUC Claim against Heritage and UCPA to be determined); and upon such receipt of 3% by holders of Allowed non-PBGC General Unsecured Claims against Heritage and UCPA, all holders of Allowed General Unsecured Claims against Heritage and UCPA (including PBGC on account of its Allowed PBGC GUC Claims) will share on a *pro rata* basis in any additional recoveries.

- PBGC shall vote each of its Allowed PBGC GUC Claims against each Debtor in favor of Plan confirmation.

- The Plan Settlement also provides for cross-debtor subsidies (the "Settlement Subsidy") contributed from the Estates of Universal and Bridon in the amount of $515,000.00 ($430,000 contributed from the Estate of Bridon, and $85,000 from the Estate of Universal) to the Estates of Heritage and UCPA. The Settlement Subsidy is in full and complete resolution of issues related to substantive consolidation and will enhance the *pro rata* distributions to holders of Allowed General Unsecured Claims against Heritage and UCPA. The Debtors and Creditors' Committee estimate that $245,000 of the Settlement Subsidy will be allocated to Heritage and $270,000 to UCPA, but the precise allocation will be determined based on the sale of any remaining assets owned by UCPA and certain administrative liabilities of UCPA.

As noted above, the proposed Settlement Subsidy was a result of extensive negotiations between the Creditors' Committee, Debtors and PBGC. These discussions included the appropriateness of substantive consolidation in these Chapter 11 Cases, as in any substantive consolidation scenario, PBGC would have received a substantially-reduced recovery. PBGC took the position that any attempts to substantively consolidate the Debtors' estates could not be justified and would likely fail under controlling precedent, *In re Owens Corning*, 419 F. 3d 195 (3d Cir. 2005). In particular, PBGC maintains that in seeking substantive consolidation, the Debtors would be using it offensively against PBGC, with the primary purpose of disadvantaging the agency, which the Third Circuit expressly prohibits. *See id.* at 211. PBGC further maintains that proof has not been established that the Debtors, prepetition, disregarded separateness so significantly that their creditors treated them as one legal entity, or that post-petition, their assets and liabilities were so intermixed that separating them would be prohibitive and a harm to all creditors – factors that are required in the Third Circuit for substantive consolidation. *See id.*

While the parties were aware of PBGC's position, given the *de minimis* assets held by Debtors UCPA and Heritage, and the large PBGC claims held against those estates, the parties also discussed the risk that creditors of those estates had a very strong incentive to litigate and argue in favor of substantive consolidation.

In the view of the Debtors and Creditors' Committee, respectively, several facts relevant to these Chapter 11 Cases would have supported an argument for substantive consolidation, including, but not limited to: (i) a shared cash management system among the Debtors' entities which was not reconciled by entity; (ii) books and records not fully compartmentalized by Debtor entity, and intertwining of certain records; (iii) intercompany payables/receivables and/or formal lending agreements between entities were not maintained; and (iv) common management with respect to many of the Debtor entities. However, other facts cut against substantive consolidation of the Debtors' estates, including, but not limited to: (i) entity specific purchase orders, invoices, and check stock; (ii) many records were entity specific (*e.g.* sales, accounts payable, accounts receivable, fixed assets); (iii) potential to unwind transactions at the entity level; (iv) Bridon assets were separable from the other entities and were in fact sold; and (v) the Debtors were able to determine assets and liabilities for their respective schedules.

Given these positions, and in the interest of (i) avoiding litigation costs regarding substantive consolidation (which costs in opposing substantive consolidation arguments would have largely been borne by the estates of Bridon and Universal); (ii) settling all of PBGC's claims, including PBGC's administrative and lien Claims (which benefits creditors at each of the Debtors' estates); and (iii) providing for more than a *de minimis* recovery to creditors with Claims against Debtors UCPA and Heritage, the Creditors' Committee, Debtors and PBGC entered into the Plan Settlement (including the Settlement Subsidy), the terms of which (i) are incorporated into the Plan and estimated Distribution Chart (annexed as Exhibit 1 to the Plan), which provides for the allocation of value and certain claims among the Debtors' Estates; and (ii) will be implemented upon the Effective Date of the Plan.

The Plan provides for the distribution of cash proceeds from the liquidation of the Debtors' assets, including proceeds from the Bridon/Heritage Sale and sales of residual assets that were not included in the Bridon/Heritage Sale or the Eagan Property Sale. The Plan also provides for further sales of residual assets and litigation that may result in additional cash proceeds for the benefit of the Debtors' Estates and their creditors. The distribution of such cash proceeds to creditors, from sales of assets and litigation, shall be in full and complete satisfaction of all claims against the Debtors' Estates. To that end, the Plan provides for the treatment of Claims against the Debtors and Equity Interests in the Debtors, as well as the allocation of cash proceeds from the sale of the Debtors' assets among the Estates.

Pursuant to the Plan, on the Effective Date, all of the Estates' Assets will vest in and be transferred to the Liquidating Trust. The Liquidating Trust shall be administered by the Liquidating Trustee who shall, among other things, liquidate the Estates' remaining assets, resolve any disputed Claims, wind down the affairs of the Debtors, prosecute Causes of Action, and make Distributions in accordance with the Plan.

Distributions made under the Plan are dictated by the entity against which a Claim is held, as the Debtors are not seeking to substantively consolidate their Estates (though the Plan Settlement includes the Settlement Subsidy in full and complete satisfaction and resolution of any potential arguments regarding substantive consolidation, all of which potential arguments PBGC disputes).

In accordance with the terms of the Plan and the Distribution Chart and as further detailed in **Section VII.A.**  (**"Summary of Chapter 11 Plan—Overall Structure of the Plan"**):

- Each Debtor is entitled to (a) the amount of the Net Bridon/Heritage Sale Proceeds and Net Eagan Property Sale Proceeds allocated to it pursuant to the Distribution Chart, and (b) the gross amount available from the liquidation of additional assets (*i.e.*, the assets that were not sold as part of the Bridon/Heritage Sale or the Eagan Property Sale) and/or allocated to it pursuant to the Distribution Calculation, including any cash or assets from Litigation Proceeds (if any) and/or Foreign Non-Debtor Affiliates;

- Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Tax Claims, Allowed Other Secured

Claims, Liquidating Trust Expenses, and the costs of administering the Debtors' Estates, which will be paid or satisfied in full from the respective Debtor's assets.

- Allowed General Unsecured Claims against a Debtor will receive their *pro rata* share of the remaining proceeds of such Debtor's assets, after taking into account (i) the amount of the Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Tax Claims and Other Secured Claims allowed against or allocated to such Debtor pursuant to the Distribution Calculation, (ii) the amount of all costs of administering the Estates of such Debtor, as allocated pursuant to the Distribution Calculation, and (iii) the Liquidating Trust Expenses allocated to such Debtor.

The Debtors and Creditors' Committee estimate that, as illustrated in the chart immediately below, the anticipated distributions provided based on the Plan Settlement will generally improve anticipated recoveries to creditors holding Allowed General Unsecured Claims against Heritage, Bridon, and UCPA, and although the projected recoveries for creditors holding Allowed General Unsecured Claims against Bridon under the Plan Settlement are slightly reduced, this is because Bridon creditors would stand to lose the most in a substantive consolidation scenario, and thus will provide the Settlement Subsidy to avoid any litigation regarding substantive consolidation:

[CHART FOLLOWS ON NEXT PAGE]

01:17392327.3

| | Estimated Range of Cash Available for Distribution to Holders of Allowed General Unsecured Claims[3] | Estimated Range of Recovery |
|---|---|---|
| Allowed General Unsecured Claims Against Universal | $500,000 - $1,794,446 | 1.6% - 5.7% |
| Allowed General Unsecured Claims Against Bridon | $8,000,000 - $9,219,679 | 37.6% - 43.3% |
| Allowed General Unsecured Claims Against Heritage | $150,000 - $274,310 | 1.7% - 3%[4] |
| Allowed General Unsecured Claims Against UCPA | $150,000 - $247,907 | 1.8% - 3%[4] |
| Allowed General Unsecured Claims Against Agrilon | $0 | 0% |
| Allowed General Unsecured Claims Against Pavalon | $0 | 0% |

The above chart demonstrates the impact of the Plan Settlement on the estimated recoveries for general unsecured creditors. The first column provides the estimated cash available for holders of Allowed General Unsecured Claims. The second column provides the estimated range of recovery based on the Plan Settlement. **Creditors are cautioned that the estimates set forth in the chart above include a number of assumptions with respect to anticipated recoveries and the total Allowed amount of Claims. Accordingly, the actual amount of Net Distributable Assets may vary materially, including downward, from the amounts projected, and thus anticipated recoveries could materially vary from the projections set forth herein.**

THIS EXECUTIVE SUMMARY IS INTENDED SOLELY AS A SUMMARY OF CERTAIN PROVISIONS OF THIS DISCLOSURE STATEMENT. YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN AND EACH OF THEIR RESPECTIVE EXHIBITS AND SCHEDULES IN THEIR ENTIRETY PRIOR TO MAKING ANY DETERMINATION TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS AND CREDITORS' COMMITTEE EACH BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE

---

[3] These ranges are based on high and low estimates of recoveries from the sale of Excluded Assets and high and low estimates of the Claims pool.

[4] These projected recoveries do not include the estimated recovery amount for the Allowed PBGC GUC Claims against Heritage and UCPA. In the event that the Allowed non-PBGC General Unsecured Claims against Heritage and UCPA receive distributions of 3% and sufficient funds exist (based on the Distribution Calculation) to also provide distributions of 3% to the PBGC General Unsecured Claims against Heritage and UCPA, any remaining funds will be distributed on a *pro rata* basis to all General Unsecured Claims against Heritage and UCPA (*i.e.*, to both the Allowed PBGC GUC Claims and other Allowed non-PBGC General Unsecured Claims against Heritage and UCPA).

DEBTORS AND THEIR CREDITORS.   THE DEBTORS AND THE CREDITORS' COMMITTEE JOINTLY URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

THE CREDITORS' COMMITTEE HAS ALSO PREPARED A LETTER IN SUPPORT OF CONFIRMATION OF THE PLAN, WHICH LETTER IS INCLUDED IN THE SOLICITATION PACKAGES.   CREDITORS SHOULD REVIEW THE CREDITORS' COMMITTEE'S LETTER IN CONNECTION WITH EVALUATING THE PLAN AND DISTRIBUTIONS TO BE MADE UNDER THE PLAN.

## A.    SOLICITATION AND ACCEPTANCE OF PLAN

### 1.    General

This Disclosure Statement is being furnished to holders of Claims in the Voting Classes (as defined herein) for the purpose of soliciting their votes on the Plan.   This Disclosure Statement is also being furnished to certain other creditors and other entities for notice or informational purposes.   The primary purpose of this Disclosure Statement is to provide adequate information to holders of Claims in the Voting Classes to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

A copy of the Disclosure Statement Order entered by the Bankruptcy Court and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "Notice of Confirmation Hearing") are also being transmitted with this Disclosure Statement.   The Disclosure Statement Order and the Notice of Confirmation Hearing set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims and the assumptions for tabulating Ballots.   In addition, detailed voting instructions accompany each Ballot.   Each holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan.   These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

### 2.    Who Is Entitled to Vote

Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.   To be confirmed, the Plan must be accepted by the holders of Claims in certain Classes and the Plan must be confirmed by the Bankruptcy Court. ***See Section IX ("Voting Requirements") and Section X ("Confirmation of the Plan")***.   Class 5, which consists of holders of Equity Interests in the Debtors, will receive no Distribution or benefits under the Plan, and, therefore, is conclusively deemed to have rejected the Plan, and holders therein are not entitled to vote.   The Debtors are seeking acceptances of the Plan from holders of Claims in each of Classes 4A, 4B, 4C, 4D, 4E, 4F (collectively, the "Voting Classes").   The Claims in all other Classes are Unimpaired, and the holders of Claims in Unimpaired Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.   For a description of the Classes, Claims and Equity Interests,

and their treatment under the Plan, *see Section VII.C.   ("Summary of Chapter 11 Plan— Classification of Claims and Equity Interests") and Section VII.D.   ("Summary of Chapter 11 Plan—Treatment of Claims and Equity Interests Under the Plan")*.

**3.      Ballots**

If you are entitled to vote to accept or reject the Plan, *see Section IX.B.   ("Voting Requirements—Holders of Claims Entitled to Vote")*, a Ballot or Ballots, specific to the Claim held, is enclosed for voting on the Plan.  If you hold Claims in more than one Class and are entitled to vote such Claims in more than one Class, you must use separate Ballots for each Class of Claims.  If you hold more than one Claim classified in a single class of Claims, you must vote all your Claims within that Class to either accept or reject the Plan, and may not split your votes within a particular Class; thus, a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted.  Importantly, when you vote, you must use only the Ballot or Ballots sent to you (or copies if necessary) with this Disclosure Statement.  **IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RECEIVED SO THAT IT IS RECEIVED NO LATER THAN AUGUST 27, 2015 AT 4:00 P.M. (PREVAILING EASTERN TIME) BY THE VOTING AGENT AS SET FORTH ON THE BALLOT.** *See Section IX.A. ("Voting Requirements—Voting Deadline") and Section IX.D.1    ("Voting Requirements— Voting Procedures—Ballots")*.

Prior to the Voting Deadline, if you cast more than one Ballot voting the same Claim, the last received, validly executed Ballot received before the Voting Deadline shall be deemed to reflect your intent and thus to supersede any prior Ballots.  After the Voting Deadline, if you wish to change your vote, you can do so, if you meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advanced notice so that it can be heard prior to the Confirmation Hearing scheduled for September 3, 2015.  Any such application must be filed and served in accordance with the procedures set forth in detail in the Disclosure Statement Order.

**4.      Inquiries**

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the Claims Agent by regular mail at Universal Cooperatives, Inc. Ballot Processing, c/o Prime Clerk, LLC, 830 3rd Avenue, 9th Floor, New York, NY 10022, by telephone at (844) 205-4337, or email at ucoopballots@primeclerk.com.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Claims Agent by regular mail at Universal Cooperatives, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 9th Floor, New York, NY 10022, by telephone at (844) 205-4337, or email at ucoopballots@primeclerk.com. Copies of the Plan, this Disclosure Statement, or any exhibits to such documents may also be obtained free of charge on the Claim Agent's website for these chapter 11 cases (http://cases.primeclerk.com/ucoop).

01:17392327.3

## B.      PLAN OF LIQUIDATION

### 1.      Overview of Plan

The following is a brief summary of certain material provisions of the Plan.  For a more detailed description of the terms of the Plan, see **Section VII ("Summary of Chapter 11 Plan— Overall Structure of the Plan")**.  These descriptions are qualified in their entirety by the provisions of the Plan.

The Plan incorporates a consensual resolution and global settlement among the Debtors, the Creditors' Committee, and PBGC regarding PBGC's claims (including administrative and secured lien claims), issues related to substantive consolidation, allocation of the Debtors' Assets among the Debtors' Estates, and recoveries to non-PBGC holders of Allowed General Unsecured Claims. The Plan has the support of the Debtors, the Creditors' Committee, and PBGC.

In accordance with the Plan, holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Tax Claims will be paid in full in Cash, and holders of Allowed Other Secured Claims will, at the option of the Debtors or the Liquidating Trustee, either be paid in full in Cash or will receive the collateral securing such Allowed Other Secured Claim.

Further, in accordance with the Plan, Allowed General Unsecured Claims in Classes 4A, 4B, 4C, 4D, 4E, and 4F will receive the Distribution Pro Rata Share of their respective Net Distributable Assets. **See Section VII.C.    ("Summary of Chapter 11 Plan—Classification of Claims and Equity Interests") and Section VII.D.     ("Summary of Chapter 11 Plan— Treatment of Claims and Equity Interests Under the Plan")**.

### 2.      Summary of Classification and Treatment under Plan

The following table summarizes the classification and treatment of prepetition Claims and Equity Interests under the Plan.  This classification and treatment for all Classes are described in more detail in **Section VII.C.    ("Summary of Chapter 11 Plan—Classification of Claims and Equity Interests")**.  Estimated Claim amounts set forth in the following table are based upon the Debtors' books and records.  **There can be no assurance that the actual Claim amounts will not be significantly different from the estimates.**  This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.  Accordingly, this summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached as **Exhibit A** hereto.

01:17392327.3

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired – not entitled to vote.<br><br>Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Non-Tax Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim. | $908,230 | 100% |
| 2 | Secured Tax Claims | Unimpaired – not entitled to vote.<br><br>Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Secured Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; provided further, that the Liquidating Trustee may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion. | $164,533 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired – not entitled to vote.<br><br>Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidating Trustee, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date. | $4,137,280[5] | 100% |
| 4A | General Unsecured Claims against Universal | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4A agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4A shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of Universal's Net Distributable Assets. | $31,569,367 | 1.6% - 5.7% |

[5] This amount includes secured claims already paid in connection with the closing of the Eagan Property Sale and Bridon/Heritage Sale.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| 4B | General Unsecured Claims against Bridon | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4B agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4B shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of Bridon's Net Distributable Assets. | $21,302,867 | 37.6% - 43.3% |
| 4C | General Unsecured Claims against Heritage | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4C agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4C shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of Heritage's Net Distributable Assets; provided, however, that (i) PBGC shall receive a reduced recovery on account of its Allowed PBGC GUC Claim against Heritage sufficient to permit non-PBGC holders of Allowed General Unsecured Claims against Heritage to receive up to and including a 3% recovery, and (ii) upon receipt of a 3% recovery by non-PBGC holders of Allowed General Unsecured Claims against Heritage, any additional Net Distributable Assets of Heritage shall be distributed on a *pro rata* basis with holders of Allowed General Unsecured Claims against Heritage (including PBGC). | $23,338,377 | 1.7% - 3%[6] |

---

[6] These projected recoveries do not include the estimated recovery amount for the Allowed PBGC GUC Claims against Heritage and UCPA. In the event that the Allowed non-PBGC General Unsecured Claims against Heritage and UCPA receive distributions of 3% and sufficient funds exist (based on the Distribution Calculation) to also provide distributions of 3% on account of the PBGC General Unsecured Claims against Heritage and UCPA, any remaining funds will be distributed on a *pro rata* basis to all General Unsecured Claims against Heritage and UCPA (*i.e.*, to both the Allowed PBGC GUC Claims and other Allowed General Unsecured Claims against Heritage and UCPA).

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| 4D | General Unsecured Claims against UCPA | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4C agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4C shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of UCPA's Net Distributable Assets; provided, however, that (i) PBGC shall receive a reduced recovery on account of its Allowed PBGC GUC Claim against UCPA sufficient to permit non-PBGC holders of Allowed General Unsecured Claims against UCPA to receive up to and including a 3% recovery, and (ii) upon receipt of a 3% recovery by non-PBGC holders of Allowed General Unsecured Claims against UCPA, any additional Net Distributable Assets of UCPA shall be distributed on a *pro rata* basis with holders of Allowed General Unsecured Claims against UCPA (including PBGC). | $22,420,267 | 1.8% -3%[6] |
| 4E | General Unsecured Claims against Agrilon | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4E agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4E shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of Agrilon's Net Distributable Assets. | $14,277,667 | 0% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| 4F | General Unsecured Claims against Pavalon | Impaired – entitled to vote.<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4F agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4F shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim its Distribution Pro Rata Share of Pavalon's Net Distributable Assets. | $14,277,667 | 0% |
| 5 | Equity Interests | Impaired – not entitled to vote.<br><br>On the Effective Date, the Equity Interests in the Debtors shall be cancelled and the holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Plan. | N/A | 0% |

## C.    DESCRIPTION OF OTHER NECESSARY PROCEDURES

The hearing to determine whether to confirm the Plan has been scheduled to commence on September 3, 2015, at 10:30 a.m. (prevailing Eastern Time) before the Honorable Mary F. Walrath, United States Bankruptcy Judge, of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Fifth Floor, Courtroom #4, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. In addition, except as expressly provided in the Plan, the Plan may be modified pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest. At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code have been satisfied and, if appropriate, will enter an order confirming the Plan. *See Section IX ("Voting Requirements") and Section X ("Confirmation of the Plan")*. Both confirmation and consummation of the Plan are subject to certain conditions, which may be waived by the Debtors. *See Section VII.J. ("Summary of Chapter 11 Plan—Conditions Precedent to the Effective Date")*.

# TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Definitions | 1 |
| | B. Notice to Holders of Claims in Voting Classes | 2 |
| | C. Solicitation Package | 3 |
| | D. Voting Procedures | 4 |
| | 1. General Information | 4 |
| | 2. Voting on the Plan | 4 |
| | E. Confirmation Hearing | 5 |
| II. | OVERVIEW OF THE DEBTORS AND THEIR BUSINESSES | 7 |
| | A. General | 7 |
| | B. Corporate Structure | 10 |
| | C. The Debtors' Prepetition Indebtedness | 10 |
| III. | CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES | 12 |
| IV. | OVERVIEW OF CHAPTER 11 CASES | 14 |
| | A. Commencement | 14 |
| | B. Parties in Interest | 14 |
| | 1. Court | 14 |
| | 2. Advisors to the Debtors | 14 |
| | 3. Creditors' Committee and Its Advisors | 15 |
| | C. First Day Orders | 15 |
| | 1. Joint Administration Motion | 15 |
| | 2. Tax Motion | 15 |
| | 3. Insurance Motion | 16 |
| | 4. Cash Management Motion | 16 |
| | 5. Employee Wage and Benefit Motion | 17 |
| | 6. Customer Programs Motion | 18 |
| | 7. DIP Financing Motion | 18 |
| | 8. Utilities Motion | 18 |
| | D. Key Employee Incentive Plan | 19 |

01:17392327.3

# TABLE OF CONTENTS
(continued)

PAGE

E. Filing Deadline for Prepetition Claims ....................................................................19

F. Statements of Financial Affairs and Schedules of Assets and Liabilities.............19

V. SALE OF SUBSTANTIALLY ALL ASSETS TO BCHU ........................................ 20

A. Debtors' Prepetition Marketing Efforts ..........................................................20

B. BCHU Acquisition LLC Stalking Horse Bid......................................................20

C. Marketing/Sale Timeline Under the Bidding Procedures Order..........................21

D. Approval of Bridon/Heritage Sale ........................................................21

VI. OTHER DEVELOPMENTS IN THE CHAPTER 11 CASES........................................ 21

A. Sale of Eagan Property..............................................................21

B. Sales of Residual Assets ........................................................22

C. Motion to Establish Administrative Expense Bar Date ........................................23

D. Committee Standing Motion ........................................................23

E. Plan Settlement ........................................................24

VII. SUMMARY OF CHAPTER 11 PLAN ........................................................ 24

A. Overall Structure of the Plan........................................................24

B. Treatment of Administrative Expense Claims, Priority Tax Claims, and Other Unclassified Claims Under the Plan ........................................................26

1. Administrative Expense Claims........................................................26

2. Professional Fee Claims........................................................28

3. Priority Tax Claims........................................................28

C. Classification of Claims and Equity Interests........................................................29

D. Treatment of Claims and Equity Interests Under the Plan ........................................30

1. Class 1: Priority Non-Tax Claims........................................................30

2. Class 2: Secured Tax Claims ........................................................30

3. Class 3: Other Secured Claims ........................................................30

4. Class 4A: General Unsecured Claims Against Universal........................31

5. Class 4B: General Unsecured Claims Against Bridon ........................31

6. Class 4C: General Unsecured Claims Against Heritage........................31

7. Class 4D: General Unsecured Claims Against UCPA........................32

8. Class 4E: General Unsecured Claims Against Agrilon ........................32

01:17392327.3

xviii

# TABLE OF CONTENTS

(continued)

| | | | |
|---|---|---|---|
| | 9. | Class 4F: General Unsecured Claims Against Pavalon | 33 |
| | 10. | Class 5: Equity Interests in Debtors | 33 |
| | 11. | Reservation of Rights Regarding Claims and Equity Interests | 33 |
| E. | | Acceptance or Rejection of the Plan | 33 |
| | 1. | Voting of Claims | 33 |
| | 2. | Elimination of Vacant Classes | 34 |
| | 3. | Nonconsensual Confirmation | 34 |
| | 4. | Revocation of the Plan | 34 |
| F. | | Means of Implementation of the Plan | 35 |
| | 1. | Plan Settlement | 35 |
| | 2. | Liquidating Trust | 35 |
| | 3. | Effectuating Documents; Further Transactions | 40 |
| | 4. | Cancellation of Instruments and Stock | 41 |
| | 5. | Disposition of Books and Records | 41 |
| | 6. | Corporate Existence and Dissolution of Debtors | 41 |
| | 7. | Closing the Chapter 11 Cases | 41 |
| G. | | Distributions Under the Plan | 42 |
| | 1. | Distributions on Allowed General Unsecured Claims | 42 |
| | 2. | Timing of Distributions | 42 |
| | 3. | Delivery of Distribution | 42 |
| | 4. | Undeliverable and Unclaimed Distributions | 43 |
| | 5. | Transfer of Claims | 44 |
| | 6. | Manner of Payment | 44 |
| | 7. | Time Bar to Cash Payments by Check | 44 |
| | 8. | No Fractional Cents | 44 |
| | 9. | Setoffs and Recoupment | 44 |
| | 10. | Allocation of Plan Distributions Between Principal and Interest | 45 |
| | 11. | Interest on Claims | 45 |
| | 12. | No Distribution in Excess of Allowed Amount of Claim | 45 |
| | 13. | Payment of Taxes on Distributions Received Pursuant to the Plan | 45 |
| | 14. | Reserves | 45 |

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| | 15. | Withholdings ...................................................................................46 |
| | 16. | *De Minimis* Distributions ...............................................................46 |
| H. | | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims..........46 |
| | 1. | Claims Administration Responsibilities .........................................46 |
| | 2. | Claims Objections ...........................................................................46 |
| | 3. | Estimation of Claims.......................................................................47 |
| | 4. | Adjustment to Claims Without Objection........................................47 |
| | 5. | No Distributions Pending Allowance ..............................................47 |
| | 6. | Distributions After Allowance ........................................................48 |
| | 7. | Disallowance of Certain Claims .....................................................48 |
| | 8. | Amendments to Claims....................................................................48 |
| | 9. | Claims Paid and Payable by Third Parties ......................................48 |
| I. | | Executory Contracts and Unexpired Leases ...........................................49 |
| | 1. | Executory Contracts and Unexpired Leases Deemed Rejected.............49 |
| | 2. | Bar Date For Rejection Damages ....................................................49 |
| J. | | Conditions Precedent to the Effective Date ...........................................49 |
| | 1. | Conditions Precedent to the Effective Date....................................49 |
| | 2. | Waiver of Conditions Precedent to the Effective Date...................50 |
| | 3. | Satisfaction of Conditions...............................................................50 |
| K. | | Effect of Confirmation ...........................................................................50 |
| | 1. | Compromise and Settlement of Claims, Equity Interests, and Controversies ...................................................................................50 |
| | 2. | Binding Effect..................................................................................51 |
| | 3. | Reservation of Causes of Action/Reservation of Rights.................51 |
| L. | | Exculpation, Injunction, and Related Provisions ...................................51 |
| | 1. | Exculpation ......................................................................................51 |
| | 2. | Claims under Title I of ERISA .......................................................52 |
| | 3. | Injunction.........................................................................................52 |
| | 4. | Term of Injunctions.........................................................................53 |
| M. | | Retention of Jurisdiction .........................................................................53 |
| N. | | Miscellaneous Provisions........................................................................54 |

01:17392327.3

# TABLE OF CONTENTS
(continued)

**PAGE**

VIII.   CERTAIN FACTORS TO BE CONSIDERED ................................................................ 55

    A.    General Considerations ........................................................................55

    B.    Certain Bankruptcy Considerations ...................................................55

        1.    Parties-in-Interest May Object to the Debtors' Classification of Claims .............................................................................55

        2.    Failure to Satisfy Vote Requirement ........................................55

        3.    Risk of Non-Confirmation of Plan; Feasibility ........................55

        4.    Non-Consensual Confirmation .................................................56

        5.    The Debtors or the Liquidating Trustee May Object to the Amount of a Claim ...........................................................56

        6.    Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan ...................................................56

        7.    Risk of Chapter 7 Liquidation ..................................................56

    C.    Claims Could Be More Than Projected, Assets Could Be Less Than Projected ...........................................................................57

    D.    Inherent Uncertainty of the Financial Projections .................................57

    E.    Disclosure Statement Disclaimer ........................................................57

        1.    Information Contained Herein is for Soliciting Votes ...............57

        2.    Disclosure Statement May Contain Forward Looking Statements ...........57

        3.    No Legal or Tax Advice is Provided to You by this Disclosure Statement ...............................................................58

        4.    No Admissions Made ................................................................58

        5.    Failure to Identify Litigation Claims or Projected Objections ..................58

        6.    No Waiver of Right to Object or Right to Recover Transfers and Assets ...............................................................58

        7.    Information Was Provided by the Debtors and Was Relied upon by the Debtors' Advisors ...............................................58

        8.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ...............................................................59

        9.    No Representations Outside the Disclosure Statement are Authorized ...............................................................59

    F.    Certain Tax Considerations ................................................................59

IX.    VOTING REQUIREMENTS ......................................................................... 59

01:17392327.3

# TABLE OF CONTENTS
(continued)

A.     Voting Deadline ................................................................................60

B.     Holders of Claims Entitled to Vote.................................................60

C.     Vote Required for Acceptance of Class ..........................................62

D.     Voting Procedures ...........................................................................62

       1.     Ballots .................................................................................62

       2.     Withdrawal or Change of Votes on Plan ..................................63

       3.     Voting Multiple Claims ........................................................63

X.       CONFIRMATION OF THE PLAN.............................................................64

A.     Confirmation Hearing .....................................................................64

B.     Deadline to Object to Confirmation.................................................64

C.     Requirements for Confirmation of the Plan ....................................64

       1.     Requirements of Section 1129(a) of Bankruptcy Code ............65

       2.     Acceptance by Impaired Classes .........................................67

       3.     Feasibility............................................................................68

       4.     Requirements of Section 1129(b) of Bankruptcy Code ...........68

XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN 69

A.     Liquidation Under Chapter 7 ..........................................................69

B.     Alternative Plan ..............................................................................69

C.     Dismissal.........................................................................................69

XII.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS........................................70

A.     Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests .............................................................................72

B.     Certain U.S. Federal Income Tax Consequences to the Debtors............................74

C.     Consequences of the Liquidating Trust ...........................................74

D.     Consequences of the Disputed Claims Reserve................................76

XIII.    CONCLUSION .....................................................................................77

01:17392327.3

## TABLE OF EXHIBITS

Exhibit A          PLAN OF LIQUIDATION
Exhibit B          DISCLOSURE STATEMENT ORDER (WITHOUT EXHIBITS)

01:17392327.3

**APPROVED AMENDED DISCLOSURE STATEMENT FOR JOINT
ADMINISTRATIVELY CONSOLIDATED PLANS OF LIQUIDATION OF THE
DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

## I.    INTRODUCTION

The Debtors and Creditors' Committee submit this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the *Joint Administratively Consolidated Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* (the "Plan"), which is attached as ***Exhibit A*** to this Disclosure Statement.  The Debtors have not filed any other chapter 11 plan in connection with the Chapter 11 Cases.

This Disclosure Statement sets forth specific information regarding the Debtors' pre-bankruptcy history, significant events that have occurred during the Chapter 11 Cases, and the liquidation and distribution of the Debtors' assets by the Liquidating Trustee under provision of the Plan.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and certain risk factors.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Impaired Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS, *PLEASE SEE SECTION VII ("SUMMARY OF CHAPTER 11 PLAN") AND SECTION VIII ("CERTAIN FACTORS TO BE CONSIDERED")*.    SECTIONS II THROUGH VI FOLLOWING THIS INTRODUCTION DISCUSS THE BACKGROUND OF THE DEBTORS' BUSINESSES AND THE CHAPTER 11 CASES.

## A.    Definitions

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  A term used but not defined in this Disclosure Statement or the Plan has the meaning given to it in the Bankruptcy Code and/or the Bankruptcy Rules.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender will include the masculine, feminine, and the neutral gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (e) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of

construction set forth in section 102 of the Bankruptcy Code will apply; and (g) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**B.**     **Notice to Holders of Claims in Voting Classes**

This Disclosure Statement is being furnished to holders of Claims in the Voting Classes for the purpose of soliciting their votes on the Plan.  This Disclosure Statement is also being furnished to other creditors and other entities for notice or informational purposes.  The primary purpose of this Disclosure Statement is to provide adequate information to holders of Claims in the Voting Classes to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

On July 20, 2015, the Bankruptcy Court entered the Disclosure Statement Order approving the Disclosure Statement as containing information of a kind and in sufficient detail to enable holders of Claims in Voting Classes to make an informed judgment about the Plan.  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN, WHEREVER LOCATED.  THUS, IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement contains important information about the Plan, the Debtors' businesses and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtors other than the information contained herein. Other than as explicitly set forth in this Disclosure Statement, you should not rely on any information relating to the Debtors, their Estates, the value of their properties, the nature of their Liabilities, or their creditors' Claims.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

01:17392327.3

Except with respect to the projected information (the "Projections") set forth in the Distribution Chart attached as Exhibit 1 to the Plan and the descriptions of the Liquidating Trust set forth herein, and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof. Such events may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE KEYSTONE CONSULTING GROUP, LLC. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, CREDITORS' COMMITTEE OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**IRS CIRCULAR 230 NOTICE**: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

C.    **Solicitation Package**

For the holders of Claims in Voting Classes as of the Voting Record Date (as defined in the Disclosure Statement Order), accompanying this Disclosure Statement are copies of the

following documents (collectively with this Disclosure Statement, the "Solicitation Package"): (a) the Plan, which is annexed to this Disclosure Statement as ***Exhibit A***; (b) a copy of the Disclosure Statement Order (excluding exhibits attached thereto), which is annexed to this Disclosure Statement as ***Exhibit B***; (c) a Notice of Confirmation Hearing; (d) an appropriate Ballot to vote to accept or reject the Plan; and (e) a letter from the Creditors' Committee encouraging creditors to vote to accept the Plan.

If you did not receive a Ballot in your package and believe that you should have, please contact the Claims Agent by regular mail at Universal Cooperatives, Inc. Ballot Procession c/o Prime Clerk, LLC, 830 3rd Avenue, 9th Floor, New York, New York 10022, by telephone at (844) 205-4337, or by email at ucoopballots@primeclerk.com.

**D.    Voting Procedures**

1.    General Information

Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited.  Thus, if a creditor holds Claims included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the creditor is conclusively presumed to have accepted the Plan with respect to such Claims, and its vote of such Claims will not be solicited.  Pursuant to the Bankruptcy Code, a class of claims or interests is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are altered, other than by curing defaults and reinstating maturity.  The Plan provides that Classes 1, 2, and 3 are Unimpaired.  Any holder of a Claim in any of these Classes may, however, object to the Plan to contest the Plan's characterization of the creditor's non-impaired status.

The Bankruptcy Code provides that the holders of allowed claims are entitled to vote on a plan.  A Claim to which an objection has been filed is not entitled to vote unless and until the Bankruptcy Court rules on the objection and allows the Claim.  Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline (as defined herein), rules on the objection and allows the Claim, or (b) on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan.  If the Debtors have served an objection or request for estimation as to a claim at least fourteen (14) calendar days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except as ordered by the Court before the Voting Deadline.

2.    Voting on the Plan

If a holder of a Claim is classified in a Voting Class under the Plan, such holder's acceptance or rejection of the Plan is important and must be in writing and filed by the Voting Deadline (as defined herein).  If Claims of a single holder are held in more than one Class and the holder of such Claims is entitled to vote in more than one Class, separate Ballots must be used for each Class of Claims.  The holder of more than one Claim classified in a single class of Claims must vote all its Claims within that Class to either accept or reject the Plan, and may not

split its votes within a particular Class; thus, a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted. When voting, a creditor must use only the Ballot or Ballots sent to it (or copies if necessary) with this Disclosure Statement.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please check the appropriate boxes on the enclosed Ballot to indicate your vote to accept or reject the Plan. **PLEASE COMPLETE AND SIGN YOUR BALLOT(S) AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY THE VOTING AGENT BY NO LATER THAN AUGUST 27, 2015 AT 4:00 P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE").**

IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND RECEIVED BEFORE THE VOTING DEADLINE BY THE VOTING AGENT.

If you have any questions about the procedure for voting your Claim or the packet of materials that you received, please contact the Voting Agent at the address indicated in subsection C above.

Prior to the Voting Deadline, if you cast more than one Ballot voting the same Claim, the last validly executed Ballot received before the Voting Deadline shall be deemed to reflect your intent and thus to supersede any prior Ballots. After the Voting Deadline, if you wish to change your vote, you can do so, if you meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advance notice so that it can be heard prior to the Confirmation Hearing scheduled for September 3, 2015. Any such application must be filed and served in accordance with the procedures set forth in detail in the Disclosure Statement Order.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Claims Agent by regular mail at Universal Cooperatives, Inc. Ballot Processing c/o Prime Clerk, LLC, 830 3rd Avenue, 9th Floor, New York, New York 10022, by telephone at (844) 205-4337, or by email at ucoopballots@primeclerk.com. Copies of the Plan, this Disclosure Statement, or any exhibits to such documents may also be obtained free of charge on the Claims Agent's website for these chapter 11 cases (http://cases.primeclerk.com/ucoop).

E.    <u>Confirmation Hearing</u>

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on September 3, 2015 at 10:30 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Mary F. Walrath, United States Bankruptcy Judge, of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Fifth Floor, Courtroom #4, Wilmington, Delaware 19801. **THE BANKRUPTCY COURT HAS DIRECTED THAT**

01:17392327.3

**OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND FILED WITH THE CLERK OF THE BANKRUPTCY COURT AND SERVED SO THAT THEY ARE RECEIVED ON OR BEFORE AUGUST 27, 2015 AT 4:00 P.M. (PREVAILING EASTERN TIME) BY:**

Counsel for the Debtors:

FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Attn:   Mark L. Prager, Esq.
        Michael J. Small, Esq.
        Emil P. Khatchatourian, Esq.

*and*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn:   Robert S. Brady, Esq.
        Andrew L. Magaziner, Esq.
        Travis Buchanan, Esq.

Counsel for the Creditors' Committee:

LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
Attn:   Sharon Levine, Esq.
        Philip Gross, Esq.

*and*

VENABLE LLP
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
Attn:   Jamie L. Edmonson, Esq.

United States Trustee:

Office of the United States Trustee for the District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, Delaware 19801
Attn:   Benjamin Hackman, Esq.

01:17392327.3

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE PLAN HAS THE SUPPORT OF THE DEBTORS, THE CREDITORS' COMMITTEE, AND PBGC.  IN THE VIEW OF THE DEBTORS AND THE CREDITORS' COMMITTEE, THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION.  ACCORDINGLY, THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND, THUS, RECOMMEND THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO CAST BALLOTS VOTE TO ACCEPT THE PLAN.

## II.  OVERVIEW OF THE DEBTORS AND THEIR BUSINESSES[7]

## A.  General

Before the Petition Date, the Debtors were an inter-regional farm supply cooperative. Universal consolidated the purchasing power of its cooperative members (collectively, the "Members") to procure, and/or manufacture, and distribute high quality products at competitive prices.  Historically, Universal entered and exited various lines of business as directed by the Members, including paint, grocery, hardware, lubricants, tires, livestock equipment, dairy equipment, animal nutrition, and bird seed.  Immediately preceding the Petition Date, Universal's focus shifted to direct shipment of products to Members' dealer locations rather than Members' warehouse locations.

Prior to the Petition Date and the implementation of certain restructuring measures the Debtors' businesses were comprised of seven units:  (i) Bridon; (ii) Heritage; (iii) UCPA; (iv) UCI do Brasil; (v) Sainte Germaine; (vi) Animal Health; and (vii) Pet's Corner (each, a "Business Unit," and collectively, the "Business Units").  Each Business Unit operated, prior to the Bridon/Heritage Sale, in its own unique market space, although certain Business Units ceased operating prior to the Petition Date.

### i..    Bridon Cordage LLC

Prior to the consummation of the Bridon/Heritage Sale, Bridon was a wholly-owned subsidiary of Universal that manufactured polypropylene baler twine, industrial twines and industrial fibers, and distributed other baling products such as netting and bale wrap.

---

[7]  A detailed summary of the Debtors' businesses, corporate history, organizational structure and prepetition capital structure may be found in the *Declaration of Dennis Gyolai in Support of First Day Motions*, filed on the Petition Date [Docket No. 3] (the "First Day Declaration"), which is incorporated herein by reference.

01:17392327.3

### ii.     Heritage Trading Company, LLC

Located in Kansas City, Missouri, prior to the Bridon/Heritage Sale, Heritage was a diversified distribution company focused on feed/farm stores in the United States.  Heritage both supplied products to its customers and provided marketing/merchandising support, sales and logistics management in conjunction therewith.  Heritage was a distributor with access to over 400 manufacturers with over 500,000 individual items.  As a distributor of this kind, Heritage possessed little inventory at any given time.  Heritage's staff, prior to the Bridon/Heritage Sale, consisted of twelve employees, including three field sales representatives based in Texas, Missouri and Washington.

Major product categories supplied by Heritage included livestock equipment, hardware, fence and wire, pet and equine, apparel, lawn and garden, gifts, and grain handling equipment. In the years immediately preceding the Bridon/Heritage Sale, Heritage had been increasingly focused on fencing and livestock equipment, the two largest product types purchased by Heritage and Universal Members.

### iii.    Universal Crop Protection Alliance, LLC

Prior to a wind down commenced before the Petition Date, Universal Crop Protection Alliance LLC ("UCPA") owned and operated a production facility in Napoleon, Ohio, and procured, formulated, packaged, and distributed a proprietary line of Crop Protection Products ("CPPs") for sale to its members, associate members, and non-member customers.  CPPs included herbicides, insecticides, adjuvants, and spray additives used in commercial agriculture.

### iv.    UCI do Brasil Industria E Comerica LTDA ("UCI do Brasil")

UCI do Brasil, Universal's majority-owned subsidiary located in Brazil, is not a debtor in these Chapter 11 Cases.  UCI do Brasil was established by Universal in 1993 and operated as an ISO 9001:2008-certified plant located in Salvador, Bahia, Brazil.

During the pendency of these Chapter 11 Cases, UCI do Brasil, through its advisors, has worked diligently to wind up its affairs, including its efforts to obtain government approval and payment of valuable tax credits and to satisfy remaining liabilities in Brazil.

### v.     Filatures Et Corderies Ste. Germaine S.A. ("Sainte Germaine")

Prior to the Petition Date, Sainte Germaine was Universal's majority-owned, France-based subsidiary and distributor of sisal and polypropylene baler twines, bale wrap/stretch film, and netting.

Universal had been selling sisal baler twine in France, Germany and Scandinavia for over twenty years prior to the Petition Date.  Universal entered into an operating agreement with Sainte Germaine in 1997.  In 2003, Universal purchased Sainte Germaine outright in an effort to attain significant market presence in all of the key forage harvest supply products in Europe. Sainte Germaine faced strong competitive pressures from suppliers from lower-cost European countries, as well as rising production costs.

Following the Petition Date, a liquidator was appointed in France to oversee the liquidation of Sainte Germaine's assets and the winding up of its affairs. During the pendency of these Chapter 11 Cases, the Debtors have worked diligently to bring about the liquidation and winding up of Sainte Germaine's affairs, including efforts to sell assets and resolve liabilities owed to vendors and other creditors. The liquidator overseeing this process in France will return any and all surplus amounts to the Debtors upon satisfying all outstanding liabilities from the proceeds of the sale of Sainte Germaine's assets.

    *vi.*    *Animal Health*

Prior to April 2014, Universal's Animal Health Business Unit ("<u>Animal Health</u>") procured, warehoused, distributed, and assisted Members in the marketing of packaged health care products for livestock and companion animals. Animal Health stocked approximately 2,500 items in a centralized distribution center located in Bowling Green, Kentucky, for shipment to Members' dealers or directly to farms.

Animal Health marketed primarily over-the-counter animal health products through retail stores, and cattle products, especially insecticides and wormers, were the largest sales category. Negative industry trends affecting the Animal Health business line in recent years included declining prices on generic endectocides, the nationwide sell-off of a significant number of cattle, and animal health manufacturers reducing distributor margins.

For the eight months of fiscal 2014 ended on March 31, 2014, Animal Health generated $16.7 million in revenue with an operating loss of $0.2 million. On March 3, 2014, as a result of Universal's financial difficulties and liquidity challenges, Universal determined to wind-down Animal Health's operations. On March 28, 2014, substantially all of Animal Health's remaining inventory was sold to Tennessee Farmers Cooperative in consideration for cash and the relief of certain prepayment obligations. On March 23, 2014, employees of the Animal Health division were released and notices were sent to customers that the Debtors had terminated the business unit.

Pavalon, one of the Debtors in these Chapter 11 Cases, maintained and operated an internet commerce catalog for Animal Health, which filled and shipped all internet-based orders placed with Pavalon. Ultimately, Pavalon's internet commerce operations on behalf of Animal Health did not generate significant revenues for the Debtors. Accordingly, the Debtors discontinued Pavalon's internet commerce catalog service.

On March 23, 2014, employees of the Animal Health division were released and notices were sent to customers that the Debtors had terminated the business unit.

    *vii.*    *Pet's Corner*

Prior to May 2014, Universal's Pet's Corner division marketed a full line of rawhide dog chews. Through its distribution facility in Bloomington, Minnesota, Pet's Corner sold a full line of rawhide chips, sticks, strips and bones, as well as hooves, chews and novelty items to various retail outlets throughout the United States.

On March 3, 2014, as a result of the Debtors' financial difficulties and liquidity challenges, the Debtors determined to wind-down the Pet's Corner operations. At the end of April 2014, Southern States Cooperative, Inc. purchased approximately $20,000 of current Pet's Corner inventory, with the remaining inventory written off. Simultaneous with the sale and disposal of Pet's Corner's inventory, the lease on the Bloomington, Minnesota warehouse expired and was not renewed, and the three full-time Pet's Corner employees were terminated.

## B.    **Corporate Structure**

Prior to the Bridon/Heritage Sale, Universal had 14 voting Members (collectively, the "Voting Members") and over 50 associate Members (collectively, the "Associate Members"). Voting Members were required to be a cooperative organization to qualify as a candidate for full voting membership, and the membership had to be approved by Universal's Board of Directors. To participate in the governance of Universal, Voting Members were required to purchase $10,000 of Common Stock. Moreover, if a Member purchased a minimum of $1 million of products from Universal in any given fiscal year, such Member was eligible to sit on Universal's Board of Directors in the year following such purchases. As of the Petition Date, Universal's Board of Directors was comprised of nine individuals.

Prior to the Petition Date, the largest Voting Members, and their respective corresponding ownership stakes, included the following: (i) CHS, Inc. (29%), Land O' Lakes , Inc. (18%), Southern States Cooperative, Inc. ("SSC") (13%), Tennessee Farmers Cooperative ("TFC") (12%), Growmark, Inc. (9%), MFA, Inc. (4%), Intermountain Farmers Association (2%), Alabama Farmers Cooperative, Inc. (1%), Union InVivo Cooperative (1%), and United Farmers of Alberta (< 1%). The remaining 11% was held by additional third parties.

Associate Members were not required to be organized as a cooperative, though memberships had to be approved by Universal's Board of Directors. Associate Members did not participate in the governance of Universal but were eligible for patronage refunds, if and when paid. Stock was mainly held in the form of Certificates of Participation, which were issued as the non-cash portion of each Member's yearly patronage. However, in 2011, Universal's Board of Directors agreed to defer all cash patronage payments for the foreseeable future in order to support the business and increase Universal's retained capital.

## C.    **The Debtors' Prepetition Indebtedness**

### Revolving and Term Loan Credit

On December 10, 2012, Universal, Bridon, Heritage and UCPA (collectively, the "Borrowers") entered into a revolving and term loan Credit Agreement (as amended, modified or supplemented from time to time prior to the Petition Date, the "Existing Credit Agreement") with Bank of America, N.A. ("Bank of America"), as administrative agent and lender. Upon its consummation, the Existing Credit Agreement had a revolving loan commitment of $60 million (the "Revolving Loan"), which was an asset-based loan subject to a borrowing base derived from accounts receivable and inventory and a term loan (the "Term Loan") in the amount of $2 million.

01:17392327.3

On August 5, 2013, the Borrowers and Bank of America entered into a first amendment to the Existing Credit Agreement which, among other things, adjusted the availability under the Revolving Loan from August 5, 2013 through September 14, 2013, and further adjusted availability from September 15, 2013 through September 30, 2013.

On October 18, 2013, the Borrowers and Bank of America entered into a second amendment to the Existing Credit Agreement, which amended certain covenants, including a monthly cumulative minimum cash flow covenant and adjusted availability and borrowing under the Revolving Loan.

On February 28, 2014, the Borrowers and Bank of America entered into a third amendment to the Existing Credit Agreement, which amended the period during which covenants thereunder would be suspended.

On March 18, 2014, upon the occurrence of an event of default ("Event of Default") under the Existing Credit Agreement, the Borrowers and Bank of America entered into a forbearance agreement and fourth amendment (the "Forbearance Agreement"), whereby Bank of America reduced the Revolving Loan commitment and amended covenants in connection with cumulative cash receipts, disbursements and cash flow.

On April 11, 2014, given ongoing Events of Default and Universal's request for an extended Forbearance Agreement, the Borrowers and Bank of America entered into a first amendment to the Forbearance Agreement whereby Bank of America extended the forbearance period (the "Forbearance Period") through and including June 16, 2014, and extended the weekly cumulative cash receipts, disbursements and cash flow covenants consistent therewith.

On May 8, 2014, the Borrowers and Bank of America entered into a fifth amendment to the Existing Credit Agreement whereby Bank of America adjusted availability and agreed to provide the Debtors with debtor-in-possession financing.  Such debtor in possession financing was memorialized in a term sheet executed by the Borrowers and Bank of America on May 8, 2014, and the subject of the Debtors' first day motion seeking approval thereof.

As of the Petition Date, the amount outstanding under the Revolving Loan was $7,442,694.39 and the amount outstanding under the Term Loan was $1,548,230.

Pension Obligations

Universal is the contributing sponsor of the Universal Cooperatives, Inc. Employee Pension Plan (the "Pension Plan").  The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of the Employment Retirement Income Security Act of 1974 ("ERISA"), *as amended*, 29 U.S.C. §§ 1301-1461 (2012, Supp. I 2013), which created the federal pension plan termination insurance program.  PBGC is a wholly owned United States Government corporation and agency of the United States created under Title IV of ERISA to administer the federal pension insurance program and enforce compliance with the provisions of Title IV.  PBGC guarantees the payment of certain benefits upon termination of a pension plan covered by Title IV of ERISA.

01:17392327.3

11

Under ERISA, the contributing sponsor of a pension plan covered by Title IV of ERISA and each member of the sponsor's "controlled group" are jointly and severally liable for certain obligations relating to such plan. For purposes of ERISA, a "controlled group" is determined according to 29 U.S.C. § 1301(a)(14). A pension plan may be terminated only if the statutory requirements of either 29 U.S.C. § 1341 or 29 U.S.C. § 1342 are met.

PBGC filed contingent proofs of claim against each of the Debtors for: (1) the Pension Plan's unfunded benefit liabilities under 29 U.S.C. § 1362(b) in the amount of $16,948,175; (2) statutorily required minimum funding contributions under 26 U.S.C. § 412(c)(11) and 29 U.S.C. § 1082(c)(11), due to the Pension Plan in the amount of $1,084,101;[8] and (3) statutory insurance premiums due to PBGC under 29 U.S.C. § 1306(a)(3) and (a)(7) in the amount of $1,500,000 (collectively, the "Pension Claims"). The Pension Claims were filed as contingent upon termination of the Pension Plan.

Pursuant to 26 U.S.C. § 430(k), PBGC subsequently asserted statutory liens against the assets of the Debtors' non-debtor controlled group members, UCI do Brasil Industria E Comerica LTDA and Filatures Et Corderies Ste. Germaine S.A., in the amount of $1,084,101 (the "PBGC Liens"). Proceeds from the overseas liquidations of the Debtors' foreign non-debtor affiliates are in the process of being repatriated to the Debtors's Estates.

By agreement between Universal and PBGC, the Pension Plan was terminated pursuant to 29 U.S.C. § 1342(c), effective August 31, 2014, and PBGC was appointed as the Plan's statutory trustee, effective April 8, 2015.

In resolution of the Pension Claims and the PBGC Liens, the Debtors, the Committee, and PBGC reached the agreement embodied by the Plan Settlement, as discussed below.

## III.   CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

The events leading to the commencement of these Chapter 11 Cases are discussed in detail below.

Animal Health. At its core, Animal Health suffered from deteriorating margins. Animal Health had historically operated as a traditional cooperative that had very high levels of service, but very low margins. In part, this structure was sustained by volume discounts and purchasing rebates from major suppliers. As suppliers stopped providing rebates or reduced the prevalence of these programs, however, selling prices did not rise significantly enough to pass cost increases through to customers. Animal Health operated at a loss prior to the Petition Date. As the Debtors' liquidity became further constrained, the Debtors determined that there were insufficient funds to continue making inventory purchases for the Animal Health Business Unit. Given Animal Health's fiscal position, the Debtors concluded that a sale of the business unit was in the Debtors' best interest. A sale was ultimately completed on March 28, 2014, between

---

[8]  PBGC originally filed claims against each of the Debtors for missed contributions totaling $967,176. PBGC, if the Debtors so require, may amend such claims to reflect the liquidated amount of $1,084,101.

Universal and TFC for a sale price of $934,400 following the failure of negotiations with a large non-member animal health distributor.

UCPA.  Prior to the Petition Date, UCPA suffered from increased market competition and the consolidation of crop protection products, mixing seed and feed products by such competitors.  Customers transitioned business away from UCPA in favor of more diverse enterprises.  Consequently, UCPA's Napoleon, Ohio facility ran significantly below capacity, thereby driving overhead costs as a percentage of operations up, while margins moved down.

Sainte Germaine and UCI do Brasil.  After Universal's acquisition of Sainte Germaine in 2005, it was expected that Universal would be able to reduce costs and gain market share through improved management practices and synergies with existing businesses.  Unfortunately, increased demand and synergy-based increases in value were not derived.  In addition, cash resources were depleted by a contentious arbitration matter between Sainte Germaine and one of its suppliers.

UCI do Brasil's production required cash payment in advance of manufacture and shipment of sisal bales.  UCI do Brasil was able to source a local secured loan to help supplement its cash needs, but operations were unprofitable and resulted in a large margin adjustment for fiscal year 2013.

In addition, UCI do Brasil had begun to suffer, like many Brazilian sisal twine producers, from increasing material costs due to a large multi-year drought across much of Brazil.  These increased material costs, along with rising wages and employee costs in the greater Salvador, Brazil area, further reduced profit margins, as price increases could not be passed through to customers at the same rate as which they were experienced on the production side.  As prices increased, domestically based farmers often made the decision to switch from natural sisal fiber based twine to a less expensive synthetic alternative.

Pet's Corner.  Pet's Corner historically generated annual revenues of approximately $1 million but operated at a loss in the years immediately preceding the Petition Date.

Pension Obligations.  A contributing factor to the Debtors' liquidity challenges was the funding of the Pension Plan.  The Pension Plan covers certain eligible employees aged 21 and over with a hire date prior to January 1, 2005.  The benefits of the Pension Plan are based on the credited service, the employees' final average compensation, and Social Security covered compensation.  While the Pension Plan was a useful tool in attracting and retaining talented and motivated employees, as liquidity became restricted in recent years, the Plan became a significant financial burden.  Aggregate contributions under the Pension Plan exceeded $7.3 million during the last five years.

Decreased liquidity in 2013, in combination with reduced inventory reserves and vendors' refusal or inability to provide extended payment terms for purchased inventory, undermined the Debtors' ability to purchase inventory at the rate required to operate at full levels.  This reduction in ability to purchase inventory resulted in lost sales.  By January of 2014, sales were approximately 40% of the prior comparable year.  These decreased sales then led to decreased receivables, and therefore decreased cash collections and decreased ability to purchase

01:17392327.3

new inventory.  This trend ultimately led to the situation faced by the Debtors prior to the Petition Date and necessitated commencement of the Chapter 11 Cases.

After considering all available options, the Debtors determined that pressing liquidity constraints were impeding their ability to implement successful operational improvements and structure and consummate an out-of-court restructuring.  The Debtors concluded that seeking chapter 11 relief was in their best interests, as well as the best interests of their estates, creditors, and other parties in interest, and, accordingly, commenced the Chapter 11 Cases.

## IV.   OVERVIEW OF CHAPTER 11 CASES

### A.   <u>Commencement</u>

On May 11, 2014, the Debtors filed voluntary petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code.  Universal's chapter 11 case bears Case Number 14-11187 (MFW) and is being jointly administered with the Chapter 11 Cases of its affiliated debtors and debtors-in-possession.

All of the motions and orders filed and entered in these Chapter 11 Cases can be found and viewed free of charge at http://cases.primeclerk.com/ucoop.

### B.   <u>Parties in Interest</u>

#### 1.   <u>Court</u>

The Chapter 11 Cases are pending in the Bankruptcy Court before the Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware.

#### 2.   <u>Advisors to the Debtors</u>

The Debtors retained Foley & Lardner LLP as their general bankruptcy counsel by order dated June 5, 2014 .  The Debtors also retained the following additional advisors:

- Young Conaway Stargatt & Taylor, LLP was retained by the Debtors as their co-counsel, by order dated June 5, 2014.

- The Keystone Consulting Group, LLC ("<u>Keystone</u>") was retained by the Debtors to provide interim management services and to provide the chief restructuring officer services of Mr. Christophe Jeannin, by order dated June 5, 2014.

- Prime Clerk LLC was retained by the Debtors as claims and noticing agent, as well as administrative advisor, by orders dated May 13, 2014, and June 5, 2014, respectively.

- Kelly Garfinkle Strategic Restructuring LLC ("<u>KGSR</u>") was retained by the Debtors to provide pension advisory services, by order dated November 18, 2014.

3.      Creditors' Committee and Its Advisors

On May 28, 2014, the U.S. Trustee appointed a single committee of unsecured creditors to represent the interests of unsecured creditors in all of the Chapter 11 Cases.  The current members of the Creditors' Committee are Nufarm Americas Inc., Merial Limited, Zoetis, United Hardware Distribution Co., Trademark Plastics Corporation, Chicago Heights Steel, and Nexus Resin Group LLC.

The Creditors' Committee retained:

- Lowenstein Sandler LLP as its general bankruptcy counsel, by order dated July 8, 2014.

The Creditors' Committee also retained the following additional advisors:

- Venable LLP was retained by the Creditors' Committee as co-counsel, by order dated July 8, 2014.

- EisnerAmper LLP, was retained by the Creditors' Committee as its financial advisor, by order dated July 8, 2014.

## C.      **First Day Orders**

Although after the Petition Date the Debtors continued to operate as debtors and debtors-in-possession, certain transactions outside of the ordinary course of business required the Bankruptcy Court's approval, following notice and the opportunity for a hearing in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, on the Petition Date, the Debtors requested entry of specific orders from the Bankruptcy Court authorizing the Debtors to pay certain prepetition claims and to continue specific prepetition practices essential to their continued business operations during the pendency of the Chapter 11 Cases.  On May 13, 2014, the Bankruptcy Court granted several "first day" orders concerning various matters related to the Debtors' continued business operations.  Included in such "first day" orders were the following:

1.      Joint Administration Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for Order Authorizing Joint Administration Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1* [Docket No. 2] (the "Joint Administration Motion") seeking an order directing the joint administration of the Chapter 11 Cases.  The Bankruptcy Court granted the Joint Administration Motion by order dated May 13, 2014 [Docket No. 35].  Accordingly, the Chapter 11 Cases are jointly administered under Case Number 14-11187 (MFW).

2.      Tax Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code Authorizing (I) Payment of Certain Prepetition Taxes and (II) Financial Institutions to Receive, Process and Honor Related*

*Checks and Transfers* [Docket No. 5] (the "<u>Tax Motion</u>").  In the Tax Motion, the Debtors sought entry of an order:

- authorizing, but not directing, the Debtors to pay certain sales, use, franchise, and real and personal property taxes, and such other similar taxes, as well as fees for licenses, permits, and other similar charges and assessments, including any penalties and interest thereon to various government and other licensing authorities in the United States, in the ordinary course of business without regard to whether such amounts accrued or arose before or after the Petition Date; and

- authorizing and directing banks and financial institutions to honor and process checks and transfers related to such payments.

The Bankruptcy Court granted the Tax Motion by order dated May 13, 2014 [Docket No. 44].

> 3.      <u>Insurance Motion</u>

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order (A) Authorizing the Debtors (I) to Maintain Existing Insurance Policies, (II) to Pay Policy Premiums and Brokers' Fees Arising in Connection Therewith, Including Prepetition Obligations Arising in the Ordinary Course of Business, and (III) to Continue Insurance Premium Financing Program and (B) Granting Certain Related Relief* [Docket No. 10] (the "<u>Insurance Motion</u>").  In the Insurance Motion, the Debtors sought entry of an order:

- authorizing, but not directing, the Debtors to (i) continue, in their sole discretion, their workers' compensation program as well as their general liability, auto liability, property, professional liability, fiduciary liability, directors; and officers' liability, and other insurance programs, (ii) pay all undisputed prepetition and postpetition obligations in connection with such insurance programs, including premiums, excess, retrospective adjustments, administrative and broker's fees, deductibles, and other fees and costs related thereto, and (iii) continue to honor insurance premium financing obligations; and

- authorizing and directing banks and financial institutions to honor and process check and transfers related to such obligations.

The Bankruptcy Court granted the Insurance Motion by order dated May 13, 2014 [Docket No. 41].

> 4.      <u>Cash Management Motion</u>

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order (I) Approving Continued Use of Cash Management System, (II) Authorizing Waiver of Certain Bank Account and Related Requirements of the Office of the United States Trustee for the District of Delaware, and (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis* [Docket No. 8] (the "<u>Cash Management Motion</u>").  In the Cash Management Motion, the Debtors sought entry of an order, among other things:

- authorizing the Debtors to continue using their existing cash management system;

- authorizing and directing banks and financial institutions to honor and process checks and transfers;

- waiving the requirements of section 345(b) of the Bankruptcy Code; and

- authorizing the Debtors to use their existing bank accounts and existing business forms.

The Bankruptcy Court granted the Cash Management Motion by order dated May 14, 2014 [Docket No. 46].

5.    Employee Wage and Benefit Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation, (II) Reimbursement of Prepetition Employee Business Expenses, (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course, (IV) Payments of Workers' Compensation Obligations, (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions and (B) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers* [Docket No. 7] (the "Employee Wage and Benefit Motion").  In the Employee Wage and Benefit Motion, the Debtors sought entry of an order, among other things:

- authorizing, but not directing, the Debtors, in their sole discretion to make all payments required under or related to wage obligations, staffing obligations, independent contractor obligations, payroll taxes and deductions, incentive compensation programs, fringe benefits, severance programs, expense reimbursements, health and welfare benefits, and 401(k) plans, and all costs incident to the foregoing, and to continue to honor their practices and policies for their workforce, as those practices, programs, and policies were in effect as of the Petition Date and as such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business; and

- authorizing and directing banks and financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors accounts in satisfaction of the Debtors' workforce obligations to the extent that the Debtors have sufficient funds standing to their credit with such financial institutions.

The Bankruptcy Court granted the Employee Wage and Benefit Motion by order dated May 13, 2014 [Docket No. 37].  The Bankruptcy Court granted the Employee Wage and Benefit Motion on a supplemental basis by order dated June 6, 2014 [Docket No. 134].

01:17392327.3

17

6.      Customer Programs Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Authorizing the Debtors to Honor Certain Prepetition Customer Obligations and to Continue Certain Prepetition Customer Programs and Practices in the Ordinary Course of Business* [Docket No. 6] (the "Customer Programs Motion").  In the Customer Programs Motion, the Debtors sought entry of an order, among other things:

- authorizing the Debtors to maintain and administer certain customer programs and to honor prepetition obligations related thereto in the ordinary course of business and in a manner consistent with past practice and to honor their obligations under certain credit card agreements and pay certain credit card obligations, including certain credit card fees; and

- authorizing banks and financial institutions to honor and process prepetition checks and transfers in respect of the Debtors' customer programs.

The Bankruptcy Court granted the Customer Programs Motion by order dated May 13, 2014 [Docket No. 36].

7.      DIP Financing Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors (A) to Obtain Post-Petition Financing on a Senior Secured Superpriority Basis; (B) to Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 11] (the "DIP Financing Motion").

The Bankruptcy Court granted the DIP Financing Motion (with certain revisions) on an interim basis by order dated May 13, 2014 [Docket No. 47].   The Court granted the DIP Financing Motion on a final basis by order entered on June 17, 2014 [Docket No. 163] (the "DIP Financing Order").   Subsequent thereto, a supplemental order was entered with respect to the DIP Financing Motion on July 7, 2014 [Docket No. 220].

The supplemental order approved an agreement between the Debtors, CoBank, ACB ("CoBank"), and Bank of America, N.A. ("BOA"), which provided for BOA's DIP facility to be satisfied in full and the insertion of CoBank as the Debtors' postpetition secured lender.  CoBank was subsequently paid in full from proceeds of the Bridon/Heritage Sale.

8.      Utilities Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 9] (the "Utilities Motion").  In the Utilities Motion, the Debtors sought entry of an order, among other things:

- prohibiting utility companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance (as set forth in the Utilities Motion) pending entry of the final order;

- approving the Debtors' proposed adequate assurance (as set forth in the Utilities Motion) and the procedure for requesting such adequate assurance; and

- determining that the utilities companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

The Bankruptcy Court granted the Utilities Motion (with certain revisions) on an interim basis by order dated May 13, 2014 [Docket No. 39]. The Bankruptcy Court granted the Utilities Motion on a final basis by order dated June 6, 2014 [Docket No. 137].

## D.    Key Employee Incentive Plan

On July 29, 2014, the Debtors filed the *Debtors' Motion, Pursuant to Sections 105, 363(b) and 503(c) of the Bankruptcy Code, for Entry of an Order (I) Authorizing the Debtors to Pay Incentive Bonuses to Certain Employees; (II) Approving the Debtors' Key Employee Incentive Plan and (III) Granting Related Relief* [Docket No. 305] (the "KEIP Motion"). In the KEIP Motion, the Debtors sought entry of an order approving a proposed key employee incentive plan (the "KEIP"). The KEIP participants included certain employees whose institutional knowledge and skill were essential to the Debtors' sale efforts.

On August 14, 2014, the Bankruptcy Court approved the KEIP [Docket No. 360] with certain modifications agreed to between the Debtors and the U.S. Trustee.

## E.    Filing Deadline for Prepetition Claims

On August 4, 2014, the Debtors filed the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 324] (the "Bar Date Motion"). The Bar Date Motion sought entry of an order (a) establishing deadlines and related procedures for filing proofs of claim in respect of prepetition claims, including any claims under section 503(b)(9) of the Bankruptcy Code, secured claims, and priority claims against the Debtors and (b) approving the form and manner of notice thereof.

The Bankruptcy Court granted the Bar Date Motion by order dated August 25, 2014 [Docket No. 396]. Among other things, the Bankruptcy Court established September 30, 2014 at 4:00 p.m. (prevailing Eastern Time) as the general claims bar date and November 7, 2014 at 4:00 p.m. (prevailing Eastern Time) as the claims bar date for claims of governmental units.

## F.    Statements of Financial Affairs and Schedules of Assets and Liabilities

Each of the Debtors filed its Statement of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules") on July 2, 2014. The Schedules reflect the assets and liabilities of

Universal and each of its affiliated Debtors as reflected in the Debtors' books and records as of the Petition Date.

## V.    SALE OF SUBSTANTIALLY ALL ASSETS TO BCHU

### A.    Debtors' Prepetition Marketing Efforts

The Debtors, in consultation with their professional advisors, diligently evaluated a number of options to address their liquidity concerns prior to the commencement of the Chapter 11 Cases.  Based on the Debtors' evaluation, and in an exercise of the Debtors' business judgment, the Debtors concluded that a sale of all or substantially all of the assets of Bridon and Heritage, and certain assets of Universal, was the best way to maximize value for their creditors. To that end, prior to the Petition Date, the Debtors and their professional advisors commenced robust and aggressive marketing initiatives that generated several expressions of interest from various parties.

As part of that process, the Debtors and their advisors worked closely with any and all potential strategic and financial buyers, many of which conducted site visits at the Debtors' facilities and entered into confidentiality agreements as part of their due diligence in conjunction therewith.

### B.    BCHU Acquisition LLC Stalking Horse Bid

The Debtors were in continuous contact with the Creditors' Committee and its advisors once the Creditors' Committee was appointed regarding the terms of a stalking horse asset purchase agreement, potential counterparties to such an agreement, and the structure for the sale process—including the bidding procedures under which the sale would be conducted.

As part of their marketing efforts, the Debtors and Keystone contacted over 200 entities, to solicit interest in providing liquidity either through financing (in-court or out-of-court) or through a sale of some or all of the assets of the Debtors.  The universe of parties Keystone contacted included parties that have historically been active in the Debtors' industry or distressed asset purchases, and could reasonably be expected to have an interest in the process and the wherewithal to consummate the transaction contemplated.

After considering various inquiries and proposals, the Debtors and BCHU entered into an asset purchase agreement, pursuant to which, and subject to Court approval, BCHU agreed to purchase substantially all of the assets of Bridon and Heritage for approximately $16,000,000, subject to reduction for certain working capital adjustments.  The Debtors further determined that BCHU's offer for the target assets was fair, reasonable and in the best interest of creditors, and that the floor established by the proposed sale to BCHU, subject to higher and better bids pursuant to an open auction process approved by the Court, afforded the Debtors the best opportunity to maximize value for their creditors.

On the July 8, 2014, the Debtors filed a motion for authorization to conduct a stalking horse sale process in which BCHU would serve as a stalking horse bidder [Docket No. 227] (the "Sale Motion").  The Court entered an order [Docket No. 292] approving certain bid procedures

01:17392327.3

(the "Bid Procedures," and such order approving the Bid Procedures, the "Bidding Procedures Order") on July 23, 2014.

## C.    Marketing/Sale Timeline Under the Bidding Procedures Order

The Bidding Procedures Order set the Bid Deadline (as defined therein) for August 18, 2014, and the Auction (as defined therein), if necessary, for August 20, 2014.

## D.    Approval of Bridon/Heritage Sale

After extensive marketing efforts by the Debtors and the Creditors' Committee, the Debtors received two Qualified Bids (as defined in the Bidding Procedures Order), in addition to the stalking horse bid by BCHU, prior to the Bid Deadline.  The two other Qualified Bids were made by RKW America, LLC ("RKW") and Tama Plastics USA, Inc. ("Tama") respectively. Accordingly, the Debtors' conducted an open auction for the available assets at the office of Young Conaway Stargatt & Taylor, LLP on August 20, 2014.  After announcing that the Debtors had selected Tama as the highest and best bid for the target assets at the outset of the Auction, over 20 rounds of bidding subsequently occurred, at the conclusion of which BCHU was determined to have the highest and best bid at the Auction.  Accordingly, BCHU was selected as the Successful Bidder (as defined in the Bidding Procedures Order).  At the August 25, 2014 sale hearing, the Debtors requested that the Bankruptcy Court approve the Bridon/Heritage Sale pursuant to the terms of the BCHU Asset Purchase Agreement, as revised following the conclusion of the Auction.  One day later, on August 26, 2014, the Bankruptcy Court entered an order approving the Bridon/Heritage Sale to BCHU.  The Bridon/Heritage Sale closed shortly thereafter on August 28, 2014.  In consideration for the sale of the Acquired Assets (as defined in the BCHU Asset Purchase Agreement), the Debtors received consideration of approximately $19,162,438 in the form of cash and other assumed liabilities.

## VI.    OTHER DEVELOPMENTS IN THE CHAPTER 11 CASES

## A.    Sale of Eagan Property

On September 9, 2014, Universal filed a motion [Docket No. 425] (the "Eagan Property Sale Motion") seeking, among other things, authorization to sell a certain parcel of real property (the "Eagan Property") located in Eagan, Minnesota which served as Universal's corporate headquarters, and related assets free and clear of all liens, claims, and encumbrances on the terms and conditions set forth in the related purchase and sale agreement (such sale, the "Eagan Property Sale").  Pursuant to the Eagan Property Sale Motion, the Debtors sought entry of an order establishing certain bid procedures (the "Eagan Bid Procedures") to be implemented in conjunction with the contemplated sale.  Consistent with the Eagan Bid Procedures, the Debtors subsequently selected Interstate Companies, Inc. ("Interstate") to serve as the stalking horse bidder in connection with the Eagan Property Sale.  The initial purchase price offered by Interstate was $3,800,000.  The Debtors subsequently received one other competing bid for the real property parcel, and in accordance with the Eagan Bid Procedures, conducted an auction on November 13, 2014.  At the conclusion of the auction, the Debtors, in consultation with the Creditors' Committee's advisors, selected Gloria Real Estate Holdings ("Gloria") as the prevailing bidder.  The Bankruptcy Court approved the Eagan Property Sale to Gloria by order

01:17392327.3

dated November 18, 2014 [Docket No. 636] (the "Eagan Sale Order"). The Eagan Property Sale closed on December 19, 2014. Universal received proceeds of approximately $4,762,000.

In connection with the closing of the Eagan Property Sale, the Debtors and Creditors' Committee commenced discussions with Ameritas Life Insurance Corp. ("Ameritas"), the holder of a pre-petition mortgage and secured claim with respect to the Eagan Property. Ameritas filed a secured proof of claim against Universal, asserting a claim (the "Ameritas Secured Claim") in the amount of not less than $3,332,070.98, which as of September 1, 2014, allegedly consisted of (i) principal in the amount of $2,692,020.21, plus additional accruing interest, (ii) a prepayment/make-whole premium in the amount of $639,400.77, and (iii) $650.00 for processing and recording fees, plus additional accruing attorneys' fees and costs (the "Fees and Costs").

As of December 1, 2014 (the "Eagan Effective Date"), and upon receipt of a December mortgage payment, Universal was indebted to Ameritas on account of the Ameritas Secured Claim in the principal amount of $2,645,647.46, plus $650.00 for processing and recording fees (the "Ameritas Effective Date Amount") and interest that accrued at the rate of $499.73 per diem from the Eagan Effective Date until payoff of the Ameritas Secured Claim (the "Per Diem Amount").

Pursuant to the good-faith, arm's-length negotiations that took place between the respective legal advisors of Universal, Ameritas and the Creditors' Committee, the parties agreed that in addition to the Ameritas Effective Date Amount and any Per Diem Amounts incurred and owing from and after the Eagan Effective Date, the Ameritas Secured Claim would consist of (i) a prepayment/make-whole premium in the reduced amount of $320,000.00 (*i.e.* an approximately 50% reduction from the prepayment/make-whole premium asserted by Ameritas in the Ameritas Secured Claim), and (ii) the Fees and Costs capped at $30,000.00. These amounts were to be paid to Ameritas along with other components of the Secured Claim, as detailed below.

On or about December 19, 2014, as authorized by the Bankruptcy Court pursuant to the Eagan Sale Order, the Debtors paid to Ameritas, in full and final satisfaction of the Ameritas Secured Claim, (a) the Ameritas Effective Date Amount, (b) the Per Diem Amounts incurred from and after the Eagan Effective Date, (c) $320,000.00 on account of and in full and final settlement and satisfaction of the asserted prepayment/make-whole premium, and (d) the Fees and Costs. Ameritas agreed that, upon receipt of payment of these amounts, it no longer had any other or further claims of any kind against any of the Debtors.

## B.    Sales of Residual Assets

On October 22, 2014, the Bankruptcy Court entered the *Order (I) Authorizing and Approving Procedures to Sell, Lease or Otherwise Dispose of Certain Residual Assets, (II) Authorizing the Retention of Brokers and Other Sales Agents, and (III) Waiving the Requirements of Local Bankruptcy Rule 2016-2* [Docket No. 562] (the "Procedures Order"), authorizing the Debtors to sell, lease or dispose of certain residual assets (collectively, the "Residual Assets") pursuant to the procedures set forth in the Procedures Order.

01:17392327.3

Pursuant to the Procedures Order, the following Residual Assets have been sold:

- Universal's shares and equity in Changzhou Agrinet Company Limited on account of its contribution to 50% of the Company's registered capital, together with all rights and benefits attaching thereto; Residual Assets sold to Changzhou Wujin Xinhui Netting Factory for $72,300 [*See* Docket Nos. 900, 934, 936].

- Certain pesticide products of Universal and UCPA registered and in good standing with the United States Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide and Rodenticide Act; Residual Assets sold to Ragan & Massey, Inc. for $30,000 [*See* Docket No. 726, 767, 772].

- Trade names and trademarks in connection with the following agricultural adjuvants for use with herbicides, insecticides, and of Universal and UCPA: (1) AIRLINK; (2) CROSSLINK; and (3) EXCLAIM; Residual Assets sold to Whitaker Distribution, Inc. for $10,000 [*See* Docket Nos. 884, 927, 930];

The Debtors continue to market additional Residual Assets pursuant to the Procedures Order, and in this regard have retained Lingate Financial Group to serve as broker to attempt to sell certain remaining Residual Assets [*See* Docket No. 870].

## C.   Motion to Establish Administrative Expense Bar Date

On April 23, 2015, the Debtors filed their *Motion for an Order (I) Fixing Deadline for Filing Requests for Allowance of Administrative Expense Claims Arising on or Before April 30, 2015, and (II) Designating Form and Manner of Notice Thereof* (the "Administrative Expense Bar Date Motion").  The Administrative Expense Bar Date Motion sought entry of an order (a) establishing deadlines and related procedures for filing requests for the allowance of administrative expense claims that arose during the period from the Petition Date through April 30, 2015 and (b) approving the form and manner of notice thereof.

On May 18, 2015, the Bankruptcy Court entered the *Order (I) Fixing Deadline for Filing Requests for Allowance of Administrative Expense Claims Arising on or Before April 30, 2015, and (II) Designating Form and Manner of Notice Thereof* [Docket No. 976] (the "Administrative Expense Bar Date Order"), establishing the deadlines and related procedures for filing requests for the allowance of administrative expense claims that arose during the period from the Petition date through April 30, 2015.  Pursuant to the Administrative Expense Bar Date Order, the Debtors fixed June 19, 2015, at 4:00 p.m. (ET) as the deadline by which each person or entity must file requests for the allowance of an administrative expense claim that arose during the aforementioned period.

## D.   Committee Standing Motion

The Creditors' Committee investigated potential causes of action against certain of the Debtors' Members (the "Member Defendants") and certain current and former directors and officers of Debtor Universal Cooperatives, Inc. (the "Management Defendants" and, together

with the Potential Member Defendants, the "Potential Defendants") relating to alleged prepetition misconduct which precipitated the filing of the Chapter 11 Cases.

On January 5, 2015, the Creditors' Committee filed a motion [Docket No. 719] (the "Committee Standing Motion") for an order granting the Creditors' Committee standing and authority to commence, prosecute and, if appropriate, settle an action (or actions) on behalf of the Debtors' estates against the proposed Defendants for, among other things: (i) breaches of fiduciary duty and aiding and abetting such breaches; (ii) avoidance actions; and (iii) disallowance, subordination and recharacterization of certain Defendants' claims (collectively, the "Causes of Action"), as set forth more fully in the draft complaint (the "Complaint") attached to the Committee Standing Motion as Exhibit A.

Following a contested hearing regarding the Committee Standing Motion, on February 2, 2015, the Bankruptcy Court entered an order [Docket No. 773] (the "Committee Standing Order") granting the Creditors' Committee standing on behalf of the Debtors' estates, and authority to commence prosecute, and if appropriate, settle any of the Causes of Action alleged in the proposed Complaint; provided, however, that the Creditors' Committee was not authorized to file the Complaint until on or after February 25, 2015 and the Creditors' Committee was permitted, within its discretion, to modify the proposed Complaint to add additional facts supporting the Causes of Action.

Subsequent to entry of the Committee Standing Order, the Creditors' Committee commenced settlement discussions with certain of the Potential Defendants.

## E.    Plan Settlement

The Plan incorporates the Plan Settlement negotiated and agreed to by and between the Debtors, PBGC, and Creditors' Committee. As described above, the Plan Settlement represents a compromise and settlement of numerous debtor-creditor and inter-creditor issues designed to achieve an economic settlement of Claims (including the Pension Claims and PBGC Liens) against the Debtors' estates and an efficient resolution of these Chapter 11 Cases. This global settlement constitutes a settlement of a number of the potential litigation issues, including issues regarding substantive consolidation, which PBGC disputes; the allocation of Assets among the Estates; and the nature and amount of the Pension Claims and PBGC Liens. The Debtors will seek the Bankruptcy Court's approval of the Plan Settlement by filing a separate motion pursuant to Bankruptcy Rule 9019, which will request, among other things, that the Bankruptcy Court find that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness. Each provision of the Plan Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.

## VII.    SUMMARY OF CHAPTER 11 PLAN

## A.    Overall Structure of the Plan

The Plan provides for the treatment of Claims against the Debtors and Equity Interests in the Debtors as well as the settlement of a number of potential litigation issues, including the

allocation of the Net Bridon/Heritage Sale Proceeds among the Estates. In addition, the Plan implements key provisions of the Plan Settlement. As described in detail in **Section V (*"Sale of Substantially All Assets to BCHU"*)**, the majority of the Debtors' assets have been liquidated pursuant to the Bridon/Heritage Sale.

The Plan provides that the Net Bridon/Heritage Sale Proceeds are allocated to each Debtor in accordance with the Distribution Calculation. The so-allocated Net Bridon/Heritage Sale Proceeds, together with the Net Eagan Property Sale Proceeds, Net Residual Assets Sale Proceeds, and the gross amount available from the liquidation of each Debtor's remaining Excluded Assets (including any Litigation Proceeds), will be distributed to the holders of Allowed Claims in accordance with the Plan. Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Liquidating Trust Expenses, and the costs of administering the Debtors' Estates shall be paid or satisfied in full from each Debtor's Assets in accordance with the Distribution Calculation.

Holders of Allowed General Unsecured Claims against a particular Debtor will receive their Distribution Pro Rata Share of the Net Distributable Assets of such Debtor. Specifically, with respect to a given Debtor, and as allocated to such Debtor including pursuant to the Distribution Calculation (which incorporates certain allocation and related issues resolved under the Plan Settlement), the Net Distributable Assets are calculated as follows:

(a)    the amount of the Net Bridon/Heritage Sale Proceeds, if any, allocated to such Debtor *plus*

(b)    the amount of the Net Eagan Property Sale Proceeds, if any, allocated to such Debtor *plus*

(c)    the amount of the Net Residual Assets Sale Proceeds, if any, allocated to such Debtor *plus*

(d)    the gross amount available from the liquidation of such Debtor's remaining Excluded Assets (including any Litigation Proceeds and/or assets from Foreign Non-Debtor Affiliate allocated to such Debtor) *minus*

(e)    (i)    the amount of all unpaid Allowed and Disputed A/P/S Claims allowed against or allocated to such Debtor,

(ii)    the amount of all costs of administering the Estate of such Debtor, and

(iii)    the Liquidating Trust Expenses allocated to such Debtor.

Additionally, pursuant to the Plan Settlement, the Distribution Calculation includes a Settlement Subsidy to be contributed from the Estates of Universal and Bridon in the amount of $515,000.00 ($430,000 to be contributed from the Estate of Bridon, and $85,000 from the Estate of Universal) to the Estates of Heritage and UCPA. The Settlement Subsidy is in full and complete resolution of issues related to substantive consolidation and will enhance the *pro rata* distributions to holders of Allowed General Unsecured Claims against Heritage and UCPA. The Settlement Subsidy will slightly reduce the Net Distributable Assets for the Estates of Universal

and Bridon and increase the Net Distributable Assets to be distributed to the Estates of UCPA and Heritage.

Pursuant to the Plan, on the Effective Date, all of the Estates' Assets will vest in and be transferred to the Liquidating Trust. The Liquidating Trust shall be administered by the Liquidating Trustee who shall, among other things, liquidate the Debtors' remaining Assets, resolve any Disputed Claims, wind down the affairs of the Debtors, prosecute Causes of Action (including the Causes of Action set forth in the Complaint), and make Distributions in accordance with the Plan. On the Effective Date, all existing stock and equity interest in the Debtors shall be deemed canceled and extinguished and, to the extent necessary, Universal shall reissue one (1) share of common stock to the Liquidating Trust.

As noted, the Plan does not provide for the substantive consolidation of the Debtors. However, the Plan Settlement provides for a Settlement Subsidy and other consideration in full and complete resolution of any issues related to substantive consolidation and the validity of PBGC's claims.

The Debtors and the Creditors' Committee, together with their respective advisors, have agreed on the Distribution Calculation, which is designed to determine the projected assets available for distribution to holders of Allowed General Unsecured Claims against the respective Debtors and provide for the anticipated Distributions set forth above. **Creditors are cautioned that the Distribution Chart includes a number of assumptions with respect to estimated recoveries and the amount of claims and administrative expenses. Accordingly, the actual amount of Net Distributable Assets may vary materially, including downward, from the amounts projected using the Distribution Calculation, and thus anticipated recoveries could materially vary from the projections set forth herein**.

## B.    Treatment of Administrative Expense Claims, Priority Tax Claims, and Other Unclassified Claims Under the Plan

### 1.    Administrative Expense Claims

#### (a)    Treatment of Non-Professional Fee Administrative Expense Claims

Administrative Expense Claims include any Claim for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code, including (a) Professional Fee Claims and (b) any postpetition taxes entitled to administrative expense priority under the Bankruptcy Code; provided, however, that any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 15.8 of the Plan.

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of: (i) on or as soon as practicable

01:17392327.3

after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.

(b)    <i>Supplemental Administrative Expense Claims Bar Date</i>

Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from May 1, 2015 through the Effective Date must file requests for payment of Administrative Expense Claims so as to be **actually received on or before 4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** (the "Supplemental Administrative Expense Claims Bar Date") by the Claims Agent at the following address:

> If by mail:

> > Universal Cooperatives, Inc. Claims Processing Center
> > c/o Prime Clerk LLC
> > 830 3rd Avenue, 9th Floor
> > New York, New York 10022

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Supplemental Administrative Expense Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.   The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Supplemental Administrative Expense Claims Bar Date and shall constitute notice of such bar date.

The following claims are **not** required to be filed on or before the Supplemental Administrative Expense Claims Bar Date:

> (a)    Professional Fee Claims;

> (b)    any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise, or (ii) have otherwise been satisfied;

> (c)    any Administrative Expense Claims previously filed with the Claims Agent or the Court;

> (d)    any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;

> (e)    any claims for bonus payments arising under the Key Employee Incentive

Plan approved by order of the Bankruptcy Court [Docket No. 374];

(f)    any claims by any direct or indirect non-debtor subsidiary or affiliate of the Debtors;

(g)    any claims for fees payable to the Clerk of this Court; and

(h)    any U.S. Trustee Fees.

Any Person that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Plan and fails to do so by the Supplemental Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidating Trust, the Liquidating Trustee, the Debtors, the Estates, and their respective properties, and the Liquidating Trust, the Liquidating Trustee, the Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 13.4 of the Plan and the Confirmation Order.

2.    Professional Fee Claims

The Liquidating Trustee shall pay Allowed Professional Fee Claims, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by such Professionals.  Professional Fee Claims shall be paid from the Liquidating Trust Assets.

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such claim.  The Liquidating Trustee is authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidating Trust Agreement.

3.    Priority Tax Claims

Priority Tax Claims include any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Priority Tax Claim (a) on, or as soon as practicable after, the later of: (i) the Effective Date and (ii) the date such Allowed Priority Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; provided, that the Liquidating Trustee may prepay the entire amount of the Allowed Priority Tax Claim at any time in its sole discretion.

C.    <u>Classification of Claims and Equity Interests</u>

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Plan and therefore are deemed to reject the Plan or are entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Plan and therefore are deemed to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Description | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 4A | General Unsecured Claims against Universal | Impaired | Yes |
| 4B | General Unsecured Claims against Bridon | Impaired | Yes |
| 4C | General Unsecured Claims against Heritage | Impaired | Yes |
| 4D | General Unsecured Claims against UCPA | Impaired | Yes |
| 4E | General Unsecured Claims against Agrilon | Impaired | Yes |
| 4F | General Unsecured Claims against Pavalon | Impaired | Yes |
| 5 | Equity Interests in Debtors | Impaired | No (deemed to reject) |

**D.**   **Treatment of Claims and Equity Interests Under the Plan**

1.   Class 1: Priority Non-Tax Claims

    *(a)*   *Definition*: A Priority Non-Tax Claim is a Claim entitled to priority in payment as specified in sections 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

    *(b)*   *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Non-Tax Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim.

2.   Class 2: Secured Tax Claims

    *(a)*   *Definition*: A Secured Tax Claim is a Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

    *(b)*   *Treatment*:  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; provided, that the Liquidating Trustee may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion.

3.   Class 3: Other Secured Claims

    *(a)*   *Definition*: An Other Secured Claim is a Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff, other than a Secured Tax Claim.

01:17392327.3

(b)     *Treatment*:   Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidating Trustee, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date.

4.      Class 4A: General Unsecured Claims Against Universal

(a)     *Definition*: A General Unsecured Claim against Universal is a Claim against Universal other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)     *Treatment*:   Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4A agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4A shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of Universal's Net Distributable Assets.

5.      Class 4B: General Unsecured Claims Against Bridon

(a)     *Definition*: A General Unsecured Claim against Bridon is a Claim against Bridon other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)     *Treatment*:   Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4B agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4B shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of Bridon's Net Distributable Assets.

6.      Class 4C: General Unsecured Claims Against Heritage

(a)     *Definition*: A General Unsecured Claim against Heritage is a Claim against Heritage other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4C agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4C shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of Heritage's Net Distributable Assets; provided, however, that (i) PBGC shall receive a reduced recovery on account of its Allowed PBGC GUC Claim against Heritage sufficient to permit non-PBGC holders of Allowed General Unsecured Claims against Heritage to receive up to and including a 3% recovery, and (ii) upon receipt of a 3% recovery by non-PBGC holders of Allowed General Unsecured Claims against Heritage, any additional Net Distributable Assets of Heritage shall be distributed on a *pro rata* basis equally to holders of Allowed General Unsecured Claims against Heritage (including to PBGC).

7.    Class 4D: General Unsecured Claims Against UCPA

(a)    *Definition*: A General Unsecured Claim against UCPA is a Claim against UCPA other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4D agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4D shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of UCPA's Net Distributable Assets; provided, however, that (i) PBGC shall receive a reduced recovery on account of its Allowed PBGC GUC Claim against Heritage sufficient to permit non-PBGC holders of Allowed General Unsecured Claims against UCPA to receive up to and including a 3% recovery, and (ii) upon receipt of a 3% recovery by non-PBGC holders of Allowed General Unsecured Claims against UCPA, any additional Net Distributable Assets of UCPA shall be distributed on a *pro rata* basis equally to holders of Allowed General Unsecured Claims against UCPA (including to PBGC).

8.    Class 4E: General Unsecured Claims Against Agrilon

(a)    *Definition*: A General Unsecured Claim against Agrilon is a Claim against Agrilon other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4E agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4E shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of Agrilon's Net Distributable Assets.

9.      Class 4F: General Unsecured Claims Against Pavalon

(a)     *Definition*: A General Unsecured Claim against Pavalon is a Claim against Pavalon other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, or Equity Interest.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 4F agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each holder of an Allowed General Unsecured Claim in Class 4F shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its Distribution Pro Rata Share of Pavalon's Net Distributable Assets.

10.     Class 5: Equity Interests in Debtors

(a)     *Definition*:  Equity Interest means, as of the Petition Date, any capital stock or other ownership interest in the Debtors, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in any of the Debtors.

(b)     *Treatment*:  On the Effective Date, the Equity Interests in the Debtors shall be cancelled and the holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Plan.

11.     Reservation of Rights Regarding Claims and Equity Interests

Except as otherwise explicitly provided in the Plan, nothing shall affect either the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**E.      Acceptance or Rejection of the Plan**

1.      Voting of Claims

(a)     *Classes Entitled to Vote*

Each holder of a Claim, that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, in Classes 4A, 4B, 4C, 4D, 4E, and 4F or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) in such Classes, shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

(b)      *Classes Conclusively Presumed to Accept*

Each of Classes 1, 2, and 3 is Unimpaired under the Plan, and each such Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(c)      *Classes Deemed to Reject*

Equity Interests in Class 5 will not receive or retain any property on account of such Equity Interests under the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Class 5 is deemed to have rejected the Plan.

2.      Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a holder of an Allowed Claim or Allowed Equity Interest, or a holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

3.      Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.5 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to Impaired Classes of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

4.      Revocation of the Plan

Subject to Section 15.6 of the Plan, the Debtors-in-Possession, after consultation with the Creditors' Committee, may revoke and withdraw the Plan in its entirety at any time prior to entry of the Confirmation Order.  If the Plan is so revoked or withdrawn, then it shall be deemed null and void.

**F.**    **Means of Implementation of the Plan**

1.    Plan Settlement

As described in detail above (pages iv.-v.) the Debtors, PBGC, and the Creditors' Committee entered into the Plan Settlement.  Subject to entry of an order by the Bankruptcy Court under Bankruptcy Rule 9019, the Plan will incorporate the Plan Settlement, which is a compromise and settlement of numerous debtor-creditor issues designed to achieve an economic resolution of Claims against the Debtors and an efficient resolution of these Chapter 11 Cases. This Plan Settlement constitutes a settlement of a number of potential litigation issues, including the allocation of Assets among the Estates, the nature and amount of the Pension Claims and PBGC Liens, and substantive consolidation issues, which PBGC disputes.  The Debtors will seek the Bankruptcy Court's approval of the Plan Settlement by filing a separate motion pursuant to Bankruptcy Rule 9019, which will request, among other things, that the Bankruptcy Court find that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness.  Each provision of the global settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  Commencing on the Effective Date, the Liquidating Trustee shall implement the allocation of the Debtors' Assets to the respective Debtors' Estates in accordance with the Distribution Calculation.

2.    Liquidating Trust

*(a)    Appointment of Liquidating Trustee*

The Liquidating Trustee shall be selected by the Committee and shall be identified in the Liquidating Trust Agreement to be filed with the Bankruptcy Court with the Plan Supplement. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and the Liquidating Trustee's duties shall commence as of the Effective Date.  The Liquidating Trustee shall administer the Plan and the Liquidating Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidating Trust is dissolved in accordance with Section 7.2(j) of the Plan and (ii) the date such Liquidating Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Liquidating Trustee resigns, is terminated, or is otherwise unable to serve, the Liquidating Trust Oversight Committee shall appoint a successor to serve as the Liquidating Trustee in accordance with the Liquidating Trust Agreement.  To the extent that the Liquidating Trust Oversight Committee does not appoint a successor within the time periods specified in the Liquidating Trust Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee.  Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

(b)    *Responsibilities of Liquidating Trustee*

Responsibilities of the Liquidating Trustee shall include, but are not limited to:

(i)     administering the implementation of the Plan, including the making of the Distributions contemplated herein;

(ii)    marshalling, marketing for sale, and liquidating the Estates' Assets for Cash;

(iii)   conducting an analysis of any and all Claims and prosecuting objections thereto or settling or otherwise compromising such Claims, if necessary and appropriate, in accordance with Article IX of the Plan;

(iv)    maintaining and administering the Reserves in accordance with the terms of the Plan;

(v)     commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance with the Plan and paying all associated costs;

(vi)    recovering and compelling turnover of the Debtors' property;

(vii)   paying Liquidating Trust Expenses;

(viii)  abandoning any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to holders of Allowed Claims would not be feasible or cost-effective in the Liquidating Trustee's reasonable judgment;

(ix)    preparing and filing post-Effective Date operating reports;

(x)     filing appropriate tax returns in the exercise of the Liquidating Trustee's fiduciary obligations;

(xi)    retaining such professionals as are necessary and appropriate in furtherance of Liquidating Trustee's fiduciary obligations; and

(xii)   taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust, including winding down the Debtors' business affairs.

(c)    *Establishment of a Liquidating Trust*

Any and all of the Estates' Assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidating Trust Agreement, be transferred to and vest in the Liquidating Trust.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee

shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Liquidating Trust Agreement, compromise or settle any Liquidating Trust Assets. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidating Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee on or after the Effective Date, except as otherwise expressly provided in the Plan and the Liquidating Trust Agreement. The Liquidating Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth in the Plan, no other Person may pursue such Liquidating Trust Assets on or after the Effective Date. The Liquidating Trustee shall be deemed substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant to the Plan. In the event of any conflict between the terms of Article VII of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall control.

### (d)    *Liquidating Trust Assets*

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors shall be deemed, subject to the Liquidating Trust Agreement, to have automatically transferred to the Liquidating Trust all of their right, title, and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege. All such assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth in the Plan and the expenses of the Liquidating Trust as set forth in the Plan and in the Liquidating Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

### (e)    *Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest*

The Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

01:17392327.3

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust.  For all federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the holders of Allowed General Unsecured Claims entitled to distributions from the Liquidating Trust Assets, followed by a transfer by such holders to the Liquidating Trust.  Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, provided, however, that the Liquidating Trustee shall not be required to hire an expert to make such a valuation.  This valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee, and the holders of General Unsecured Claims) for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.  The Liquidating Trustee may expend the Cash of the Liquidating Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidating Trust) and (iii) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement (including the payment of any taxes).

*(f)      The Liquidating Trust Oversight Committee*

Any Creditors' Committee member that elects to serve shall serve as the members of the Liquidating Trust Oversight Committee, which shall have the responsibilities set forth in the Liquidating Trust Agreement.  The Debtors or the Creditors' Committee shall file a notice identifying the members of the Liquidating Trust Oversight Committee no later than five (5) days prior to the Voting Deadline.  Vacancies on the Liquidating Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Liquidating Trust Oversight Committee from among the holders of General Unsecured Claims, and the Liquidating Trust Oversight Committee shall use reasonable efforts to maintain such composition of the members of the Liquidating Trust Oversight Committee as existed prior to the resignation of such member.  The Liquidating Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Liquidating Trust Oversight Committee for cause.  Any successor appointed pursuant to this Section shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  For the avoidance of doubt, no member of the Liquidating Trust Oversight Committee shall be

compensated for serving as a member of the Liquidating Trust Oversight Committee, <u>provided</u>, <u>however</u>, that such members may be reimbursed from the Liquidation Trust for reasonable out of pocket expenses.

(g)      *Expenses of Liquidating Trustee*

The Liquidating Trustee Expenses shall be paid from the Liquidating Trust Assets.

(h)      *Insurance; Bond*

The Liquidating Trustee, in his or her sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Liquidating Trustee and the Liquidating Trust Oversight Committee under the Liquidating Trust Agreement.  Unless otherwise agreed to by the Liquidating Trust Oversight Committee, the Liquidating Trustee shall serve with a bond, the terms of which shall be agreed to by the Liquidating Trust Oversight Committee, and the cost and expense of which shall be paid by the Liquidating Trust.

(i)      *Fiduciary Duties of the Liquidating Trustee*

Pursuant to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all holders of Claims that will receive Distributions pursuant to the terms of the Plan.

(j)      *Termination of the Liquidating Trust*

The Liquidating Trust will terminate on the earlier of: (a) final liquidation, administration and distribution of the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth in the Liquidating Trust Agreement or the Plan; and (b) the fifth (5th) anniversary of the Effective Date.  Notwithstanding the foregoing, multiple fixed-term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidating Trust and each extended term, provided that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (a) the final Distributions pursuant to the Plan, (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(k)      *Liability of Liquidating Trustee; Indemnification*

The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee, the Liquidating Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, an "<u>Exculpation Party</u>" and collectively, the "<u>Exculpation Parties</u>") (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses)

which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud. Persons dealing or having any relationship with the Liquidating Trustee shall have recourse only to the Liquidating Trust Assets and shall look only to the Liquidating Trust Assets to satisfy any liability or other obligations incurred by the Liquidating Trustee or the Liquidating Trust Oversight Committee to such person in carrying out the terms of the Liquidating Trust Agreement, and neither the Liquidating Trustee nor the Liquidating Trust Oversight Committee shall have any personal obligation to satisfy any such liability.  Neither the Liquidating Trustee nor the Liquidating Trust Oversight Committee shall be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidating Trust Agreement against any of them. The Liquidating Trust shall promptly pay expenses reasonably incurred by any Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidating Trust Agreement or the duties, acts or omissions of the Liquidating Trustee or otherwise in connection with the affairs of the Liquidating Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Exculpation Party hereby undertakes, and the Liquidating Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidating Trust Agreement.   The foregoing indemnity in respect of any Exculpation Party shall survive the termination of such Exculpation Party from the capacity for which they are indemnified.

*(l)     Full and Final Satisfaction Against Liquidating Trust*

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidating Trust Agreement.  All payments and all Distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

3.      Effectuating Documents; Further Transactions

The appropriate officer or director of the Debtors or the Liquidating Trustee, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

01:17392327.3

4.      Cancellation of Instruments and Stock

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized or issued under the Plan, shall be canceled and extinguished.  Additionally, as of the Effective Date, all Equity Interests in all of the Debtors, and any and all warrants, options, rights, or interests with respect to such Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued, shall be deemed cancelled and extinguished without any further action of any party; provided, however, that Universal shall issue one (1) share of common stock to the Liquidating Trust.  The Liquidating Trustee shall have all power and authority that may be or could have been exercised, with respect to the Liquidating Trust Assets, by any officer, director, shareholder or other party acting in the name of the Debtors or their estates with like effect as if duly authorized, exercised and taken by action of such officers, directors, shareholders or other party.

The holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

5.      Disposition of Books and Records

After the Effective Date, the Debtors shall transfer the Debtors' books and records in the Debtors' possession to the Liquidating Trust.  From and after the Effective Date, the Liquidating Trustee shall continue to preserve and maintain all documents and electronic data transferred to the Liquidating Trust by the Debtors, and the Liquidating Trustee, subject to Section 7.8 of the Plan, shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Court after a hearing upon notice to parties-in-interest; provided, however, that the Liquidating Trustee may destroy or abandon such books and records upon entry of a Final Order closing the last Chapter 11 Case.

6.      Corporate Existence and Dissolution of Debtors

Immediately after the Effective Date, the Liquidating Trustee shall be authorized to take, in his or her sole and absolute discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.   Upon the final Distributions, any Debtors that have not been previously dissolved shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Liquidating Trustee shall be authorized to file any certificate of cancellation or other documents as may be necessary or desirable to terminate the legal existence of Universal.

7.      Closing the Chapter 11 Cases

After all Causes of Action and Disputed Claims have been resolved, the U.S. Trustee Fees have been paid, all of the Estates' Assets have been distributed in accordance with this Plan,

or at such earlier time as the Liquidating Trustee deems appropriate, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## G.    **Distributions Under the Plan**

### 1.    Distributions on Allowed General Unsecured Claims

At the written request of the Liquidating Trustee, any creditor holding multiple Allowed General Unsecured Claims shall provide to the Liquidating Trustee a single address to which any Distributions shall be sent.

### 2.    Timing of Distributions

#### (a)    *Distributions on Account of Allowed A/P/S Claims*

The Liquidating Trustee shall pay any unpaid Allowed A/P/S Claim against the Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

#### (b)    *Interim Distributions on Account of Allowed General Unsecured Claims*

Subject to the terms of the Liquidating Trust Agreement, (a) the Liquidating Trustee shall make an interim distribution to holders of Allowed General Unsecured Claims at least once annually provided that any such distribution is not unduly burdensome to the Liquidating Trust, and (b) shall have the right to make more frequent interim distributions if the Liquidating Trustee determines that such interim distributions are warranted and economical; provided, however, that any such distribution shall only be made if the Liquidating Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

#### (c)    *Final Distributions on Allowed General Unsecured Claims*

Notwithstanding anything else in the Plan, upon the settlement and satisfaction of all A/P/S Claims, the completion of the prosecution and settlement of all Claims Objections and Causes of Action, and the completion of the sale and liquidation of all Assets, the Liquidating Trustee shall distribute, as soon as practicable, all remaining Liquidating Trust Assets to holders of Allowed General Unsecured Claims.

### 3.    Delivery of Distribution

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidating Trustee have been notified in writing of a change of address, including by the filing of a proof of claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in the Plan shall

require the Debtors or the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

    4.    <u>Undeliverable and Unclaimed Distributions</u>

    *(a)*    *Holding Undeliverable and Unclaimed Distributions*

If the Distribution to any holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such holder unless and until the Liquidating Trustee is notified in writing of such holder's then-current address.  Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

Prior to making Distributions, if the Liquidating Trustee's records indicate that it does not have a Taxpayer Identification Number or Employer Identification Number for any holder of an Allowed Claim, the Liquidating Trustee shall make one request for each such holder's Taxpayer Identification Number or Employer Identification Number (*i.e.*, social security number for an individual and employer identification number for a business) and a completed Form W-9 or, if not a US company, Form W-8 which may be found on the IRS website: http://www.irs.gov/uac/Form-W-8,-Certificate-of-Foreign-Status. If any holder fails to provide the Taxpayer Identification Number/Employer Identification Number, Form W-9 or Form W-8, each such holder's Distribution shall be treated as undeliverable. The Liquidating Trustee shall make all Distributions that have become deliverable as soon as reasonably practicable after such Distribution has become deliverable or has been claimed. Any holder of an Allowed Claim that remains undeliverable at the time of the Liquidating Trustee's final Distribution shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall re-vest in the Liquidating Trust, without further Order of the Court.

    *(b)*    *Failure to Claim Unclaimed/Undeliverable Distributions*

Subject to Section 8.7 of the Plan, any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed Distribution within six (6) months after the Distribution is made shall be deemed to have its Claim expunged and shall have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claims against the Debtors, their Estates, their property or the Assets.  In such cases, such unclaimed/undeliverable Distributions shall be redistributed and paid to holders of Allowed Claims in accordance with the Plan, free of any restrictions thereon and notwithstanding any federal or state escheatment laws to the contrary.

    *(c)*    *Charitable Donations*

On or about the time that a final Distribution is made and upon the Liquidating Trustee determining that there are insufficient funds remaining to cost-effectively make a further Distribution to holders of Claims under the Plan, the Liquidating Trustee may donate any undistributed funds to the American Bankruptcy Institute Endowment Fund.

5.      <u>Transfer of Claims</u>

The Claims Register shall remain open after the Effective Date and the Liquidating Trustee shall recognize any transfer of Claims in accordance with Bankruptcy Rules 3001(e) at any time thereafter, provided that for purposes of each Distribution, the Liquidating Trustee will not recognize any transfer during the period commencing thirty (30) calendar days prior to making any Distribution.  Except as otherwise provided in the Plan, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim under the Plan and any such transferred Claim shall be subject to classification and treatment under the Plan as if such Claim were held by the transferor who held such Claim on the Petition Date.

6.      <u>Manner of Payment</u>

At the option of the Liquidating Trustee, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

7.      <u>Time Bar to Cash Payments by Check</u>

Checks issued by, or on behalf of, the Debtors or the Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the Liquidating Trustee by the holder of the Allowed Claim with respect to which such check originally was issued on or before the later of (a) the first anniversary of the Effective Date, (b) the first anniversary of the date on which the Claim at issue became an Allowed Claim, and (c) six (6) months after the date the check was issued.  After such dates, all Claims in respect of void checks shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall re-vest in the Liquidating Trust.

8.      <u>No Fractional Cents</u>

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down) with fractions equal to or greater than half of a cent being rounded up and fractions less than half of a cent being rounded down.

9.      <u>Setoffs and Recoupment</u>

The Liquidating Trustee may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any rights to payment of any nature whatsoever that the Debtors may have against the claimant; <u>provided</u>, <u>however</u>, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidating Trust of any such right to payment they may have against such claimant.  For the avoidance of doubt, this provision shall not create or expand any right to setoff or recoupment that did not exist pursuant to applicable nonbankruptcy law and section 553 of the Bankruptcy Code.

01:17392327.3

10.     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

11.     Interest on Claims

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims, and no holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  In addition, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date through the date such Claim becomes an Allowed Claim.  Except as expressly provided herein, no Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

12.     No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

13.     Payment of Taxes on Distributions Received Pursuant to the Plan

All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, all appropriate federal, state and local taxes on account of such Distributions.

14.     Reserves

On the Effective Date, and after making all Distributions required to be made on the Effective Date under the Plan, the Liquidating Trustee shall establish and maintain a separate reserve (each, a "Reserve") for the estimated amount of the Liquidating Trust Expenses, as well as each Class of Claims and Unclassified Claims, which Reserve shall be administered by the Liquidating Trustee.  To the extent that Reserves are established and maintained for the benefit of any holder of a Disputed Claim, such Reserves shall include an amount of Cash equal to the Distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee.

15.    Withholdings

The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidating Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive, or other governmental requirement.

16.    *De Minimis* Distributions

All De Minimis Distributions will be held by the Liquidating Trustee for the benefit of the holders of Allowed Claims entitled to such De Minimis Distributions. When the aggregate amount of De Minimis Distributions held by the Liquidating Trustee for the benefit of a holder of a Claim exceeds $25.00, the Liquidating Trustee will distribute such De Minimis Distributions to such holder. If, at the time that the final Distribution under the Plan is to be made, the De Minimis Distributions held by the Liquidating Trustee for the benefit of a holder of a Claim totals less than $25.00, such funds shall not be distributed to such holder, but rather, such Claims shall be deemed expunged and such Distribution shall vest in the Liquidating Trust and be distributed to other holders of Allowed Claims in accordance with the terms of the Plan.

**H.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

2.    Claims Objections

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidating Trustee shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense (excluding Professional Fee Claims), priority, secured or unsecured, including any and all objections to the validity or amount of any and all alleged Administrative Expense Claims (excluding Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, General Unsecured Claims, Equity Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of such Claim. In addition, the U.S. Trustee's right to object to Claims (including Administrative Claims) is preserved.

Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims (including Administrative Expense Claims but excluding Professional Fee

Claims) by the Liquidating Trustee shall be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed (the "Claims Objection Deadline"), provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment; provided further that with respect to Claims that, as of the Claims Objection Deadline, are subject to a pending objection (an "Initial Objection") wherein the objection to such Claim is ultimately denied, the Claims Objection Deadline shall be extended to the later of sixty (60) calendar days from the date on which (a) the Bankruptcy Court enters an order denying such Initial Objection or (b) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

       3.      Estimation of Claims

The Liquidating Trustee may (but is not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

       4.      Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, amended, settled or superseded may be adjusted or expunged on the Claims Register by the Claims Agent at the direction of the Liquidating Trustee without the Liquidating Trustee having to file an application, motion, complaint, Claim Objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

       5.      No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

6.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

7.      Disallowance of Certain Claims

Any Claims held by Persons from which property is recoverable pursuant to a Court order under section 542, 543, 550, or 553 of the Bankruptcy Code or held by a Person that is a transferee of a transfer that the Court has ordered is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Person have been turned over or paid to the Liquidating Trust.

8.      Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trustee and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full and expunged without any further action; provided, however, that, if the Debtors amend or supplement their Schedules (a) to reduce the undisputed, noncontingent, or liquidated amount of a Claim, (b) to change the nature or characterization of a Claim, or (c) to add a new Claim to the Schedules, the holder of such Claim, if it disagrees with the amendment, is required to file a proof of Claim in respect of the amended scheduled claim so that the Proof of Claim is actually received by the Claims Agent on or before twenty-one (21) days after the holder of an amended Claim is served with notice of the applicable amendment or supplement to the Schedules; provided further, however, that an affected claimant that had filed a Proof of Claim prior to an amendment or supplementation of the Debtors' Schedules is not required to amend such previously filed Proof of Claim.

9.      Claims Paid and Payable by Third Parties

A Claim shall be Disallowed without a Claim Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Liquidating Trust, or the Liquidating Trustee.  Distributions under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' insurance policies solely up to the amount of, and in full and complete satisfaction of, the portion of such Allowed Claim that is within the deductible or self-insured retention under such insurance policy.  Except as provided in Section 9.9 of the Plan, no Person shall have any other recourse against the Debtors, the Estates, the Liquidating Trust, or any of their respective properties or assets on account of such deductible or self-insured retention under an insurance policy.

01:17392327.3

**I.        Executory Contracts and Unexpired Leases**

      1.    Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all of the Debtors' executory contracts and unexpired leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent that (a) the Debtors previously have assumed, assumed and assigned, or rejected such executory contract or unexpired lease, (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an executory contract or unexpired lease on which the Bankruptcy Court has not ruled, (c) an executory contract and unexpired lease is specifically identified in the Plan Supplement as an executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, or (d) executory contracts and unexpired leases under which the counterparty has consented to the extension of the time by which the Debtors must assume or reject to a date beyond the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of executory contracts and unexpired leases pursuant to Section 10.1 of the Plan and sections 365(a) and 1123 of the Bankruptcy Code.

      2.    Bar Date For Rejection Damages

If the rejection by the Debtors of an executory contract or an unexpired lease pursuant to Section 10.1 of the Plan results in damages to the other party or parties to such executory contract or unexpired lease, a Rejection Claim arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

Any Person that is required to file a proof of Claim arising from the rejection of an executory contract or unexpired lease under the Plan and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidating Trust, the Liquidating Trustee, the Debtors, the Estates, and their respective properties, and the Liquidating Trust, the Liquidating Trustee, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 13.3 of the Plan and the Confirmation Order.

**J.        Conditions Precedent to the Effective Date**

      1.    Conditions Precedent to the Effective Date

The Effective Date shall not occur, and the Plan shall not become effective with respect to the Debtors, unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

      (a)    the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order;

01:17392327.3

49

(b)     the Bankruptcy Court shall have approved the Plan Settlement in all material respects, whether through the Confirmation Order or other order approving the Plan Settlement, which shall have become a Final Order;

(c)     the Debtors and the Liquidating Trustee shall have executed the Liquidating Trust Agreement; and

(d)     all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable.

2.     Waiver of Conditions Precedent to the Effective Date

Each of the conditions precedent in Section 11.1 of the Plan may be waived, in whole or in part, by the Debtors, after consultation with the Creditors' Committee, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court. The Debtors and the Liquidating Trustee reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

3.     Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 11.1 of the Plan shall not have occurred or otherwise been waived pursuant to Section 11.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Order were never entered, and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## K.     **Effect of Confirmation**

1.     Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made on account of such Allowed Claim or Allowed Equity Interest. The Debtors will seek the Bankruptcy Court's approval of the Plan Settlement by filing a separate motion pursuant to Bankruptcy Rule 9019, which will request, among other things, that the Bankruptcy Court find that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and

are fair, equitable, and well within the range of reasonableness.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims and Causes of Action.

2.      Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan, the Plan Supplement, and the Confirmation Order shall bind (a) any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired under the Plan, whether or not such holder has voted to accept the Plan, and whether or not such holder is entitled to a Distribution under the Plan), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, (c) each Person acquiring property under the Plan or the Confirmation Order, and (d) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

3.      Reservation of Causes of Action/Reservation of Rights

Except with respect to the exculpation in Section 13.1 of the Plan or other Court order (including the DIP Financing Order wherein preference actions against non-insiders were waived), nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any Causes of Action that the Debtors or the Liquidating Trust, as applicable, may have or may choose to assert against any Person, including but not limited to the Causes of Action authorized to be commenced by the Creditors' Committee against the Potential Defendants (as listed in the Complaint annexed to the Committee Standing Motion) pursuant to the Committee Standing Order (which authority shall continue to vest in the Liquidating Trustee on and after the Effective Date).

L.      **Exculpation, Injunction, and Related Provisions**

1.      Exculpation

**None of the Debtors, the Debtors-in-Possession, and the current or former directors, officers, or employees of the Debtors who served or were employed in such capacities after the Petition Date, the professionals retained by the Debtors pursuant to Court order, members of the Creditors' Committee and the professionals retained by the Creditors' Committee pursuant to Court order shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of the Chapter 11 Cases, the sale of the Debtors' Assets, the formulation, dissemination, implementation, approval, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with or arising out of the Chapter 11 Cases, the Plan, the Disclosure Statement, or any contract, instrument, document or other agreement related thereto;**

**provided, however,** that the foregoing shall not affect the Liability of any Person resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law, Court order, or rules protecting such Persons from liability. For the avoidance of doubt, the exculpation set forth in this paragraph does not in any way exculpate or release any of the Potential Defendants with respect to the Causes of Action authorized to be commenced pursuant to the Committee Standing Order (which authority shall continue to vest in the Liquidating Trustee on and after the Effective Date).

    2.    <u>Claims under Title I of ERISA</u>

    Nothing in the Plan, this Disclosure Statement, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed as discharging, releasing, or relieving the Debtors, or their reorganized forms, or any entity in the Debtors' controlled group, or any such parties' officers, directors, or other representatives, or any other person or entity, in any capacity, from any liability with respect to the Pension Plan under Title I of ERISA, the Internal Revenue Code, or any other law, government policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability against any party as a result of the Plan's provisions for satisfaction, release, and discharge of claims.

    3.    <u>Injunction</u>

    Except as otherwise provided in the Plan, all Persons that have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date are permanently enjoined, solely with respect to any such Claims or Equity Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any property of the Debtors or their Estates that is transferred to the Liquidating Trust or any other Person pursuant to the Plan, the Liquidating Trust, or the Liquidating Trustee; (b) enforcing, attaching, collecting, or recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any property of the Debtors or their Estates that is transferred to the Liquidating Trust or any other Person pursuant to the Plan, the Liquidating Trust, or the Liquidating Trustee; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or encumbrance against any property of the Debtors or their Estates that is transferred to the Liquidating Trust or any other Person pursuant to the Plan, the Liquidating Trust, or the Liquidating Trustee; (d) except to the extent permitted by sections 362(b), 553, 559, 560, or 561 of the Bankruptcy Code, asserting any right of setoff, subrogation, or recoupment against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee; (e) pursuing any Claim or Cause of Action released pursuant to the Plan; or (f) taking any actions which interfere with the implementation or consummation of the Plan.

    The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever. However, notwithstanding any provision of the Plan,

the Debtors shall not receive a discharge as set forth in section 1141(d)(3)(A) of the Bankruptcy Code.

    4.    <u>Term of Injunctions</u>

**The injunctions set forth in Section 13.3 of the Plan shall permanently remain in full force and effect.**

## M.    <u>Retention of Jurisdiction</u>

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to:

(a)    hear and determine pending motions for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    hear and determine any and all adversary proceedings, applications and contested matters;

(c)    hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    hear and determine any Claim Objections (including requests for estimation) in connection with Disputed Claims, in whole or in part;

(e)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, the Liquidating Trust Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or request by the Liquidating Trustee after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j)    hear and determine all disputes involving the existence, scope, and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k)    issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l)    hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or Liquidating Trust pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory (including, but not limited to the Causes of Action authorized to be commenced pursuant to the Committee Standing Order against the Potential Defendants set forth in the Complaint);

(n)    recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(o)    enforce the terms of the Liquidating Trust Agreement;

(p)    enforce the releases granted and injunctions issued pursuant to the Plan and the Confirmation Order;

(q)    enter a final decree closing the Chapter 11 Cases; and

(r)    hear and determine any other matter not inconsistent with the Bankruptcy Code.

This provision shall not be construed to expand this Court's or any other court's (a) subject matter jurisdiction beyond that provided in 28 U.S.C. § 1334 or (b) authority to hear, determine, or enter any final orders or judgments beyond that provided in 28 U.S.C. § 157. The right of any party (including any counterparty in post-confirmation litigation brought by the Liquidating Trustee or other party) to contest this Court's or any other court's jurisdiction or judicial authority is hereby fully preserved.

## N.    Miscellaneous Provisions

Article XV of the Plan provides for certain additional provisions including, but not limited to, effectuating documents and further transactions, dissolution of the Creditors' Committee, withholding and reporting requirements, corporate action, modification of the Plan, revocation or withdrawal of the Plan, the Plan Supplement, payment of statutory fees, exemption from transfer taxes and expedited tax determination.

## VIII.   CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS IN THE VOTING CLASSES SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR REFERRED TO HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.      General Considerations

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.  The Plan sets forth the means for satisfying the various Claims against the Debtors.

### B.      Certain Bankruptcy Considerations

#### 1.      Parties-in-Interest May Object to the Debtors' Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim in a particular class only if such Claim is substantially similar to the other Claims in such class.  The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created nine (9) Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

#### 2.      Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.   In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.      Risk of Non-Confirmation of Plan; Feasibility

Even if all Impaired Classes of Claims accept or are deemed to have accepted the Plan, or, with respect to a Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under section 1129(a) and (b) of the Bankruptcy Code.  ***See Section X.C.       ("Confirmation of the Plan— Requirements for Confirmation of the Plan")***.   Section 1129(a) of the Bankruptcy Code requires, among other things, a demonstration that the confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors and that the value of distributions to creditors who vote to reject the Plan not be less than the value of distributions such creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  ***See Section X.C.1       ("Confirmation of the Plan—Requirements for***

*Confirmation of the Plan—Requirements of Section 1129(a) of Bankruptcy Code"*).  Although the Debtors believe that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

    4.    <u>Non-Consensual Confirmation</u>

If any Impaired Class of Claims rejects the Plan by the requisite statutory voting thresholds provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtors may (i) seek confirmation of the Plan from the Bankruptcy Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan in accordance with Section 15.5 thereof.  In order to confirm the Plan under section 1129(b), the Bankruptcy Court must determine that, in addition to satisfying all other requirements for confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that has not accepted the Plan.  *See Section X.C.4 ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code").*

If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including the cramdown requirements under section 1129(b) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in such manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code.  Such amendments may include, but are not limited to, the alteration or elimination of Distributions to various Classes.

    5.    <u>The Debtors or the Liquidating Trustee May Object to the Amount of a Claim</u>

Except as otherwise provided in the Plan, the Debtors and the Liquidating Trustee reserve the right to object to the amount of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    6.    <u>Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan</u>

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

    7.    <u>Risk of Chapter 7 Liquidation</u>

If the Plan is not confirmed and consummated, there can be no assurance that the Debtors' Chapter 11 Cases will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code, or that any alternative plan would be on terms as favorable to holders of Claims as the terms of the Plan.  If a liquidation under chapter 7 of the Bankruptcy Code were to

occur, the distributions to holders of Allowed Claims under the Plan would be reduced. The Debtors believe that, in a liquidation under chapter 7, before holders of Allowed Claims received any distributions, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants, and other professionals would cause a substantial diminution in the value of their Estates.

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' remaining assets would result in a diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. This is so because a chapter 7 liquidation would require the appointment of a trustee, which would require substantial additional expenses and would delay the orderly liquidation of the estates' assets, thereby lowering recoveries to holders of Claims. Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to holders of Claims than would liquidation under chapter 7 of the Bankruptcy Code.

### C.    Claims Could Be More Than Projected, Assets Could Be Less Than Projected

The Allowed amount of Claims in each Class could be greater than projected, which in turn, could cause the amount of distributions to creditors to be reduced substantially. Likewise, the amount of cash realized for the liquidation of the Debtors' assets could be less than projected, which could cause the amount of distributions to creditors to be reduced substantially.

### D.    Inherent Uncertainty of the Financial Projections

The Projections forecast recoveries from liquidation of the Debtors' assets, including various Causes of Action that belong to the Debtors' Estates and that are still being evaluated. Accordingly, the Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms and general business and economic conditions, many of which will be beyond the control of the Liquidating Trustee, and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the value realized from the liquidation of the Debtors' assets. These variations may be material and may affect the recoveries of holders of Claims entitled to Distributions under the Plan. Because the actual results achieved may vary from the projected results, the Projections should not be relied upon as a guarantee, representation or other assurance of the actual results that will occur.

### E.    Disclosure Statement Disclaimer

#### 1.    Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

#### 2.    Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of

01:17392327.3

any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

> 3.     No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

> 4.     No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims, or any other parties in interest.

> 5.     Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors and/or the Creditors' Committee (as applicable and until the Effective Date) and the Liquidating Trustee (on and after the Effective Date) may investigate and object to Claims and file and prosecute Causes of Action.

> 6.     No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Liquidating Trustee to object to that holder's Claim, or to bring additional or further Causes of Action, regardless of whether any Claims or causes of action of the Debtors or their Estates are specifically or generally identified herein.

> 7.     Information Was Provided by the Debtors and Was Relied upon by the
>        Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited

01:17392327.3

due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

8.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.     No Representations Outside the Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee, and/or the United States Trustee for the District of Delaware.

**F.     Certain Tax Considerations**

A summary of certain U.S. federal income tax considerations relevant to the Plan is provided below in ***Section XII***    *(**"Certain Federal Income Tax Considerations"**)*.

**IX.     VOTING REQUIREMENTS**

On July 20, 2015, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing.  A copy of the Disclosure Statement Order and the Notice of Confirmation Hearing are enclosed with this Disclosure Statement as part of the Solicitation Package.  The Disclosure Statement Approval Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines.  The Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the Claims Agent at (844) 205-4337 or by email at ucoopballots@primeclerk.com.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits to such documents, at your own expense, unless otherwise specifically required by

01:17392327.3

Bankruptcy Rule 3017(d), please contact the Claims Agent by regular mail at Universal Cooperatives, Inc. Ballot Processing c/o Prime Clerk LLC, 830 3rd Avenue, 9th Floor, New York, NY 10022, by telephone at (844) 205-4337, or by email at ucoopballots@primeclerk.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of the Debtors concerning the Plan have been adequate and have included information concerning all Distributions made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Impaired Classes unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes, which may be the case under the Plan; (ii) is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all holders of Claims or Equity Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all of these conditions.

## A.    Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims who are entitled to vote on the Plan.  There is a separate Ballot designated for each Voting Class in order to facilitate vote tabulation; however, all Ballots are substantially similar in form and substance (except that, as noted below, the Ballots sent to holders of Unsecured Claims will permit them to elect certain treatment of their Claims), and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 27, 2015 (THE "VOTING DEADLINE"). ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

## B.    Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim or interest for any damages resulting from such holder's reasonable reliance on such

legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In general, a holder of a claim or equity interest may vote to accept or reject a plan if (1) the claim or interest is "allowed," which means generally that it is not disputed, contingent, or unliquidated and (2) the claim or interest is impaired by a plan.  If the holder of an Impaired Claim or Equity Interest will not receive any distribution under the Plan in respect of such Claim or Equity Interest, the Bankruptcy Code deems such holder to have rejected the Plan and provides that the holder of such Claim or Equity Interest is not entitled to vote.  If the Claim or Equity Interest is not Impaired, the Bankruptcy Code conclusively presumes that the holder of such Claim or Equity Interest has accepted the Plan and provides that the holder is not entitled to vote.

In general, and subject to the voting requirements set forth in the Disclosure Statement Order, the holder of a Claim against the Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2) (a) the Claim has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent, or unliquidated) or (b) the holder timely filed a proof of Claim pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018.  A Claim to which an objection has been filed and is unresolved within fourteen (14) of the Voting Deadlines is not entitled to vote unless and until the Bankruptcy Court rules on the objection and allows the Claim.  Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline, rules on the objection and allows the Claim, or (b) on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan.  If the Debtors have served an objection or request for estimation as to a claim at least fourteen (14) calendar days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except as ordered by the Court before the Voting Deadline.

Pursuant to the Bar Date Order, holders of Equity Interests (which interests are based exclusively on the ownership of common or preferred stock in the Debtors, or warrants, options, or rights to purchase, sell, or subscribe to a security interest in the Debtors) were excused from filing proofs of interest on or before the General Bar Date (as defined in the Bar Date Order); provided, however, that holders of Equity Interests who wished to assert a Claim against the Debtors that arises out of or relates to the ownership or purchase of an Equity Interest, including Claims arising out of or relating to the sale, issuance or distribution of the Equity Interest, were required to file a proof of Claim on or before the Bar Date, unless another exception set forth in the Bar Date Order applied.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Disclosure Statement Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

01:17392327.3

Each of Classes 4A, 4B, 4C, 4D, 4E, and 4F is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Class 5 is conclusively deemed to have rejected the Plan and holders therein are not entitled to vote.  Each of Classes 1, 2, and 3 is Unimpaired under the Plan and holders of Claims in each such Class are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

## C.      Vote Required for Acceptance of Class

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Equity Interests vote to accept the Plan, except under certain circumstances.  ***See Section IX.B.      ("Voting Requirements—Holders of Claims Entitled to Vote")***.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but, for that purpose, counts only those who actually vote to accept or reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number actually voting cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## D.      Voting Procedures

### 1.      Ballots

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY BALLOT RECEIVED THAT (I) IS NOT SIGNED, (II) IS ILLEGIBLE, OR (III) CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT, SHALL BE AN INVALID BALLOT AND SHALL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

ANY BALLOT THAT IS OTHERWISE PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED TO THE VOTING AGENT BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

Ballots must be delivered to the Voting Agent, at:

If by mail:
Universal Cooperatives, Inc. Balloting Processing
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, New York 10022

01:17392327.3

so as to be **received** by the Voting Deadline.  **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER**.  If such delivery is by mail, it is recommended that holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to assure timely delivery.

Parties entitled to vote may alternatively cast an electronic Ballot via electronic, online transmission through the customized "E-Ballot" section on the Debtors' case website (https://cases.primeclerk.com/ucoop).  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner, and the creditor's electronic signature will be deemed to be immediately legally valid and effective. Creditors who cast an electronic Ballot shall not also submit a paper Ballot.  If a creditor casts both an electronic Ballot and a paper Ballot with respect to the same claim, the paper Ballot shall not be counted.

In accordance with Rule 3018(c) of the Bankruptcy Rules, the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these cases. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Claim for voting purposes (if the Claim is a Disputed Claim, this amount may not be the amount ultimately Allowed for purposes of Distribution), and the Class to which the Claim has been attributed.

2.      Withdrawal or Change of Votes on Plan

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent, so that the Voting Agent receives such notice prior to the Voting Deadline.  Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court.

In order to be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the votes on the Plan to be withdrawn, (ii) contain the description of the Claims to which it relates, and (iii) be signed by the holder in the same manner as on the Ballot.  The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

3.      Voting Multiple Claims

Separate forms of Ballots are provided for voting the various Classes of Claims.  Ballot forms may be copied if necessary.  Any person who holds Claims in more than one Class is

01:17392327.3

required to vote separately with respect to each Claim. Any person holding multiple Claims within a Class should use a single Ballot to vote such Claims, which will represent the aggregate amount of such claims within that Class. Please sign and return your Ballot(s) in accordance with the instructions set forth herein and in the Ballot(s).

## X.    CONFIRMATION OF THE PLAN

### A.    <u>Confirmation Hearing</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to commence on September 3, 2015 at 10:30 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Mary F. Walrath, United States Bankruptcy Judge, of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Fifth Floor, Courtroom #4, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    <u>Deadline to Object to Confirmation</u>

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all grounds for the objection, and (iii) the amount of the Claim or number and class of shares of stock of the Debtors held by the objector. Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Walrath's chambers, and served so that it is received by the Bankruptcy Court, chambers, and the following parties on or before August 27, 2015 at 4:00 p.m. (prevailing Eastern Time): (a) counsel for the Debtors, (i) Foley & Lardner LLP, 321 North Clark Street, Chicago, IL 60654, Attn: Mark Prager, Esq., Michael A. Small, Esq., and Emil Khatchatourian, Esq., and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware, 19801, Attn: Robert S. Brady, Esq. and Andrew L. Magaziner, Esq.; (b) counsel for the Creditors' Committee, (i) Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068, Attn: Sharon L. Levine, Esq. and Philip Gross, Esq. and (ii) Venable LLP, 1201 Market Street, Suite 1400, Wilmington, Delaware 19080, Attn: Jamie Edmonson, Esq. and Daniel A. O'Brien, Esq.; and (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Benjamin Hackman, Esq.

### C.    <u>Requirements for Confirmation of the Plan</u>

Among the requirements for confirmation of the Plan are that the Plan (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of creditors and stockholders that are Impaired under the Plan.

01:17392327.3

1.      Requirements of Section 1129(a) of Bankruptcy Code

        (a)     *General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)     The Plan has been proposed in good faith and not by any means proscribed by law.

(4)     Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(6)     Any governmental regulatory commission with jurisdictions, after confirmation of the Plan, over the rates of the debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(7)     With respect to each Class of Claims or Equity Interests, each holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated

on the Effective Date under chapter 7 of the Bankruptcy Code. ***See Section X.C.I.A.1(b) ("Confirmation of the Plan— Requirements for Confirmation of the Plan—Requirements of Section 1129(a) of Bankruptcy Code—Best Interests Test").***

(8)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

(9)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

(10)    At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(11)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. ***See Section X.C.3 ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Feasibility").***

    *(b)    Best Interests Test*

As described above, the Bankruptcy Code requires that each holder of an Impaired Claim or Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Expense Claims and Other Priority Claims that may result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation,

the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals.  These costs, expenses, fees and any other Claims that may arise in a liquidation case under chapter 7 would be paid in full from the liquidation proceeds *before* the balance of those proceeds would be made available to pay chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) potential increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each Class of Allowed Claims in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time.  In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the Claims and prepare for distributions.  In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and Administrative Expense Claims further increased.

2.     Acceptance by Impaired Classes

Each of Classes 4A, 4B, 4C, 4D, 4E, and 4F is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Class 5 is conclusively deemed to have rejected the Plan; and the Debtors intend to seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class. ***See Section X.C.4   ("Confirmation of the Plan— Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code")***.  In addition, the Debtors reserve the right to seek nonconsensual confirmation of the Plan (without further notice) with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan.

01:17392327.3

3.      Feasibility

The Debtors believe that they will be able to perform their obligations under the Plan.  In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation is proposed in the Plan.

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed the ability of any Liquidating Trustee to be appointed pursuant to the Plan to meet its obligations under the Plan.  The Debtors believe that there are sufficient assets available to satisfy distributions required to be made under the Plan and, accordingly, the Plan meets the feasibility requirements of the Bankruptcy Code.

4.      Requirements of Section 1129(b) of Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

- No Unfair Discrimination.  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a chapter 11 plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

- Fair and Equitable Test.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

  o Secured Claims.  Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (ii) receives the "indubitable equivalent" of its allowed secured claim.

  o Unsecured Claims.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

  o Equity Interests.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to

the equity interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Class 5 is deemed to reject the Plan, because as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such a dissenting Class will receive or retain any property on account of Equity Interests in such Class.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of the (i) increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation, (iii) the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7 and the "fire sale" atmosphere that would prevail, (iv) the cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding, (v) the Plan Settlement would not apply, thereby reducing the funds available for distribution to general unsecured creditors and increasing the total pool of general unsecured claims, and (vi) the application of the rule of absolute priority to distributions in a chapter 7 liquidation.

The Debtors believes that in a chapter 7 case, holders of Equity Interests in Class 5 would receive no distributions of property.  Accordingly, the Plan satisfies the rule of absolute priority.

### B.    <u>Alternative Plan</u>

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of liquidation has expired, any other party in interest) could attempt to formulate a different chapter 11 plan.  Such a plan might involve an orderly liquidation of its assets under chapter 11.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that the Plan, as described herein, enables creditors to realize the greatest value under the circumstances.

### C.    <u>Dismissal</u>

If these Chapter 11 Cases are dismissed, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Debtors and the Holders of Claims and Equity Interests.

01:17392327.3

Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to Confirmation of the Plan.

## XII.   CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF CLAIMS INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan. To the extent that the following discussion relates to the consequences to holders of Claims or Equity Interests, it is limited to holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- an estate, the income of which is subject to federal income taxation regardless of its source; or

- a trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of its particular facts and circumstances, or to certain types of holders subject to special treatment under the IRC.  Examples of holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, holders that are or hold their Claims or Equity Interests through a

partnership or other pass-through entity, dealers in securities or foreign currency, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address other U.S. federal taxes or the foreign, state, or local tax consequences of the Plan. Furthermore, this discussion generally does not address the U.S. federal income tax consequences to holders that are unimpaired under the Plan.

The tax treatment of holders of Claims or Equity Interests and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the holder in exchange for the Claim, and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules apply to the holder. Therefore, each holder should consult such holder's own tax advisor for tax advice with respect to that holder's particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Equity Interest. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S**

**PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, AND LOCAL INCOME TAX CONSEQUENCES, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES, OF THE PLAN.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR EQUITY INTERESTS UNDER THE IRC; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON EACH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests**

A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on a Allowed Claim but was not previously paid by the Debtors or included in income by the holder of the Allowed Claim. A holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its Allowed Claim and the amount realized by the holder in respect of its Allowed Claim. The amount realized generally will equal the sum of Cash and the fair market value of other consideration received (or deemed received) by the holder under the Plan on the Effective Date or a subsequent distribution date in respect of the holder's Allowed Claim, less the amount, if any, attributable to accrued but unpaid interest.

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the holder, the nature of the Allowed Claim in the holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the holder's holding period of the Allowed Claim. If the Allowed Claim in the holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the holder held such Allowed Claim for longer than one year, or short-term capital gain or loss if the holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of ordinary income in any single taxable year.

A holder of an Allowed Claim who receives, in respect of the holder's Allowed Claim, an amount that is less than that holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a) or a worthless securities deduction under IRC Section

165(g). The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take either deduction. A holder that has previously recognized a loss or deduction in respect of that holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC Section 453B.

The holders of certain Allowed Claims are expected to receive only a partial Distribution with respect to their Allowed Claims. Whether the holder of such a Claim will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of each holder and its Claim. Accordingly, a holder of such a Claim should consult such holder's own tax advisor.

Under backup withholding rules, a holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Allowed Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment of any backup withholding.

Holders of Disallowed Claims or Equity Interests will not receive any Distribution as part of the Plan. Accordingly, because such a holder may receive an amount that is less than that holder's tax basis in such Claim or Equity Interest, such holder may be entitled to a bad debt deduction under IRC Section 166(a) or a worthless securities deduction under IRC Section 165(g). The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Disallowed Claims or Equity Interests, therefore, are urged to consult their tax advisors with respect to the ability to take either deduction.

01:17392327.3

B.      **Certain U.S. Federal Income Tax Consequences to the Debtors**

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, holders of certain Allowed Claims are expected to receive less than full payment on their Claims, and holders of Disallowed Claims are expected to receive no payments. The Debtors' liability to the holders of such Claims in excess of the amount satisfied by Distributions under the Plan will be cancelled and therefore will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtors, such as the NOLs, as described above. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD Income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

C.      **Consequences of the Liquidating Trust**

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "grantor trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684. No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust,

01:17392327.3

the federal income tax consequences to the Liquidating Trust and the holders of Allowed Claims could vary from those discussed herein (including the potential for an entity-level tax).

For all U.S. federal income tax purposes, all parties with respect to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) must treat the transfer of Liquidating Trust Assets (other than those Liquidating Trust Assets placed in the Disputed Claims reserve) to the Liquidating Trust as (i) a transfer of such Liquidating Trust Assets by the Debtors to the Liquidating Trust Beneficiaries, followed by (ii) a transfer of such Liquidating Trust Assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each holder that is a beneficiary of the Liquidating Trust generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Allowed Claim and its adjusted tax basis in the Allowed Claim. The amount realized by a holder of an Allowed Claim will equal the fair market value of the Liquidating Trust Assets deemed received in respect of such Claim, less the amount, if any, attributable to accrued but unpaid interest. A holder that is deemed to receive Liquidating Trust Assets in respect of its Allowed Claim will then have a tax basis in such Liquidating Trust Assets in an amount equal to the fair market value of such Liquidating Trust Assets on the date of receipt, less the amount, if any, attributable to accrued but unpaid interest.

As further described below, because each holder's share of the Liquidating Trust Assets in the Liquidating Trust may change depending upon the resolution of Disputed Claims in such holder's Class, a holder may be prevented from recognizing for tax purposes all of its gain or loss from the consummation of the Plan until all Disputed Claims in such holder's Class have been resolved.

In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to IRC Sections 671 *et. seq.*, owned by the persons who are treated as transferring assets to the trust. Each holder of a beneficial interest in the Liquidating Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Liquidating Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any of the Liquidating Trust Assets not held in the Disputed Claims reserve, each Liquidating Trust Beneficiary must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust asset so sold or otherwise disposed of and (2) its adjusted tax basis in its share of the Liquidating Trust asset. The character of any such gain or loss to the holder will be determined as if such holder itself had directly sold or otherwise disposed of the Liquidating Trust asset. The character of items of income, gain, loss, deduction, and credit to any holder of a beneficial interest in the Liquidating Trust, and the ability of the holder to benefit from any deductions or losses, will depend on the particular circumstances or status of the holder.

Given the treatment of the Liquidating Trust as a grantor trust and subject to the discussion below regarding the Disputed Claims reserve, each Liquidating Trust Beneficiary has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or

other disposition of a Liquidating Trust asset), which obligation is not dependent on the distribution of any cash or other Liquidating Trust assets by the Liquidating Trust. Accordingly, a Liquidating Trust Beneficiary may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes cash or other assets. Due to the requirement that the Liquidating Trust maintain certain reserves, the Liquidating Trust's ability to make current cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidating Trust Assets, a Liquidating Trust Beneficiary may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the holder during the year.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust Beneficiary will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust Beneficiaries who received their interests in connection with the Plan.

## D.    Consequences of the Disputed Claims Reserve

It is anticipated that the Liquidating Trustee will make an election under Treasury Regulation Section 1.468B-9(c)(2)(ii) to treat the Disputed Claims reserve as a "disputed ownership fund." Accordingly, a holder of a Disputed Claim, unlike the holder of an Allowed Claim, will not be treated as receiving any of the Liquidating Trust Assets on the Effective Date due to holding such Disputed Claim. The disputed ownership fund will be treated as the owner of the assets it holds (i.e., those Liquidating Trust Assets transferred to the Disputed Claims reserve) and will be taxable as a qualified settlement fund pursuant to the rules of Treasury Regulation Section 1.468B-2 due to all of the assets in the disputed ownership fund being passive investment assets. These rules generally provide that the "modified gross income" of a qualified settlement fund is taxed at the maximum rate applicable to estates and trusts under IRC Section 1(e), which is currently 39.6%.

"Modified gross income" is the qualified settlement fund's IRC Section 61 gross income computed with the modifications detailed in Treasury Regulation Section 1.468B-2(b)(1)-(4), with such modifications including deductions for administrative costs and other incidental expenses incurred in connection with the operation of the fund that would be deductible under chapter 1 of the IRC in determining the taxable income of a corporation.

If and when a Disputed Claim becomes an Allowed Claim, the holder of the now Allowed Claim will become a Liquidating Trust Beneficiary and generally will recognize gain or loss in its taxable year that includes the date of the conversion of the Disputed Claim to an Allowed Claim in an amount equal to the difference between the amount realized in respect of its Allowed Claim and its adjusted tax basis in the Allowed Claim, as further described above under Consequences of the Liquidating Trust.

01:17392327.3

If a Disputed Claim is resolved for an amount less than the amount contributed to the Disputed Claims reserve with respect to such Disputed Claim, the difference will be released from the Disputed Claims reserve and distributed to the applicable Class of Liquidating Trust Beneficiaries in accordance with their respective Distribution Pro Rata Shares. Any such amount received by a Liquidating Trust Beneficiary will constitute an additional amount realized by such Liquidating Trust Beneficiary and will increase the gain, or reduce the loss, recognized by the Liquidating Trust Beneficiary with respect to its Claim.

## XIII.  CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recoveries to holders of Claims. Any alternative to confirmation of the Plan, such as liquidation under chapter 7 or attempts to confirm another liquidating plan, would involve significant delays, uncertainty, and substantial additional administrative costs. Moreover, as described above, the Debtors believe that their creditors will receive greater and earlier recoveries under the Plan than under the alternatives.  FOR THESE REASONS, THE DEBTORS AND THE CREDITORS' COMMITTEE URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED WITHIN THE TIME STATED IN THE NOTICE OF CONFIRMATION HEARING AND DISCLOSURE STATEMENT APPROVAL ORDER SERVED WITH THIS DISCLOSURE STATEMENT.

01:17392327.3

Dated: July 17, 2015
      Wilmington, Delaware

Respectfully submitted,

**UNIVERSAL COOPERATIVES, INC.**
(on behalf of itself and the other Debtors and Debtors-in-Possession)


By:  _/s/ Thomas H. Vicker_
Thomas H. Vicker
President of Universal Cooperatives, Inc.:


      -and-


**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF UNIVERSAL COOPERATIVES, INC., _et al._**


By:  _/s/ Michael J. Marino_
Michael J. Marino, on behalf of Zoetis
Creditors' Committee Co-Chair


By:  _/s/ Julie Moore_
Julie Moore, on behalf of United Hardware Distributing Company
Creditors' Committee Co-Chair

01:17392327.3

| | |
|---|---|
| **FOLEY & LARDNER LLP**<br>321 North Clark Street, Suite 2800<br>Chicago, Illinois 60654<br>Mark L. Prager, Esq.<br>Michael J. Small, Esq.<br>Emil P. Khatchatourian, Esq.<br>Telephone: (312) 832-4500<br>Facsimile:  (312) 832-4700<br><br>        -and-<br><br>**YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19899-0391<br>Robert S. Brady (No. 2847)<br>Andrew L. Magaziner (No. 5426)<br>Travis G. Buchanan (No. 5595)<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br><br>*Counsel to the Debtors and Debtors in<br>Possession* | **LOWENSTEIN SANDLER LLP**<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Sharon Levine, Esq.<br>Philip J. Gross, Esq.<br>Anthony De Leo, Esq.<br>Telephone: (973) 597-2500<br>Facsimile:  (973) 597-2400<br><br>        -and-<br><br>Bruce S. Nathan, Esq.<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone:     (212) 262-6700<br>Facsimile:     (212) 262-7402<br><br>        -and-<br><br>**VENABLE LLP**<br>1201 North Market Street, Suite 1400<br>Wilmington, DE  19899<br>Jamie L. Edmonson, Esq. (No. 4247)<br>Daniel A. O'Brien, Esq. (No. 4897)<br>Telephone:  (302) 298-3535<br>Facsimile:  (302) 298-3550<br><br>*Counsel to the Official Committee of Unsecured<br>Creditors* |

01:17392327.3